```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
     * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,           ) Criminal Action
                                    ) No. MJ 21-297
vs.                                 )
                                    ) March 16, 2021
THOMAS F. SIBICK,                   ) 12:58 p.m.
             Defendant.             ) Washington, D.C.
     * * * * * * * * * * * * * * *
```

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE JUDGE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**
*(All parties appearing via video and/or teleconference)*

**APPEARANCES:**

FOR THE UNITED STATES:  CARA ANNE GARDNER
                        TARA RAVINDRA
                        DOJ-USAO
                        555 4th St NW
                        Washington, DC 20001
                        (202) 252-7009
                        Email: cara.gardner@usdoj.gov
                        Email: tara.ravindra@usdoj.gov


FOR THE DEFENDANT:   ALEXANDER ANZALONE
                     MARIANNE MARIANO
                     TIMOTHY MURPHY
                     Federal Defender's
                     Western District of New York
                     300 Pearl Street, Suite 200
                     Buffalo, New York 14202
                     (716) 551-3341
                     Alexander_anzalone@fd.org

                     MICHELLE M. PETERSON
                     FPD, District of Columbia
                     625 Indiana Avenue, NW, Suite 550
                     Washington, DC 20004
                     (202) 208-7500
                     Email: shelli_peterson@fd.org


ALSO PRESENT:        CHRISTINE SCHUCK, Pretrial Services
                     (Appearing telephonically)


Court Reporter:      Elizabeth SaintLoth, RPR, FCRR
                     Official Court Reporter


          Proceedings reported by machine shorthand, transcript
                produced by computer-aided transcription.

**P R O C E E D I N G S**

1
2          THE DEPUTY:  The United States District Court for
3     the District of Columbia is now in session.  Chief Judge
4     Beryl A. Howell presiding.
5          Matter before the Court, Magistrate Case
6     No. 21-297, United States of America versus Thomas F.
7     Sibick.
8          Counsel, please state your names for the record,
9     starting with the government.  And, Your Honor, for the
10    record, Pretrial Agent Christine Schuck is joining us via
11    telephone.
12         Government, please go ahead.
13         MS. GARDNER:  Good afternoon.
14    Cara Gardner on behalf of the United States.  And we also
15    have Tara Ravindra here as well.
16         THE COURT:  Could you say that name again,
17    Ms. Gardner.
18         MS. GARDNER:  Tara Ravindra.
19         THE COURT:  How do you spell that?
20         MS. GARDNER:  R-A-V-I-N-D-R-A.
21         THE COURT:  Okay.  Thank you.  And good afternoon.
22         MS. GARDNER:  Good afternoon.
23         THE COURT:  Okay.  And for defense counsel?
24         MR. ANZALONE:  Good afternoon, Your Honor.
25    Alexander Anzalone with the Federal Defender's office in the

1    Western District of New York.

2            I am appearing with Shelli Peterson, from the

3    Defender's office in D.C., as well as Marianne Mariano who

4    is a Federal Defender in the Western District of New York,

5    and Timothy Murphy who is another attorney working on this

6    case from our office.  Mr. Murphy is present by video.

7            THE COURT:  Okay.  All right.  Thank you.

8            This Court does appreciate the assistance being

9    provided by Federal Public Defenders from offices outside of

10   Washington, D.C., so thank you for participating in this and

11   providing some continuity of representation for the

12   defendant, Mr. Sibick, in the case.

13           Let me just begin by saying for those of you who

14   are not from this court:  I like to start on time, so I

15   apologize that I was an hour delayed.  But the judicial

16   conference on which I also sit is also meeting today, so I

17   was, sort of, juggling between judicial conference meetings;

18   so it went over, so I do -- this is not the norm for me.  I

19   am usually quite punctual.

20           So with that, Mr. Sibick, are you having any

21   difficulty hearing today?

22           THE DEFENDANT:  No, Your Honor.

23           THE COURT:  Okay.  Good.

24           Let me just note that the hearing is being held

25   remotely with counsel and Mr. Sibick, the defendant,

 1    participating via videoconference.

 2              Mr. Sibick, do you agree, after consultation with

 3    your counsel, to participate in this hearing remotely

 4    without being physically present in the courtroom here in

 5    D.C.?

 6              THE DEFENDANT:  Yes, Your Honor.

 7              THE COURT:  Okay.  I'd like to remind anyone

 8    listening to the hearing over the public teleconference line

 9    that:  Under my standing order 20-20, recording and

10    rebroadcasting of court proceedings, including those held by

11    videoconference is strictly prohibited; it's a Federal Rule

12    of Criminal Procedure.

13              Violation of these prohibitions may result in

14    sanctions, including removal of court-issued media

15    credentials, restricted entry to future hearings, denial of

16    entry to future hearings, or any other sanctions deemed

17    necessary by the presiding judge.

18              All right.  I have before me today the

19    government's request for review of the release order entered

20    by the magistrate judge in the Western District of New York.

21              And let me just review what I have looked at in

22    connection with the hearing today.  I certainly have looked

23    at the government's request for review; the complaint in the

24    case; as well as the government's memo in support of

25    pretrial detention docketed at ECF 8; the defendant's

1    response docketed at ECF 9.

2           I have looked at the magistrate judge's order

3    setting the conditions of release; and I have also reviewed

4    two video clips submitted by the government by -- via email

5    that I also understand were provided to defense counsel.

6           Is that correct, that it was provided to defense

7    counsel?

8           MR. ANZALONE:  That's right, Your Honor.  Yes, it

9    was.

10           THE COURT:  Okay.  All right.  So it's the

11    government's motion so, Ms. Gardner, I will begin with you.

12           I just want to be clear about the charges against

13    Mr. Sibick in this case.  He is charged with two

14    misdemeanors under 18 U.S.C. Sections 1752(a)(1) and

15    40 U.S.C. 5104(e)(2)(D).  He is also charged with a

16    violation of 18 U.S.C. Section 111(a)(1), but that charge

17    can be both a misdemeanor and a felony; and it's not clear

18    from the complaint whether it's intended to be charged as a

19    felony or a misdemeanor in this case.

20           MS. GARDNER:  Your Honor, the government is

21    charging it as a felony.

22           THE COURT:  As a felony.  And for a felony it has

23    to involve -- the acts have to involve physical contact with

24    the victim of the assault or intent to commit another

25    felony; so which prong of that, both?

```
 1                    MS. GARDNER:  Yes, Your Honor.

 2                    THE COURT:  Both prongs.  All right.

 3                    So then the defendant is -- I just wanted to

 4       clarify that the defendant is charged with two misdemeanors

 5       and, then, three felonies; not -- in terms of the felonies,

 6       it's not just the Section 111(a)(1) but, also, Section

 7       231(a)(3), obstructing, impeding, or interfering with a law

 8       enforcement officer engaged in performance of his official

 9       duties; and 18 U.S.C. Section 2111, taking by force and

10       violence or by intimidation anything of value from the

11       person or presence of another within the territorial

12       jurisdiction of the U.S.

13                    And so based on those charges he's facing a

14       maximum of 15 years, and that's on the Section 2111 charge;

15       is that right?

16                    MS. GARDNER:  Yes, Your Honor.

17                    THE COURT:  All right.  And in reviewing the

18       papers, the government isn't arguing that the defendant is a

19       flight risk; right?

20                    MS. GARDNER:  That's correct.

21                    THE COURT:  So the only basis for pretrial

22       detention being urged by the government here is under

23       3142(f)(1)(A) because he is charged with a crime of

24       violence?

25                    MS. GARDNER:  Yes, Your Honor.
```

1          THE COURT:  So, as I look at the record, the

2     defendant spoke to the FBI at least four times; and it

3     doesn't appear, based on the government's proffer, that he

4     told the whole truth most of those times.  He also buried

5     evidence, in the form of a stolen police badge, in his

6     backyard; and he got rid of other evidence.  You say he

7     threw out the police radio that was grabbed from the police

8     officer.

9          So is there any reason the government is not

10     seeking detention also under 3142(f)(2)(B) for imposing a

11     serious risk of obstruction of justice?

12          MS. GARDNER:  Your Honor, the government

13     determined that its strongest argument was under

14     dangerousness, and that's why we moved the way we did.

15          THE COURT:  So you are not urging obstruction?

16          MS. GARDNER:  That's correct.

17          THE COURT:  Okay.  So according to the

18     government's proffer, the defendant didn't mention grabbing

19     the badge or the radio in his first interview or second

20     interview with law enforcement on January 27th or

21     February 2nd; and that he only mentioned having taken the

22     badge and radio at the next interview on the 23rd, after the

23     FBI had obtained the body-worn camera footage.

24          Do I have the sequencing correct?

25          MS. GARDNER:  Yes, Your Honor.  That's correct.

```
 1              THE COURT:  And when -- and in that February 23rd
 2    interview, did the government tell the defendant that they
 3    had gotten the body-worn camera footage?
 4              MS. GARDNER:  Yes, Your Honor.
 5              So the FBI agents who interviewed him showed him
 6    still shots from the body-worn camera footage, and that's
 7    when he said that he took the items.
 8              THE COURT:  Okay.
 9              All right.  So one of the things -- one of the
10    things that the defendant has suggested in his papers is
11    that -- and, also, in his interviews, I guess, with the FBI
12    is that he was actually trying to help with -- some kind of
13    good samaritan, helping the police officer who was being
14    beaten and tasered by members of this mob.
15              And what -- could you just summarize what the
16    evidence is that either supports that argument or doesn't
17    support that argument?
18              MS. GARDNER:  So, Your Honor, the evidence that
19    supports that he was not trying to help that officer is not
20    only the fact that he forcibly ripped off those items --
21    there was a hole in the officer's tactical vest where he
22    forcibly ripped off the badge; and, also, the radio would
23    have been secured -- it was securely attached to him, so he
24    would have had to forcibly pull it off in order to get it.
25              Additionally, there is the fact of his greater
```

1    conduct that day.  There is the Instagram video of him

2    yelling that he just got tear gassed but he is going to go.

3    There is the fact that he tried to forcibly enter the

4    Capitol by going into that tunnel on the lower west terrace;

5    and there is the fact that when he exited that tunnel, when

6    he was unable to enter, that he told another member of the

7    mob who thanked him for his, quote, service that he was

8    going to go, he just needed to get refreshed.  And then it

9    was minutes later -- eight minutes later that he

10   participated on the attack on the officer by robbing him.

11          THE COURT:  All right.  And one -- one aspect of

12   what the defendant said about trying to help the officer

13   rather than joining in the attack on the officer was that --

14   he said he pressed the emergency button on the officer's

15   radio after he grabbed it from him.  And according to the

16   defendant -- and I think as he explained on February 23rd,

17   during his FBI interview, that he pressed that emergency

18   button to call for help.

19          Now, I know, over the course of reading the

20   briefing in this case, the government has obtained

21   additional information and data from that -- of the radio

22   use, even though it hasn't recovered the radio, but it's

23   looked at data.

24          So could you summarize what the government has

25   been able to show or analyze about the radio transmissions

1    from the stolen radio from the officer that either shows

2    that there is some merit to the defendant's argument that he

3    was some kind of good samaritan calling for help for the

4    police officer as opposed to just a member of the mob

5    attacking the officer?

6          MS. GARDNER:  So, Your Honor, the data shows that

7    that button was pressed; however, it was pressed at 3:37,

8    which is 16 minutes after the officer was pulled to safety;

9    and we know that from the officer's body-worn camera.

10         So we have on the body-worn camera at 3:19 that

11   Mr. Sibick is taking the radio and the badge from the

12   officer.  And then the camera also shows that there was a

13   group of individuals who surrounded him at 3:20 in order to

14   try to protect him from the attackers; and that those

15   individuals then escorted the officer back to the police

16   line by 3:21.  And, as I said earlier, it wasn't until 3:37,

17   a full 16 minutes later, that the record shows that that

18   button was pressed.

19         THE COURT:  And does the body-worn camera show

20   anything identifiable about the actual good samaritans who

21   helped escort the police officer from being beaten by the

22   mob back to the police line?

23         If so --

24         MS. GARDNER:  So, Your Honor --

25         THE COURT:  -- is the defendant in that group of

1     good samaritans?

2              MS. GARDNER:  The defendant is not in that group

3     as far as we can tell from the video.

4              THE COURT:  So, essentially, the emergency button

5     on the officer's radio was only pressed -- I think your

6     papers said 16 minutes after the police officer had already

7     been returned to the police line.

8              MS. GARDNER:  That is correct, Your Honor.

9              THE COURT:  Okay.  And I understand that the

10    police officer was actually quite hurt; is that right?

11             MS. GARDNER:  Yes.  When he gets back to the

12    police line, he collapses unconscious; and he was

13    subsequently hospitalized for these injuries.

14             THE COURT:  Okay.  So, you know, the government's

15    memo emphasizes and, sort of, lays out in detail the

16    defendant's steps to -- you know, captured in images of

17    grabbing the badge, grabbing the police radio from the

18    officer, at that point who was laying on the ground being

19    beaten by other people; and it also lays out, over the

20    course of the different interviews with the FBI, the

21    statement that he made that turned out to be false.

22             And whatever you want to call that behavior --

23    reprehensible, troubling, other -- you know, whatever you

24    want to call it -- the defendant's argument is it doesn't

25    present any danger to the community now; it doesn't show

1      that.

2              I think one line in the defense brief is:  He may

3      have been a danger to the community on January 6th, but the

4      conduct then, on January 6th, and the conduct afterwards --

5      discarding evidence, lying to the FBI -- that in itself

6      doesn't spell out danger -- clear and convincing evidence of

7      danger to the community.

8              So I want to give the government an opportunity to

9      explain why does the government think that this defendant

10     continues to present a danger to other persons or the

11     community now?

12             MS. GARDNER:  So, Your Honor, the government's

13     argument is that his post-assault behavior, which Your Honor

14     has characterized as being specifically obstructive, shows

15     that he continues to be a danger because he was willing to

16     lie to the FBI; he was willing to dispose of evidence; he

17     was willing to hide evidence.  And he only came clean about

18     what he did when faced with the possibility that there could

19     be surveillance footage showing what happened at that

20     dumpster where he said that he threw out those items.

21             There is no indication that Mr. Sibick -- whatever

22     caused Mr. Sibick to engage in the violent behavior that he

23     engaged in on January 6th -- that he has renounced that or

24     that has somehow been ameliorated.  To the contrary, he has

25     been obstructionistic and lied to the FBI, which the

1    government believes shows that he is a continued danger to

2    the community.

3              THE COURT:  But the defense argument is, sure, he

4    may have obstructed justice by burying the badge in his

5    backyard; throwing away the radio, if we can believe that;

6    and lying over the course of several interviews with the

7    FBI.  But those are all the marks of a scared person, not a

8    dangerous person; so why shouldn't I accept that argument?

9    The magistrate judge must have accepted it; why shouldn't I

10   accept it?

11             MS. GARDNER:  Your Honor, the fact that he

12   eventually came clean because he thought that he was going

13   to be found out doesn't, in any way, mean that he would not

14   engage in some sort of dangerous or assaultive behavior in

15   the future should the opportunity present itself.

16             THE COURT:  And what -- I mean, in many of these

17   cases the government has presented, you know, a number of

18   media posts by one of the members of the mob on the assault

19   on the Capitol on January 6th -- before January 6th, on

20   January 6th, after January 6th.

21             I haven't seen anything about what this defendant

22   may have posted before January 6th.  Certainly, I have seen

23   statements that he made on January 6th and on January 7th in

24   the Instagram video clip that you presented.

25             And what is it about that January 7th statement

1   that you think should raise concern about this defendant's

2   continuing danger to the community?

3           MS. GARDNER:  So, Your Honor, I mean, there is

4   what he actually said on January 6th.  But is Your Honor

5   also referring to what he said the day after that; is that

6   what Your Honor is asking about?

7           THE COURT:  Yes.  Where he said -- I am trying to

8   find the specific quote.  Let's just see, because he said

9   something about how -- what happened yesterday, he said, was

10  a disgrace.

11          Let me see if I can find the quote.  I am having

12  trouble putting my hands on it.  He said it was a disgrace,

13  and somebody lost -- yes.  He said, I am worried -- "I'm

14  worried for America.  Our system is broken.  The people need

15  to heal.  What happened yesterday is a disgrace.  An

16  innocent life was lost."

17          Is he referring there to the innocent life -- to

18  the woman who was a member of the mob who got shot by the

19  police?  And do you interpret that statement to be it was a

20  disgrace that she was shot?

21          MS. GARDNER:  I think that's possible; but I also

22  think that your guess is as good as mine in terms of what he

23  meant by that.  But I think that is a fair interpretation.

24          THE COURT:  I mean -- I mean, is that a remorseful

25  statement that he makes on January 7th?

1          MS. GARDNER:  Your Honor, I would not characterize

2     that as remorse.  He does say more after that.

3          He says that -- something to the effect -- and I

4     don't have the exact quote in front of me.  But he said

5     something to the effect that he believes the government has

6     failed both sides; meaning that this is -- this is someone

7     who has an issue with how the government functions, which

8     the government would posit is potentially part of what led

9     him to engage in the conduct that he engaged in on

10    January 6th.

11         THE COURT:  All right.  So in other situations,

12    you know, defendants have appeared who have been members of

13    one of these gangs -- Proud Boys, Three Percenters, Oath

14    Keepers -- there are all these different gangs with

15    different names, different colors, different insignia.  This

16    defendant doesn't appear to be a member of any of those

17    gangs; is that right?

18         MS. GARDNER:  That's correct, Your Honor.

19         THE COURT:  Does the government have any evidence

20    about that?

21         MS. GARDNER:  No, Your Honor.

22         THE COURT:  So with gang involvement, with -- you

23    know, that lends some -- that's informative, probative of

24    preplanning, gathering with other people a momentum to

25    engage in other illegal unlawful acts as part of the goals

1    of the gang to further whatever their mission or views are

2    of the political process or politics, and that can be very

3    informative and probative of future dangerousness to the

4    community or other persons.

5           How -- given the fact that this defendant is not a

6    member -- to the extent that the government has been able to

7    figure that out at this point -- of one of those gangs, how

8    should the Court figure that into evaluating his

9    dangerousness?

10          MS. GARDNER:  Your Honor, I think the fact that he

11   is not affiliated with any of those gangs is certainly

12   something that the Court could and should consider.  But the

13   government's argument is that there are other things,

14   including his conduct on that day and his post-assault

15   obstructionist behavior that shows that he is a continued

16   danger to the community.

17          THE COURT:  And is that because based on that

18   conduct, the lawless conduct -- based on his obstructionist

19   conduct that it raises doubt about his compliance with

20   conditions of release?

21          MS. GARDNER:  Yes, Your Honor.

22          I think based on his behavior -- I don't think we

23   can say with confidence that he would comply with conditions

24   of release.  And I'd also point out that he is somebody who

25   is no stranger to the criminal justice system.  He does --

1          THE COURT:  Well, that's interesting.

2          I am glad you brought that up, Ms. Gardner,

3    because even though we have unsealed the magistrate judge's

4    docket in this court, the magistrate judge's docket in the

5    Western District of New York apparently is still sealed.

6          We cannot get any pretrial services reports about

7    this defendant, so I have no -- other than your brief

8    summary and your papers, I really don't know anything about

9    this defendant's criminal history.

10          So could -- and since -- we have made efforts to

11    try and find it but -- you know, or get a copy of it; but

12    could you detail for me what the criminal history is because

13    it's a little frustrating that I am the only person at this

14    hearing that doesn't know details about this defendant's

15    criminal history.

16          MS. GARDNER:  Yes, Your Honor; and I understand

17    why that would be frustrating.  And I didn't realize Your

18    Honor didn't have that.

19          If you give me one moment, I am going to pull it

20    up so I can --

21          THE COURT:  Well, also, I don't know why -- why is

22    the docket in the Western District of New York sealed?

23          MS. GARDNER:  I cannot answer that question.

24          THE COURT:  And the judiciary takes sealed dockets

25    really seriously, so -- I don't have access to it.  You need

1    to take care of getting that unsealed.

2              MS. GARDNER:  Yes, Your Honor.  I can work with

3    the Western District of New York on that issue.

4              Just give me one moment, I am going to pull it up.

5              So the detention report that I have shows that he

6    has six prior contacts with the criminal justice system that

7    resulted in conviction.  One of them, as I noted in my memo

8    at the time that the report came out, did not have details

9    about whether or not there was an actual conviction; and I

10   can address that when I go over that one.

11             So the first set that's on here is a -- from 2005,

12   and this happened in Amherst, New York; and he -- his

13   position is that he pled guilty to criminal possession of a

14   controlled substance.  He was charged with a felony for

15   criminal possession of cocaine and, then, it was pled to a

16   misdemeanor.

17             In 2008, he was charged with a DUI in Amherst,

18   New York; and he was convicted by jury trial for driving

19   while impaired.

20             In 2010, he was charged with aggravated harassment

21   in the second degree; and I recently got information from

22   the local court that he was convicted of disorderly conduct

23   on that charge.

24             In 2013, he was charged with a misdemeanor

25   possession of drugs; and he was convicted of misdemeanor

1    possession of drugs, marijuana specifically.

2            In 2014, he was charged with reckless

3    endangerment, E felony, and attempted reckless endangerment,

4    misdemeanor; and he pled guilty to attempted reckless

5    endangerment misdemeanor.

6            THE COURT:  He pled guilty to what?

7            MS. GARDNER:  Attempted reckless endangerment,

8    which is a misdemeanor.

9            And then, in 2015, he was charged with failure to

10   stop at the command of police which is a felony, and

11   carrying a concealed loaded firearm, and reckless driving;

12   he was convicted of failing to stop or responding to a

13   police command.

14           THE COURT:  And that's a felony?

15           MS. GARDNER:  It's unclear to me whether or not

16   that's a felony or a misdemeanor.  I do know that he was

17   sentenced to 365 days in jail and 24 months of probation,

18   and a $2,000 fine --

19           THE COURT:  So was that suspended, or he served

20   one year in jail?

21           MS. GARDNER:  He -- it does not say in the report

22   that I have.

23           MR. ANZALONE:  Your Honor, I don't want to jump in

24   and answer your question to the government; but I can

25   confirm it was a suspended sentence, and he served two years

1    of probation.

2              THE COURT:  Got it.  Thank you.

3              Okay.  All right.  Well, that fills in some

4    background that I was missing.

5              So the defendant makes this big point that the

6    government knew about the defendant for about a month and a

7    half, spoke to him four times without arresting him.

8              So the defendant asked:  If Mr. Sibick was such an

9    ongoing danger to the community, why did the government

10   allow him to remain free for so long and then permit him to

11   surrender himself to authorities?

12             So what's the answer to that?

13             MS. GARDNER:  So, Your Honor, the answer to that

14   is -- so, first of all, I think it's worth talking about any

15   delay.

16             We should start with February 26th, rather than

17   his -- rather than this delay going back to January because

18   it wasn't until February 26th that the government actually

19   had the badge in its possession.  February 23rd was the

20   first time that the government spoke with Mr. Sibick about

21   what was observed on body-worn camera, with him taking the

22   radio and the badge.

23             So to the extent that we're talking about a delay,

24   we're just talking about 12 days, from February 26th to

25   March 10th, when the arrest warrants were signed.  And so,

1      Your Honor, I would point to *U.S. v Little* which says that:

2      Absent a showing that there was a delay because the

3      government did not believe that the defendant is a danger,

4      the Court shouldn't draw any conclusion from the delay.  The

5      government is entitled to continue investigating or to

6      ensure that it's taking everything that it needs to take

7      into account before charging someone.

8              In this case, this is very complicated -- the

9      January 6th investigation as a whole is complicated by the

10     fact that there are hundreds, if not thousands, of videos;

11     and the government wanted to take investigative steps before

12     arresting him to ensure that the government was taking into

13     account the full breadth of his behavior to the extent

14     possible.  And so the government took some additional

15     investigative steps before signing the arrest warrant.

16             THE COURT:  And then the government didn't go out

17     and arrest him.  You know, there have been a number of these

18     cases where the government has gone in at 5:30, 6:00 in the

19     morning --

20             MS. GARDNER:  But Your Honor --

21             THE COURT:  -- with guns drawn.  They didn't.

22     They just asked Mr. Sibick to just please walk on in at a

23     convenient time and turn himself in.

24             MS. GARDNER:  Your Honor, the first thing I would

25     say about that is that self-surrender, to the extent that it

1    is considered, should go to flight risk rather than to

2    dangerousness.

3            The last time that --

4            THE COURT:  But doesn't it also indicate a

5    willingness to comply with requests from law enforcement or

6    authority and indicate some willingness to abide by

7    conditions of release?

8            MS. GARDNER:  So, Your Honor, what I'd point to

9    there is what Your Honor said in *Chrestman*, which is the

10   fact that the defendant didn't flee or evade arrest does

11   little to mitigate the heavy weight of the other factors

12   favoring detention.

13           What had happened here is -- the last time that

14   Mr. Sibick spoke with the FBI, he had indicated that if he

15   was going to be arrested he wanted to self-surrender.  And

16   it's, frankly, safer for everyone if that's the way the

17   arrest is done rather than going in guns blazing putting

18   everyone at risk; and so that's what the FBI did, which is a

19   valid strategic decision.

20           THE COURT:  All right.

21           So the defendant also points out that nothing's

22   happened, he hasn't gotten in trouble since January 6th, so

23   shouldn't that help establish that he is not a serious

24   danger to the community since for two months he has done

25   nothing wrong?

1          MS. GARDNER:  Your Honor, I think he has

2     obstructed an investigation by misleading the FBI and

3     concealing and hiding evidence, so I wouldn't say that he

4     has done nothing wrong in between January 6th and now.

5          THE COURT:  All right.  So the magistrate judge in

6     Western District of New York denied the government's request

7     to stay the release order until this review could be

8     completed.  So the defendant is now out.  So if the release

9     order is revoked, what steps would the government recommend

10    to have the defendant detained pretrial?

11         MS. GARDNER:  So I'd recommend a warrant; and we

12    do have one ready if Your Honor decides to detain him.  We

13    have spoken with the magistrate in Buffalo, and that's what

14    they requested; so we have had one prepared.

15         THE COURT:  I see.  And then the direction to the

16    defendant would be again to self-surrender?

17         MS. GARDNER:  I mean, that's something that we

18    haven't discussed; but I think the government would be fine

19    with that if he's going to self-surrender; and that's for

20    the same reason that I discussed before in that it's safer

21    for everyone.

22         THE COURT:  All right.  Is there anything else

23    that you want to add, Ms. Gardner?

24         MS. GARDNER:  No, Your Honor.

25         THE COURT:  Okay.  So I will turn to defense

1    counsel, Mr. Anza- -- How do you pronounce your name,

2    Anzalone, Anzaloni?

3                 MR. ANZALONE:  Your Honor, it's just Anzalone.

4                 THE COURT:  Anzalone.  Got it.  Okay.

5                 With a name like -- my first name is Beryl, people

6    mispronounce it all the time; so I do try my best to

7    pronounce people's names correctly.

8                 MR. ANZALONE:  I appreciate that.

9                 THE COURT:  Okay.  So the government says that

10   18 U.S.C. Section 2111 constitutes a crime of violence, and

11   they cite this Ninth Circuit case for that.  Does the

12   defendant dispute that it is a crime of violence?

13                MR. ANZALONE:  Your Honor, we did not include in

14   our papers any dispute as to that; we are not disputing

15   that.

16                THE COURT:  Okay.  I just wanted to make that

17   clear for the record.

18                And so one of the things that you spend a lot of

19   time in your papers talking about -- and it was clearly

20   successful in Western District of New York -- is that -- is

21   the delay in arresting the defendant as showing a lack of

22   dangerousness.

23                And, I mean, as the government has said, this is a

24   very complex investigation; there is a mob.  If the mob had

25   not been successful in overrunning the police on

1    January 6th, they would have all been arrested.  But the

2    police were having -- were too busy that day trying to save

3    the people inside the Capitol to arrest members of the mob;

4    and they were too busy trying to keep them out of the

5    Capitol for the protection of the people inside to execute

6    many arrests on that day which has led to a very complex

7    investigation.  And that complexity of that investigation is

8    only complicated when defendants lie not once in the first

9    interview, like this defendant; or lie at the second

10   interview, like this defendant; but lie at the third

11   interview, like this defendant.  They keep lying and then,

12   also, throw away evidence, bury evidence like this

13   defendant.

14        So given the nature of this investigation and what

15   happened on January 6th and this -- you know, the story that

16   this defendant told that turned out to be a couple of times

17   to the FBI that they had to sort through -- why does a delay

18   in these circumstances, in arresting the defendant in order

19   for the government to get its evidence straight, the charges

20   straight, against this defendant -- why should that be held

21   against the government in a finding of dangerousness given

22   the actual conduct of what happened on January 6th and this

23   defendant's participation in an attack on a police officer

24   when he was down?

25        I mean, why -- how -- I mean, in some

1    circumstances a delay in arrest can be quite probative and

2    powerful.  I am not persuaded in this case given all these

3    circumstances, so I want to give you an opportunity to tell

4    me why, Mr. Anzalone, in this case should it be as powerful

5    as it is in possibly some other circumstances?

6          MR. ANZALONE:  Well, I think, Your Honor is

7    absolutely correct to point to the impact of the delay given

8    the individual circumstances of the case.  And in this case

9    we don't simply point to the delay because that somehow bars

10   the government from arguing that he is a danger; of course

11   it does.

12         But what we argue in this case, Your Honor, is

13   that because of the other facts that are present that the

14   Court has already honed in on, that Mr. Sibick -- there is

15   no evidence that he was a leader involved in this incident.

16   There is no evidence that he engaged in any preplanning,

17   which the government itself acknowledges at page 22 of their

18   memo.  There is no evidence that Mr. Sibick is involved in a

19   dangerous gang that was involved in this incident such as

20   the Oath Keepers or the Proud Boys.

21         There is no -- to return to the decision of

22   *Chrestman* which was referenced earlier today, there is no

23   evidence that Mr. Sibick possessed a weapon or engaged in

24   coordination; those were factors noted by the Court in

25   *Chrestman.*

1        So it's not just the delay, Your Honor; but I do

2   think that you can draw a reasonable inference from the fact

3   of the delay that there was not this urgency from the

4   government to go and get Mr. Sibick immediately when it had

5   concluded its investigation.  And let's be real, the

6   investigation had everything that they needed.

7        They had -- if the government's allegations are

8   true, they had the badge in hand on February 26th and no

9   complaint was signed; no arrest warrant was sought for

10   another nearly two weeks, until March 10th.  And even once

11   that document was signed by the magistrate judge, Mr. Sibick

12   was permitted to self-surrender not the following day but

13   the day after, on March 12th.

14        So I think that -- viewed in isolation, delay

15   itself is not a reason to leave someone out; but viewed

16   under the facts of this case it can be very powerful and

17   indicative of -- if the agents themselves who were

18   conducting this investigation who were interacting with

19   Mr. Sibick never went to the government and said:  Hey,

20   we've got to get this guy off the street, he's going to go

21   out and do something else; he is dangerous.  If that never

22   happened -- because we can all be assured if that happened

23   the government would have immediately sought to have him

24   detained; that didn't happen, Your Honor, and I think that

25   really is instructive here.  And I am asking the Court to

1    consider not just the delay but, really, the context that

2    this case occurs in.

3         And those two weeks -- I still have yet to hear an

4    explanation for -- if Mr. Sibick is such a danger, what

5    happened in those two weeks and why -- why we're only here

6    two, almost three weeks later, after the -- all of the

7    important pieces of the investigation were concluded.

8         THE COURT:  Well, I am not sure that the

9    government has concluded their investigation yet of

10   Mr. Sibick.

11        I mean, from what I understand from all of the

12   cases, there are still hours and hours of videotape to see

13   who was what, where, and creating timelines.  I can imagine

14   it's very time consuming.

15        And I have seen in cases -- it's already

16   happening, quite frankly, where the government's originally

17   charged people with misdemeanors and they're now being

18   charged with felonies grouped with other people.  So I think

19   this case is intensively still underway.  And for that

20   reason I am -- that is the -- that is the very unusual

21   circumstance here, of trying to dissect what happened in an

22   individual's conduct as part of a mob and whose conduct is

23   worthy of charges and what charges; it's a massive

24   undertaking to try and get that right -- or at least as

25   right as possible with the evidence at hand.

1          So I am not -- I have to say even though at first

2     blush this is an argument that, typically, is quite

3     persuasive for judges on the in-out decision, particularly

4     when based on dangerousness.  And in this case, I just think

5     that those special circumstances have to be, you know,

6     somewhat modified how it plays out; I mean, particularly in

7     this case where, I mean, the government had arrested this

8     defendant on February 23rd when they got the body-worn

9     camera or they wouldn't have gotten the badge back because

10    it was only after that, I guess, when the defendant

11    understood the evidence was growing, he dug up the badge

12    from his backyard and brought it in.

13          So what am I supposed to make of the January 7th

14    comments, the day after January 6th?

15          MR. ANZALONE:  Well, Your Honor, I think this has

16    been addressed already today, but there is -- there is

17    really no evidence that Mr. Sibick is an ongoing danger

18    because he holds this sort of unmitigated, unchangeable

19    vendetta against the government; that is just simply not

20    there.  And I think that --

21          THE COURT:  Well, I mean, I think it's not but,

22    you know, this is one of the difficult things about some of

23    these insurrectionist cases -- they're called -- because

24    people can hold their political beliefs.  They can think the

25    system is broken -- the political system is broken; that's

1      fine.

2              But when defendants participate in a mob beating

3      up a police officer, and those political beliefs lead to

4      lawlessness and stealing a police officer's lifeline, his

5      radio when he is down, isn't that -- isn't that an

6      indication of -- that whatever is animating the conduct --

7      if those beliefs animating that conduct remain and there is

8      no remorse for it, isn't that cause for concern about

9      dangerousness, continuing dangerousness?

10             MR. ANZALONE:  I think under some circumstances it

11     could be, Your Honor.  And what I hear in that video is that

12     Mr. Sibick specifically said that it's time for this nation

13     to heal; and I think that's important.  That's something

14     that we don't necessarily hear from some of the other

15     individuals who have been detained.

16             I mean, the Court has referred to this ongoing,

17     complex investigation; that's certainly true.  But the Court

18     is also entitled to look at the government's actions in

19     other cases.  We have the case of Mr. Barnett who is the

20     individual who made his way into speaker Pelosi's office.

21     My understanding is that that individual was arrested the

22     very next day, and that that is an individual who has

23     espoused a continuing belief in the righteousness of the

24     actions he took; and that we have not seen in this case.  I

25     think that's an important distinguishing characteristic of

1    this case, Your Honor.

2           THE COURT:  Well, he was giving interviews to the

3    press, I believe.  I mean, he was very well broadcast.  I

4    think it was -- these videos -- we're now getting to the

5    people who were involved in attacks directly on police

6    officers and sorting out faces.  Who was doing what in the

7    midst of the mob I think is a little more difficult, so...

8           Do you want to address the six convictions that

9    the defendant has?

10          MR. ANZALONE:  I would be happy to, Your Honor.

11   I think that the most recent one and, perhaps, the most

12   concerning to the Court is the conviction for the failure to

13   stop at the commands of police.

14          My understanding is that this was -- Mr. Sibick

15   was on a motorcycle.  He was signaled to pull over by a

16   police officer; he did not immediately realize that he was

17   being signaled to pull over.  Ultimately, as I mentioned,

18   given the circumstances of the case, his sentence was

19   suspended.  The firearm conviction was -- I'm sorry, the

20   firearm charge was dismissed; and he was sentenced --

21          THE COURT:  Does this defendant own firearms?

22          MR. ANZALONE:  No, Your Honor.  He does not.  I

23   believe he was licensed --

24          THE COURT:  Do his parents own firearms?

25          MR. ANZALONE:  My understanding is that there are

1    no firearms in the home where he resides, where he has been

2    placed on home incarceration with his parents, including his

3    father who is a 34-year Navy veteran.

4            THE COURT:  All right.  So what else would you

5    like me to consider?

6            MR. ANZALONE:  Well -- I'm sorry, Your Honor.  If

7    I could just have one moment, please.

8            We would ask the Court to consider our main

9    argument, that Mr. Sibick does not pose a continuing danger

10   and that the Court is empowered to impose very strict

11   conditions that would mitigate any danger that the Court

12   might find he continues to pose.

13           As the Court knows, pretrial detention is a last

14   resort, and the Court needs to find that there are no

15   conditions.  The Court is empowered to place Mr. Sibick on

16   continued home incarceration.  The Court is empowered to

17   ensure that he is tracked 24 hours a day with a GPS ankle

18   monitor.  The Court is empowered to --

19           THE COURT:  That was not imposed by the magistrate

20   judge in New York; why is that?

21           MR. ANZALONE:  I can speak to that, Your Honor.

22           So we believed that Mr. Sibick would be traveling

23   to the District of Columbia for this proceeding, so that's

24   actually why the judge scheduled it originally for today, so

25   soon after his initial appearance, once it was clear he was

1   out of custody.  By the time --

2          THE COURT:  No, I scheduled this for today.  The

3   Western District of New York did not schedule it for today.

4   I scheduled it for today because I like to do the reviews

5   promptly, as required by the statute.

6          MR. ANZALONE:  I appreciate that, Your Honor.

7   I don't think I -- I don't want to get in an argument over

8   timing.

9          My understanding was the magistrate judge

10  scheduled it for 10:00 a.m. this morning; but, regardless, I

11  understand that we are here on the bail review as filed by

12  the government.

13         The reason that he did not include that monitoring

14  was because the turnaround was so fast and because our

15  understanding was that Mr. Sibick would have to travel to

16  the District of Columbia in four days, today, on Tuesday.

17  It was scheduled by the magistrate judge for this morning,

18  Your Honor.

19         THE COURT:  Well, this magistrate judge takes on a

20  lot to schedule me and my hearings and to decline to stay a

21  release order at the government's request so that I can have

22  an opportunity to review it.  Interesting.  Okay.

23         All right.  Anything further, Mr. Anzalone?

24         MR. ANZALONE:  Your Honor, we'd just continue to

25  ask the Court to impose conditions that would reasonably

1    assure the safety to the community, specifically home

2    incarceration with 24-hour ankle monitoring so that

3    probation would be notified the moment that Mr. Sibick

4    leaves the house.  He would --

5                THE COURT:  Can I just explore one other thing

6    with you, Mr. Anzalone?

7                MR. ANZALONE:  Yes.

8                THE COURT:  And the government can respond also

9    when I finish with Mr. Anzalone.

10               But if the police had not been overwhelmed on

11   January 6th, the people who participated in the assault with

12   tasers and beating on the police officer and -- like this

13   defendant, grabbed his radio, grabbed his badge, they would

14   have been arrested promptly and identified and subject to

15   fairly prompt action then; but because of those

16   circumstances on January 6th, we're now here three months

17   later.

18               And it does seem ironic that because mob behavior

19   eliminated the opportunity for the police to take the

20   actions they surely would have liked to have taken if they

21   hadn't been full-time trying to protect the Capitol, the

22   people inside, and themselves, rather than executing arrests

23   of people who deserve to be arrested -- that that time lag

24   would be used to minimize the dangerousness of the people

25   there.  And in circumstances where the charges involve an

1    assault on a police officer, that because a mob engaged in

2    that assault -- making it more difficult to identify people

3    who were participating in it and the theft of the badge and

4    the radio -- that, again, those people, because of the

5    delay, get pretrial release is, sort of, a -- isn't that a

6    bad message to be sending out?

7           I mean, that a mob attacked a police officer --

8    overruns police so much that they can't engage in arrests,

9    that those people engaged in mob behavior get pretrial

10   release for -- you know, in other circumstances they would

11   not?  I mean, isn't there -- isn't this a situation where

12   the Court should be concerned about deterrents?

13          MR. ANZALONE:  Well, I think that deterrents --

14          THE COURT:  And that mob attack on the police,

15   stealing their lifeline of their radio to call for safety,

16   is just not acceptable; it's lawless behavior that is just

17   unacceptable and is such a danger then, now, and in the

18   future.

19          Is it -- how does deterrence play a role in this

20   context?

21          MR. ANZALONE:  I think that deterrence may

22   absolutely play a role after this case has had a chance to

23   play out.

24          But right now, Your Honor, you have an individual,

25   Mr. Sibick, who is before you cloaked in the presumption of

1      innocence, and there are still uncertainties.  There is

2      still a void in some of the evidence that we have.

3              Even today the government spoke about this group

4      of individuals who formed what it describes as a "protective

5      circle" around this officer.  We have not yet been provided

6      with that video that has anything that has -- anything that

7      pertains to that protective circle.

8              So I think that there is a reason that pretrial

9      detention is so limited and there is a reason that -- our

10     position is pretrial detention does not include deterrents

11     to other actors; and the reason is because Mr. Sibick is

12     allowed to have his day in court and evaluate all of the

13     evidence and, if it goes his way, to contest his guilt; and

14     he just can't do that at this stage, that's why pretrial

15     detention is so limited.  And that's why I'm asking the

16     Court to consider allowing him to remain out of custody

17     while we continue to investigate this case.

18             THE COURT:  Well, that is why I asked the

19     government whether Mr. Sibick was identified in the group of

20     good samaritans who tried to help the police, and they said

21     no.  And, plainly, Mr. Sibick is cloaked with the

22     presumption of innocence.

23             But the Bail Reform Act also tasks judges with

24     evaluating what is dangerousness and dangerousness to the

25     community.  And what we have to go on, despite the

1    cloaked -- cloak of presumption of innocence with which

2    Mr. Sibick is entitled, is how -- what does the evidence in

3    the government's proffer now show?

4         And his conduct is on videotape -- the offense

5    conduct is on videotape so, you know, it puts a different

6    shade on how -- when you have such egregious conduct and no

7    remorse, and a statement the day after of how what happened

8    at the Capitol was a disgrace; but "disgrace" from the

9    context of that statement suggesting it was a disgrace

10   because the police tried to stop the mob as opposed to

11   otherwise.

12        MR. ANZALONE:  Your Honor, I am not sure I agree

13   with that interpretation.  I think that there is -- there is

14   certainly remorse that the Court can draw from that video.

15   I think that given -- to some extent, to be able to observe

16   Mr. Sibick on video today, I think it's fairly clear that

17   there is certainly some emotions going on there.

18        THE COURT:  Well, clearly, Mr. Sibick does appear

19   to be quite emotional but -- but because he's facing a

20   serious decision now, and he's now facing three felony

21   charges with up to 15 years in jail, I think is the focus of

22   his attention.

23        MR. ANZALONE:  Well, you know, that may be the

24   case, Your Honor; and I think that it also goes to speak to

25   whether he continues to be a danger, whether with the hammer

1    that the U.S. government now holds over him, whether there

2    is actually a realistic probability he is going to go out

3    and commit more acts and be a danger -- I would submit to

4    the Court that that is just not a reasonable conclusion to

5    draw.

6              THE COURT:  All right.  Does the government have

7    anything to respond?

8              MS. GARDNER:  No, Your Honor.

9              THE COURT:  Okay.  The Court is ready to rule on

10   the government's motion to review the Western District of

11   New York magistrate judge's decision to release the

12   defendant pending trial.

13             On an appeal from a magistrate judge's order of

14   pretrial release, the district court must conduct a *de novo*

15   review -- must do so promptly.  18 U.S.C. Section 3145(a),

16   the Bail Reform Act, requires release of a defendant prior

17   to trial unless a judicial officer determines, after a

18   hearing, that no condition or combination of conditions will

19   reasonably assure the safety of any other people -- person

20   in the community; see 18 U.S.C. Section 3142(a)(1).

21             The charged conduct in this case does not give

22   rise to a rebuttable presumption favoring detention.  So the

23   government bears the burden to establish that the defendant

24   poses a serious risk of flight or obstruction of justice.

25             Under 3142(f)(2)(A) and (B), by a clear

1  preponderance -- by a preponderance of the evidence and/or a

2  danger to the community by clear and convincing evidence,

3  under Section 3142(f)(1)(A) in determining whether any

4  conditions of release will reasonably assure the appearance

5  of the person as required, the Court must take into account

6  the available information concerning four factors:  Nature

7  and circumstances of the offense charged; the weight of the

8  evidence against the person; the history and characteristics

9  of the person; the nature and seriousness of the danger to

10  any person in the community that would be posed at a

11  person's release; these are factors that are set out in

12  Section 3142(g) of Title 18.

13          On an appeal for review of a magistrate judge's

14  order of pretrial release, the district court must conduct a

15  *de novo* review, so I am going to start with each of these

16  factors starting with the nature and circumstances of the

17  offense charged; these factors weigh strongly in favor of

18  detention.

19          He has been -- the defendant, Mr. Sibick, has been

20  charged with three serious felony offenses, and it does bear

21  reviewing what those charges are.  He is charged first with

22  forcibly -- forcibly assaulting, resisting, opposing,

23  impeding, or interfering with officers -- law enforcement

24  officers while engaged in or on account of the performance

25  of their official duties, in violation of 18 U.S.C. Section

1    111(a)(1) by forcibly ripping a police officer's badge and

2    radio off of his person.  This occurred while the defendant

3    was part of a mob that dragged the officer deep into a crowd

4    where the officer was beaten, tased, and threatened with

5    death.  The officer was hospitalized for his injuries after

6    being unconscious when returned to the police line.  This

7    offense carries up to 8 years' imprisment because the act

8    involved physical contact with the victim of the assault,

9    the police officer.

10           He is also charged with:  Taking by force and

11   violence or by intimidation anything of value from a person

12   or presence of another within the territorial jurisdiction

13   of the United States, in violation of Section 2111.  This is

14   based on the same conduct of the Section 111(a)(1) charge;

15   and this offense carries up to 15 years' imprisonment.

16           He is also charged with obstructing, impeding, or

17   interfering with a law enforcement officer lawfully engaged

18   in the performance of his official duties incident to the

19   commission of civil disorder that adversely affects the

20   performance of any federally-protected function, in

21   violation of 18 U.S.C. Section 231(a)(3) which is also based

22   on the same conduct that I've just described, and it carries

23   up to 5 years' imprisonment.

24           He is also charged with two misdemeanor offenses.

25           In this case, the government has presented

1    overwhelming evidence that the defendant was not just

2    present at the U.S. Capitol on January 6th, but he

3    enthusiastically participated in the assault on the Capitol

4    to stop the constitutionally-mandated process of counting

5    electoral votes.

6          The video shows the defendant during that very

7    horrible day for this country screaming, "Just got

8    tear-gassed, but we're going, baby, we're going!  We're

9    pushing forward now!"  There are photos of him trying, with

10   the mob, to push into a tunnel at the Capitol and then

11   leaving because, I guess, the mob was pressing up --

12   pressing too hard, and then saying that he wanted to go get

13   refreshed.  I guess he was going to continue with his mob

14   activities.

15         And then, a few minutes later, there is

16   photographic evidence -- videos and photos that show the

17   defendant participating with this mob surrounding an

18   officer, police officer, who had been dragged down into the

19   crowd, who had fallen on the ground; and it shows the

20   defendant reaching towards the officer, pulling off his

21   badge and pulling his radio.  The defendant ultimately,

22   after multiple interviews -- several interviews with law

23   enforcement -- admitted to taking the badge and the radio

24   and has returned the badge to law enforcement.

25         While the precise scope of his involvement with --

1    in the assault on the officer is probably still under

2    investigation because other people involved in that

3    incident, I am confident, are still being investigated, what

4    is clear is that this defendant participated in this mob.

5    He was not a good samaritan.  He may have wished he were

6    now, in trying to be one of the good samaritans trying to

7    help that officer escape from this; but that doesn't appear

8    to be the case based on the videos that I have seen.

9          He not only took the officer's badge and kept it

10   as a souvenir -- I am not sure what -- but kept it -- but he

11   also took the radio which is so critical to law enforcement

12   officers when they're on duty to call for help, let other

13   officers know where they are; and this defendant took that

14   radio.

15         The defendant claims he did so accidentally while

16   trying to help the officer; but that explanation of his

17   conduct is simply not credible given what I have seen in the

18   video and also the defendant's conduct during the course of

19   this investigation of him.

20         He has lied or misled law enforcement over the

21   course of several interviews.  In his first interview with

22   law enforcement after the riot, on January 27th, he said he

23   wasn't really involved in the attack on the officer,

24   although he was able to repeat some of the things that the

25   officer was getting told about:  Take his gun, I am going to

1    kill him; really scary things for the officer.  He had been

2    dragged down there, was on his back, and being beaten.

3            The defendant didn't mention that he took the

4    badge and the radio.  What he said was he tried to help but

5    it was -- that he was scared for his own life, so he left;

6    that's not quite what happened.

7            In his second interview, on February 2nd, when

8    asked about whether details of his earlier interview were

9    accurate and honest he, again, dissembled and said yes.

10   Asked if he participated or was involved in the assault on

11   the police officer, he said no; that he hadn't participated

12   in the assault.

13           By the third interview, on February 23, when the

14   agents, in their massive collection of evidence from

15   January 6th, had the officer's body-worn camera -- in that

16   interview the defendant admitted to grabbing the badge and

17   the radio but claimed, again, that he did so while trying to

18   help the officer and even said he pressed the emergency

19   orange button when he was in possession of the radio to get

20   help.

21           But he lied again during this interview; said he

22   dropped the badge and the radio in a trash can on

23   Constitution Avenue in D.C.; he then recanted that and said

24   during that interview that, actually, he brought those items

25   back to -- back home with him to Buffalo and threw them out

1    in a dumpster behind the Lenox Hotel; that turned out to be

2    false too.

3          The agents, in an investigative ruse, told him

4    that they were going to look at the hotel security cameras

5    to see what they could find out about him throwing those

6    things in the dumpster behind the Lenox Hotel in Buffalo.

7    And at that point, the day after, the defendant called the

8    agent and said he wanted to do the right thing and said he

9    had, in fact, buried the badge in his backyard; so he dug it

10   up and returned it to law enforcement that evening.  At this

11   point, the missing -- stolen police radio is still missing.

12         One part of the defendant's continuing story to

13   the FBI about wanting and trying to help the police officer

14   as the officer was on the ground being beaten is that he

15   wanted to help the officer but was unable to get to the

16   officer.  Well, he was able to get to the officer; grabbed

17   his radio, grabbed his badge.

18         He was -- said he even pressed the emergency

19   orange button on the radio to try and get help.  And that --

20   are all stories that law enforcement has had to sort out in

21   determining what the appropriate charges are in this case;

22   and sorting it out show s this defendant was no hero here.

23         As the government has outlined today and in its

24   papers, recovered data -- although the radio hasn't been

25   found, data has shown that the emergency button was pressed

1    first at 2:37 p.m. and again at 3:37 p.m. on January 6th;

2    and the body-worn camera footage shows the defendant taking

3    the radio from the officer at 3:19 p.m. when he was on the

4    ground.  The officer got back to the police line by about

5    3:21 p.m., so the emergency button was pressed after the

6    officer had already been pulled back to safety.  So the

7    defendant's story about trying to be a hero simply doesn't

8    match the evidentiary timeline as it's been pieced together

9    by the government so far.

10          This long string of misrepresentations and

11   downright lies during the course of the investigation

12   strongly undermines the argument that the badge and radio

13   were pulled off of this officer accidentally when the

14   defendant was trying to help him and, instead, strongly

15   supports the government's charges that the defendant

16   participated in this mob attack on this officer and stole

17   the items from him; this is a very serious offense.  And as

18   I've said and as the government has said, the police radio

19   serves as a lifeline to call for help.

20          The nature and circumstances of this defendant's

21   alleged conduct on January 6th, followed by his lies to law

22   enforcement, trying to get rid of evidence after

23   January 6th, clearly weigh strongly in favor of pretrial

24   detention.

25          The weight of the evidence against the defendant

1    is overwhelming, also strongly favors detention.  The

2    government has video footage, body-worn camera footage,

3    photos of the defendant from the assault on the Capitol

4    showing him enthusiastically participating in the riot,

5    posing with the Capitol police riot shield, joining this mob

6    when they were leaning over and beating this MPD officer and

7    using that opportunity to steal his badge and his radio --

8    in short, the weight of the evidence also weighs heavily in

9    favor of pretrial detention here.

10          The third factor, the history and characteristics

11   of the defendant, he has a criminal history; it seems like

12   most of these are misdemeanors.  And misdemeanor convictions

13   of -- and, as defense counsel said, it is of concern that he

14   has a 2015 conviction for failing to obey a police officer's

15   direction.  One of the arrests was also for aggravated

16   harassment, although I think that was reduced to a

17   disorderly conduct conviction.

18          Putting aside his criminal history which has some

19   troubling aspects to it, the defendant's conduct since

20   January 6th -- as if his January 6th conduct wasn't

21   troubling enough -- is that he repeatedly lied and misled

22   law enforcement regarding his conduct during the riots.

23          It is to his credit that the government hasn't

24   presented any other evidence that he engaged in violent

25   activity since January 6th that can pose a danger to others

1    or the community; but the evidence of his obstructive

2    conduct is very concerning to this Court.

3          Also, the statement that he posted on Instagram

4    the day after January 6th showing no remorse for what

5    happened on January 6th but, instead, talking about how the

6    people are mad, the people have spoken; indicating that:

7    What happened yesterday is a disgrace which, in context of

8    the whole statement, suggests that he thought it was a

9    disgrace because the efforts of the mob to gain power over

10   our democratic processes was unsuccessful, to me is a red

11   flag of danger.

12         The defendant highlights that he turned himself in

13   on his own accord on March 12th; but this does not carry as

14   much weight as it might in some circumstances given, one,

15   that he must have recognized that the evidence being

16   gathered against him was getting stronger and stronger so he

17   made an effort to help himself by turning himself in.  And

18   the fact that law enforcement invited him to turn himself in

19   before they put law enforcement officers in danger by going

20   out to arrest him makes perfect sense.  Giving an

21   opportunity for self-surrender is always a good option if it

22   can be used rather than sending law enforcement out into the

23   community to execute an arrest where there might be other

24   bystanders around.

25         But helping himself to get -- by turning himself

1    in does little to erase the defendant's egregious conduct on

2    January 6th or the dissembling that he engaged in with law

3    enforcement that may have delayed this investigation and,

4    further, the fact that he tried to get rid of incriminating

5    evidence in the case by burying the badge, putting the radio

6    in the dumpster -- these are all factors compounded by his

7    lack of remorse, his continued apparent belief system that

8    animated this awful activity on January 6th that raises

9    concern of risk of continuing dangerousness; this factor

10   also weighs in favor of detention.

11           Now, turning to the nature and seriousness of the

12   danger to any person in the community posed by this

13   defendant's release -- to my mind, this also weighs in favor

14   of detention.  He was part of this violent assault on the

15   Capitol in which people did lose their lives; disrupted

16   Congress's constitutional task of counting Electoral College

17   votes, obstructed it for hours; terrorized people within the

18   Capitol; but, most significantly, this defendant was not

19   just somebody trying to push his way into the Capitol.  He

20   wasn't just somebody screaming and yelling out on the

21   Capitol grounds.  He appears to have joined in a terrible

22   assault on a police officer who was dragged down into the

23   mob and then stole his property.

24           Even though there is no evidence at this time that

25   he specifically beat the officer or tasered the officer --

1    other people in the mob were probably responsible for that;

2    what this defendant did was -- he didn't help the officer.

3    He stole his badge, he stole his radio which was his

4    lifeline to call for help.  His conduct on January 6th was,

5    to put it bluntly, lawless.  His conduct shows a clear

6    disregard for the safety of others and, most especially, the

7    MPD officer who was assaulted.

8         This enthusiastic participation in the Capitol

9    riot, the assault and theft from an officer who was being

10   beaten by the mob in itself suggests that this defendant

11   poses a threat to others and to the community while on

12   release.  This is not just a suggestion; it is clear and

13   convincing evidence that the government has established

14   here.  And given all of the obstructionist conduct and

15   dissembling that this defendant engaged in with law

16   enforcement over a series of discussions, the Court finds

17   that there is no condition or combination of conditions that

18   will assure his appearance as required and compliance with

19   release conditions given these consistent

20   misrepresentations, lies, and obstructive conduct.

21        The defense counsel suggests that defendant's lies

22   to law enforcement reflect a scared man engaging in poorly

23   thought-out efforts to hide his conduct rather than what the

24   government suggests, is that it shows he would go to lengths

25   to participate in further acts of violence.  I don't buy the

1    excuse as the lies to law enforcement were simply poorly

2    thought-out efforts to hide conduct; I don't buy that excuse

3    at all.

4            This defendant, even the day after what he had

5    seen on January 6th, remains convinced of the rightness of

6    his actions on that day, and that those -- those -- that

7    attitude which animated his conduct on January 6th remains

8    and continues to pose a danger.  It's true he didn't try to

9    evade arrest; but these factors are outweighed by his

10   consistent obfuscation and demonstrates he can't be trusted

11   to abide by conditions of release that the Court might

12   impose.

13           The defendant's lack of criminal conduct in the

14   two months since the Capitol riot doesn't assuage the

15   concern that he would if the opportunity presented itself

16   again.  If there was another call to arms by a political

17   figure he likes, that he might not again participate in

18   political violence.

19           The defendant's argument that the government's

20   delay in arresting him is probative of his lack of

21   dangerousness is not compelling in this case for the reasons

22   that I have discussed:  Given the complexity of the

23   investigation concerning law enforcement with voluminous

24   video, tips, other leads to pursue to identify persons in

25   the mob who engaged in activity warranting criminal charges.

1    Delay in making an arrest maybe, in this case, is very well

2    due to the government's need to investigate and build its

3    case rather than any evaluation of dangerousness; so this

4    factor, too, weighs in favor of detention.

5            So upon consideration of the proffered evidence

6    presented, the factors set forth in 18 U.S.C. Section

7    3142(g), the Court finds that all four statutory factors

8    weigh heavily in favor of pretrial detention here; and the

9    government has met its burden of establishing that no

10   condition or combination of conditions will reasonably

11   assure the safety of any other person in the community.

12           The magistrate judge's pretrial detention --

13   pretrial release order is, therefore, reversed.

14           The government's motion for review and for

15   pretrial detention is granted.

16           The defendant will be held without bond pending

17   trial.

18           I will order -- enter an order to transport the

19   defendant to the District of Columbia to be detained pending

20   trial; and I will issue the arrest warrant if the government

21   sends that to me so that arrangements can be made for

22   Mr. Sibick to turn himself in and for the arrest warrant to

23   be executed, and for him to be transported to Washington,

24   D.C.

25           Is there anything further today from the defense?

1          MR. ANZALONE:  No, Your Honor.  Thank you.

2          THE COURT:  Anything further from the government?

3          MS. GARDNER:  No, Your Honor.  Thank you.

4          THE COURT:  All right.  You are all excused.

5          (Whereupon, the proceeding concludes, 2:19 p.m.)

6                          * * * * *

7                         **CERTIFICATE**

8          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
certify that the foregoing constitutes a true and accurate
9     transcript of my stenographic notes, and is a full, true,
and complete transcript of the proceedings to the best of my
10    ability.

11         PLEASE NOTE:  This hearing was held via
videoconference and telephonically in compliance with the
12    COVID-19 pandemic stay-safer-at-home orders and is therefore
subject to the limitations associated with the use of
13    technology, including but not limited to telephone signal
interference, static, signal interruptions, and other
14    restrictions and limitations associated with remote court
reporting via telephone, speakerphone, and/or
15    videoconferencing capabilities.

16         This certificate shall be considered null and void
if the transcript is disassembled in any manner by any party
17    without authorization of the signatory below.

18

19    Dated this 19th day of March, 2021.

20

21    /s/ Elizabeth Saint-Loth, RPR, FCRR
      Official Court Reporter

22

23

24

25