**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES                                    :

     v.                                          : Crim. No. 21-CR-291-1 (ABJ)

THOMAS F. SIBICK                                 :

**<u>DEFENDANT THOMAS SIBICK'S MOTION TO REOPEN DETENTION HEARING</u>**

     Defendant Thomas F. Sibick, through undersigned counsel, pursuant to 18 U.S.C. §

3142(f), hereby moves to reopen the detention hearing previously held in this case in light of

"information … [that] was not known to the movant at the time of the hearing and that has a

material bearing" on the propriety of pretrial detention.[1]  Specifically, a video recording that the

defense recently received in discovery, and that has never been shown to any court, seriously

undercuts the government's central argument in this case – that the defendant intentionally

assaulted and robbed MPD police officer Michael Fanone (hereinafter "Officer Fanone" or "the

officer") of his police badge and radio.  The recording, from a different angle than has been seen

before, shows the defendant before and briefly after his interaction with the officer.  What it

demonstrates is that the contact between Mr. Sibick and the officer was very brief, and that

because of the press of bodies and the movement of the officer's body, it would have taken an

extraordinary feat of athleticism, for lack of a better word, for Mr. Sibick to have been able to

see the police badge and radio on the officer's vest, and then to reach in and grab them

intentionally.  The movement of the mass of people and the short duration of the event were such

that it strains credulity to conclude that Mr. Sibick was able to do what he did intentionally,

rather than accidentally.  The recording makes it appear more likely than not that the radio and

---

[1] *Id.*  See also *United States v Lee,* 451 F. Supp. 3d 1 (D.D.C. 2020).

the badge – as Mr. Sibick has claimed throughout – came off in his hand as he was reaching toward the officer to pull him to safety.

Because the assault and robbery charges have been the principal reason the defendant has been ordered detained pending trial[2] – and the validity of those charges is strongly undermined by this newly-received evidence, the defendant submits that this Court should reopen the detention hearing, review the recording, and release the defendant under conditions to be determined at the hearing.  In support of this motion, Mr. Sibick states as follows:

Defendant, Thomas F. Sibick, is before this Court having been indicted in connection with events that occurred at the United States Capitol on January 6, 2021.  The indictment handed down on or about April 9, 2021 includes charges against two other individuals – Albuquerque Cosper Head and Kyle J. Young.  Not only had Mr. Sibick never met or spoken with either of his co-defendants before that day, he never interacted with them on that day.  It appears that the government has lumped the three men together in the same indictment because they all interacted with Officer Fanone on the same date and time and place.

### The Indictment

Mr. Sibick is charged in the indictment as follows:

**Count One**:  Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2);

**Count Three:**  Civil Disorder, in violation of 18 U.S.C. § 231(a)(3);

---

[2] In its appeal of the magistrate-judge's March 12, 2021 order releasing Mr. Sibick, the government pointed out that, pursuant to 18 U.S.C. § 3142(f)(1)(A), the defendant was subject to pretrial detention because the defendant is charged with a crime of violence – robbery.  *Gov. App*. at 17.  The robbery charge is found in Count Six of the indictment.  Evidence (such as the newly-received videotape of the interaction between the defendant and Officer Fanone) that casts doubt on this charge is highly relevant, therefore, to the question whether to hold Mr. Sibick without bond.

**Count Four:**  Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1);

**Count Six:**  Robbery, in violation of 18 U.S.C. § 2111;

**Count Eight:**  Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1);

**Count Nine:**  Disorderly and Disruptive Conduct in Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2);

**Count Ten:**  Impeding Ingress and Egress in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(3);

**Count Eleven:**  Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4);

**Count Twelve:**  Impeding Passage Through the Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(E); and

**Count Thirteen:**  Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

Counts Three, Four, Six, Eleven and Thirteen appear to relate to the allegations that Mr. Sibick forcibly and violently pulled Officer Fanone's badge and radio from his vest on the afternoon of January 6, 2021 – the alleged act that is the principal reason he has been detained without bond these past six months.

### *Sibick's Interviews with Agents*

Following the events of January 6, 2021, the government developed information that led them to identify Mr. Sibick as one of the persons who interacted with Officer Fanone on that day.

Mr. Sibick then voluntarily participated in several interviews with a number of agents in Buffalo, New York, where he lived and worked (as a nursing home administrator).

During his first interview on January 27, 2021, Mr. Sibick informed the agents who were interviewing him that he saw what was happening to Officer Fanone outside the Capitol, and reached his arm out to try to pull the officer to safety.

While in that interview Mr. Sibick did not mention his possession of the badge and radio, he stated in a later interview (on February 23, 2021) that as he reached in towards the officer's body to try to pull him to safety, those objects came off in his hands. He said that he had then dropped the badge and radio on the ground at the Capitol because he feared he would be arrested if he tried to turn them in to an officer on the scene that day. He explained that because of the violence he had witnessed, he just wanted to leave the premises and go back home.

Agents asked him if he saw anyone pick up the badge and radio, and Mr. Sibick voluntarily corrected his earlier statement and said that he had in fact taken the radio and badge with him when he left the scene and dropped them in a trash can on Constitution Avenue. Mr. Sibick then voluntarily corrected that statement, and said that he had actually brought the items back to his hotel room and then to his home in Buffalo, where he was planning to turn them in to the FBI. He still feared being arrested, however, so – he claimed - he threw the items in a dumpster on North Street, in Buffalo.

The FBI sent Mr. Sibick an email on February 25, 2021 indicating that they were going to check the security cameras where he said he had dumped the items, and the next day, Mr. Sibick called the agents and said that he was "distraught" and "wanted to do the right thing." He told the agents that he had, in fact, thrown away the radio, but he stated that he had hidden the badge in his back yard by burying it, which was true.

He then purchased a metal detector, located the badge, and returned it to the agents.  The presence of dirt on the badge corroborated Mr. Sibick's statement that he had, indeed, hidden the badge in his back yard.

### The Two Bail Hearings

Following these interviews, the government filed a sealed complaint against Mr. Sibick on March 10, 2021 – about a month and a half after agents first spoke with him - and authorities instructed him to turn himself in on March 12, 2021.  He did so, as ordered, and a hearing was held on that same day before a magistrate-judge in Buffalo, New York.  At the hearing, the government asked the magistrate-judge to detain Mr. Sibick, arguing that his release would pose such a danger to the community that no conditions of release could possibly be fashioned that would reasonably assure the safety of the community.  It did not argue that Mr. Sibick was a flight risk.

Despite the government's request, and its detailed submission showing still images from camera footage from Officer Fanone's body-worn camera, the magistrate-judge in Buffalo released Mr. Sibick to "home incarceration" at his parents' house.[3]

The government then asked the magistrate-judge to stay his ruling pending the government's appeal, but the magistrate-judge declined to do so.

Thus, Mr. Sibick was released from custody on March 12, 2021, and went to live at his parents' home, where he began a four-day period of home incarceration.  The period was so brief because, following the government's appeal of Mr. Sibick's release, Chief Judge Howell, of this Court, scheduled a hearing on Mr. Sibick's conditions of release for Tuesday, March 16, 2021.

---

[3] Mr. Sibick's father is a 32-year veteran of the United States Navy, and a dentist.

That hearing was held remotely.  Following the hearing, Chief Judge Howell reversed the magistrate-judge's order releasing Mr. Sibick, and ordered him detained without bond pending trial.

On the afternoon of March 16, 2021, therefore, Mr. Sibick turned himself in for the second time in four days. He has remained in jail since that time.

### The March 16, 2021 Hearing

The alleged violence by Mr. Sibick towards Officer Fanone was the central theme of the March 16, 2021 hearing before Chief Judge Howell.  A careful and exhaustive review of the 52-page transcript of that hearing demonstrates how frequently Chief Judge Howell referenced Mr. Sibick's alleged assault on the officer, ultimately concluding that the defendant should be held without bond because his release would pose too great a danger to the public.

The transcript is replete with references to the alleged robbery/assault, and its significance, as is seen in the following passages, cannot be overstated.  Defendant submits that had Chief Judge Howell seen the video recording that the defendant recently received in discovery, and that is the subject of this motion, she would not have been so confident in her belief that Mr. Sibick engaged in violence towards the officer, or her decision to hold the defendant without bond pending trial.[4]

Mr. Sibick presents below an exhaustive list of examples of the Chief Judge's reference to Mr. Sibick's alleged assault and robbery in order to emphasize how differently the Chief Judge may have viewed the evidence had this new video recording been available to her at the time of the hearing on March 16, 2021.

---

[4] The following passages are listed sequentially, as reflected in the transcript of the hearing, but not all of the discussion between the Court and the parties is presented fully, given its 52-page length.  Furthermore, some statements by the Court or the parties are omitted when not deemed relevant to the particular issue discussed herein, i.e., the alleged robbery and assault of Officer Fanone by Mr. Sibick.

The Chief Judge's references to the alleged assault and robbery are as follows:

The Court [referencing the charge of Assaulting, Resisting, or Impeding Officers, in violation of 18 U.S.C. § 111(a)(1)]:

"…but that charge can be both a misdemeanor and a felony …"

AUSA:  "…the government is charging it as a felony."

The Court:  "As a felony.  And for a felony it has to involve – the acts have to involve physical contact with the victim of the assault or intent to commit another felony [here, the government alleges that the other felony was Robbery]…"[5]

The Court:  "So then the defendant is charged [not only with ] the Section 111(a)(1) but also Section 231(a)(3), obstructing, impeding, or interfering with a law enforcement officer engaged in performance of his official duties; and 18 U.S.C. Section 2111, taking by force and violence or by intimidation anything of value from the person…."

AUSA:  "Yes, Your Honor."

The Court:  "…the government isn't arguing that the defendant is a flight risk, right?"

AUSA:  "That's correct."

The Court:  "So the only basis for pretrial detention being urged by the government here is under 3142(f)(1)(A) because he is charged with a crime of violence?"

AUSA:  "Yes, Your Honor."[6]

The Court:  "He [Sibick] also buried evidence … and got rid of other evidence… So is there any reason the government is not seeking detention also under 3142(f)(2)(B) for imposing a serious risk of obstruction of justice?"

---

[5] Transcript of March 16, 2021 hearing, at 5 (hereinafter referred to as "Tr. [page number(s)]."
[6] Tr. 6.

AUSA:  "Your Honor, the government determined that its strongest argument was under dangerousness, and that's why we moved the way we did."

The Court:  "So you are not urging obstruction?"

AUSA:  "That's correct."

The Court:[7]  "…could you just summarize what the evidence is that either supports that argument [that the defendant was trying to help the officer who was being beaten and tasered] or doesn't support that argument?"

AUSA:  "…the evidence that supports that he was not trying to help that officer is not only the fact that he forcibly ripped off those items – there was a hole in the officer's tactical vest where he forcibly ripped off the badge …[but] there is [also] the fact of his greater conduct that day [where the defendant stated in an Instagram video that he had just been tear gassed but "we're going, baby, were going!  We're pushing forward now!"].  There is the fact that he tried to forcibly enter the Capitol by going into that tunnel on the lower West terrace….  And then it was minutes later – eight minutes later that he participated in the attack on the officer by robbing him."[8]

In response to a question from the Court, the government added that although Mr. Sibick stated that he pushed the radio's emergency button to try to summon assistance, information obtained by the government indicated that the emergency button was not pushed until 16 minutes after the officer was pulled to safety.[9]  Tr. 10.

---

[7] Again, for the sake of clarity, the defendant notes that the discussion between the government and the parties that is quoted herein does not contain all of the discussions that occurred, only the ones relating to the alleged violence (though some other discussions are included for context).  The passages that follow this footnote do not immediately follow the prior passages that are quoted above, though they are sequential.

[8] Tr. 8-9.

[9] This issue is still being investigated by the defense, and the defense disagrees with this particular claim.

The court then asked whether it was not in fact true that "the police officer was actually quite hurt…"  The government replied that this was true.  It explained that when the officer was pulled back to the police line, he collapsed into unconsciousness, and was "subsequently hospitalized for these injuries."  Tr. 11.

In a detention memorandum submitted the day before the hearing (ECF Doc. 8), the government described Mr. Sibick's alleged assault of Officer Fanone, and his alleged robbery of the officer's badge and radio.  The memorandum includes photos of still shots from the officer's body worn camera that show Mr. Sibick's face and his right hand reaching in toward Officer Fanone's body.  The hand appears to end up in the area on the officer's body where the officer's badge and police radio were located, and the two objects apparently became detached from the officer's vest.

Based on these images, the government argued that Mr. Sibick intentionally robbed the officer of his "lifeline," (the police radio) and presented a grave danger to the community.

When discussing these events, Chief Judge Howell stated as follows:

The Court:  "Okay, so, you know, the government's memo emphasizes and, sort of, lays out in detail the defendant's steps to, you know, captured in images of grabbing the badge, grabbing the police radio from the officer, at that point who was laying on the ground being beaten by other people…."  *Id*.

When asked by the Court why those actions indicated that Mr. Sibick would present a continuing danger to the community, the government stated that Mr. Sibick's willingness to lie to the FBI, to dispose of evidence, and to hide evidence supported that argument.  The government also claimed that Mr. Sibick – whatever his motivation for his actions of that day – had not "renounced that [violent behavior]…"  Tr. 12.  (While the government maintained that Mr.

Sibick's prior statements about the badge and the radio should be used against him, it was apparently not willing to credit him for his later admissions and corrections of his earlier statements, or his return of the badge.)

Chief Judge Howell then noted that Mr. Sibick's progression of truth in his statements were, according to the defense, "all the marks of a scared person, not a dangerous person."  The Judge then asked the government how his evolving statements would indicate a continuing danger.  The government responded that "the fact that he eventually came clean … doesn't, in any way, mean that he would not engage in some sort of dangerous or assaultive behavior in the future should the opportunity present itself."  Tr. 13.

The government confirmed to the Court its understanding that Mr. Sibick "doesn't appear to be a member of any of those [Proud Boys, Oath Keepers, Three Percenters] gangs…."  Tr.  15.

The Court and the government then discussed Mr. Sibick's prior record, which includes six misdemeanor cases, including possession of cocaine (Mr. Sibick completed drug court), driving while impaired (a fine was paid), disorderly conduct (another fine), possession of marijuana (drug treatment classes and payment of a fine), attempted reckless endangerment (payment of a fine), and failing to stop or respond to a police command (two years' probation that were successfully completed).  The last charge – failing to stop or respond to police command, occurred when Mr. Sibick was riding his motorcycle in the left lane of a multi-lane highway in Utah.  Mr. Sibick has stated that it took him about a half a mile to pull over because when the officer was first behind him, Mr. Sibick was in the far left lane, and could not safely stop at that location.  Thus, he slowly crossed over several lanes of traffic until he arrived at the right-most lane and a highway exit, which was about a half-mile away from where the officer

had first contacted him.  At that point he was able to safely pull over on the right shoulder of the road.

(What neither side mentioned during this discussion of Mr. Sibick's prior record is that he was never accused of having violated probation or disobeyed a court order.  One would think that this would be highly relevant when discussing whether Mr. Sibick would comply with a court order setting conditions of pretrial release.)

The next relevant discussion covered the subject of Mr. Sibick's social media post of January 7, 2021, wherein Mr. Sibick stated that "what happened yesterday was a disgrace," and "the people are mad" and "the people have spoken."

Mr. Sibick's attorney[10] argued that there was no evidence that Mr. Sibick held a "sort of unmitigated, unchangeable vendetta against the government.  That is just simply not there."

The Court replied and said "[w]ell, I mean, I think it's not but, you know, this is one of the difficult thing about these insurrectionist cases…."  Tr. 29.

The Court then added the following:

"But when defendants participate in a mob beating up a police officer, and those political beliefs lead to lawlessness and stealing a police officer's lifeline, his radio when he is down, isn't that, isn't that an indication of, that whatever is animating the conduct, if those beliefs animating that conduct remain and there is no remorse for it, isn't that cause for concern about dangerousness, continuing dangerousness?"

Tr. 30.

Mr. Anzalone responded that Mr. Sibick's Instagram post also included the statement that "it [was] time for this nation to heal."  That type of statement, Mr. Anzalone noted, was not something one heard from other individuals arrested in these January 6 cases.  Id.  He added that,

---

[10] Not undersigned counsel, but one Alexander Anzalone, of the Federal Defender Office in Buffalo, New York.

unlike another defendant named Barnett, Mr. Sibick had not expressed a continuing belief "in the righteousness of the actions he took."  *Id*.

After further argument, Chief Judge Howell made the following statement regarding the two-month delay between the events of January 6, 2021 and the government's request for a warrant for Mr. Sibick's arrest (which, the defendant had argued, indicated that the government was not that concerned about Mr. Sibick's dangerousness):

> "But if the police had not been overwhelmed on January 6th, the people who participated in the assault with tasers and beating on the police officer and, like this defendant, grabbed his radio, grabbed his badge, they would have been arrested promptly …And in circumstances where the charges involve an assault on a police officer, that because a mob engaged in that assault, making it more difficult to identify people who were participating in it and the theft of the badge and the radio, that, again, those people, because of the delay, get pretrial release is, sort of, a – isn't that a bad message to be sending out?  … And that mob attack on the police, stealing their lifeline of their radio to call for safety, is just not acceptable; it's lawless behavior that is just unacceptable and is such a danger then, now, and in the future."

Tr. 34-35.

Still later, the Court added that

> "[h]is conduct is on videotape, the offense conduct is on videotape so you, know, it puts a different shade on how, when you have such egregious conduct and no remorse, and a statement the day after of how what happened at the Capitol was a disgrace, but disgrace from the context of that statement suggesting it was a disgrace because the police tried to stop the mob as opposed to otherwise."

Tr. at 37.

The Court then reviewed the charges Mr. Sibick faced at that time (before the indictment added additional charges), beginning with the charge of forcibly assaulting, resisting, opposing, impeding, or interfering with officers (18 U.S.C. § 111(a)(1),

Chief Judge Howell stated:

"He has been – the defendant, Mr. Sibick, has been charged with three serious

felony offenses, and it does bear reviewing what those charges are. He is
charged first with forcibly – forcibly assaulting, resisting, opposing, impeding,
or interfering with officers – law enforcement officers while engaged in or on
account of the performance of their official duties…by forcibly ripping a police
officer's badge and radio off of his person. This occurred while the defendant
was part of a mob that dragged the officer deep into a crowd where the officer
was beaten, tased, and threatened with death….

He is also charged with taking by force and violence or by intimidation anything
of value from a person…. He is also charged with obstructing, impeding, or
interfering with a law enforcement officer lawfully engaged in the performance
of his official duties incident to the commission of civil disorder … which is also
based on the same conduct that I've just described…."

Tr. 39-40.

The Court added that "… there is photographic evidence – videos and photos – that show
the defendant participating with this mob surrounding an officer, police officer, who had been
dragged down into the crowd, who had fallen on the ground, and it shows the defendant reaching
towards the officer, pulling off his badge and pulling his radio." She continued: "… I am
confident … what is clear is that this defendant participated in this mob. He was not a good
Samaritan. He may have wished he were now … but that doesn't appear to be the case based on
the videos that I have seen." Tr. 41-42.

Mr. Sibick was then said to have lied to law enforcement agents when he denied being
involved in the attack on the officer, although the newly-received videotape shows that he was
very likely telling the truth. Tr. 2.

The Court then added that Mr. Sibick's "misrepresentations" about the badge and the
radio undermine "the argument that the badge and radio were pulled off of this officer
accidentally when the defendant was trying to help him and, instead, strongly support[] the
government's charged that the defendant participated in this mob attack on this officer…." Tr.
45.

Going through the four factors a judge is required to consider when determining pretrial release, the judge, with respect to each factor, kept pointing back to his "joining this mob when they were leaning over and beating this MPD officer and using that opportunity to steal his badge and his radio." Tr. 46.

When discussing "the nature and seriousness of the danger to any person in the community posed by this defendant's release …," the Court said:  "[T]his defendant was not just somebody trying to push his way into the Capitol.  He wasn't just somebody screaming and yelling out on the Capitol grounds.  He appears to have joined in a terrible assault on a police officer who was dragged down into the mob and then stole his property." Tr. 48.

Finally, the Court concluded that Mr. Sibick's "enthusiastic participation in the Capitol riot, the assault and theft from an officer who was being beaten by the mob in itself suggests that this defendant poses a threat to others and to the community while on release." Tr. 49.

As noted at the beginning of this section of the defendant's motion to reopen the detention hearing, the foregoing statements are all found in the 52-page transcript of the appeal hearing before Chief Judge Howell, and all of those statements reflect the judge's belief that there was strong evidence that Mr. Sibick intentionally (and maliciously) assaulted and robbed Officer Fanone of his police badge and radio.

Following the hearing, Chief Judge Howell memorialized her ruling in an eight-page Order of Detention Pending Trial, entered on March 17, 2021.

On page 6 of that Order, when discussing the weight of the evidence against Mr. Sibick, she wrote that "[t]he photos and videos show defendant enthusiastically participating in the riot, posing with a Capitol Police riot shield, joining a mob assaulting an MPD officer, and using the opportunity to rip from the officer his badge and his lifeline to help, his police radio."

When discussing the fourth factor a judge must consider when deciding whether to release a defendant pending trial, the Chief Judge wrote that "…most significantly, defendant appears to have joined in a terrible assault on a police officer, who was dragged into the crowd, beaten and tasered, and has his police property stolen.  Defendant was responsible for stealing the officer's badge and police radio."  Order of Detention Pending Trial, at 8.

### Mr. Sibick's Appeal to the Circuit Court of Appeals

Mr. Sibick took an appeal of the Chief Judge's ruling, and following briefing – but no oral argument – the United States Court of Appeals, in a two-page order, necessarily echoed the findings of "fact" made by the Chief Judge of the District Court ("necessarily" because the appellate court, like Chief Judge Howell, did not have the benefit of viewing this recently-disclosed videotape).  The judges wrote, in part:  "Appellant participated in an ongoing violent assault on a police officer at the Capitol on January 6, 2021, ripping off the officer's radio – his lifeline for help – and his badge."

Quoting its prior decision in *United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021), the appellate court explained that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others had cleared the way."  *Id.* at 1284.

The Judgment of the appellate court again demonstrates how both the Chief Judge and the appellate court – without the benefit of the newly-received video recording – and relying on still shots taken from Officer Fanone's body-worn camera, reached erroneous decisions regarding Mr. Sibick's pretrial detention.

This Court, at a prior status hearing, exhorted the government to turn over any evidence it possessed, or into which it came in possession, as soon as possible. And this Court, presciently, noted that there may be other video recordings from a different angle that would shed more light on the events involving Mr. Sibick on that day. We now have a new recording from a different angle, and the story it tells seriously undermines the narrative the government has been advancing since the beginning of this case.

### *The Newly-Produced Video Recording*

The video recording to which Mr. Sibick has been referring was apparently uploaded to the USAfx portal on August 12, 2021. Undersigned counsel reviewed the video on his own, but did not realize its significance until he reviewed it with Mr. Sibick sometime later because counsel did not recognize Mr. Sibick in the crowd of people.

When counsel showed it to Mr. Sibick, however, he immediately recognized his clothing in the video. He choked up when he grasped its significance to his case, exclaiming that "I've been detained all this time because no one ever saw this?"

The relevant video is one minute long, though the portion that shows this incident lasts a few seconds. Mr. Sibick can first be seen at second 41. He has on a black knit ski hat with gray trim. At that point in the video, Officer Fanone had been pulled down into the crowd, and a number of people were hitting or attempting to hit the officer. Mr. Sibick was more than 10 feet from the officer, and as the crowd and the officer moved in one direction (away from the tunnel on the West side of the Capitol), Mr. Sibick moved toward the Northwest side of the crowd (this description will be understandable upon a viewing of the video).

The crowd, including the officer, was moving from ***top to bottom*** on the screen, and the scene can only be described as chaotic and the crowd as "packed like sardines." Mr. Sibick, on

the other hand, came from out of the picture *at the bottom* of the screen, i.e., he was nowhere

near the officer while that officer was being dragged away from the tunnel where the officer had

first been pulled into the crowd.

At second 44 of 60, as several men were trying to hit the officer, or were actually hitting

the officer, Mr. Sibick pushes through the crowd, which was going in the opposite direction, and

reaches toward the officer, who was still out of Mr. Sibick's reach.

At second 46, Mr. Sibick appears to be close enough to the officer to perhaps reach him

with an extended arm.  The officer's face is hidden by a "support the Blue" flag.

To show how quickly this incident happened, at the beginning of second 47, Mr. Sibick

and a number of people in the crowd are pushed several feet to the left of the screen.  Within

moments, still on second 47 on the video recording, Mr. Sibick has been pushed or pulled by the

movement of the crowd out of reach of the officer.

At second 50, Mr. Sibick appears to have ended up on the ground, as he can be seen

disappearing below the bodies of the rest of the crowd in his immediate area.

The video can be parsed into shorter time frames (tenths of a second, for instance), as

counsel has done, but the most striking aspect of the video is how rapidly the events unfolded in

real time, and how briefly they lasted.

As noted earlier in this memo, this "rapidity and brevity" demonstrate that it defies

physics, as well as Mr. Sibick's human abilities, to believe that, coming from the angle from

which he initially came - toward the group of people the officer was surrounded by - he could

have, in the space of a couple of seconds:  a) seen, over bodies and in the moving mass, the

officer's badge and radio and then b) experienced the desire, and then c) instantly formed the

intent, and then d) instantly have been able, physically surrounded by so many people pressed up against each other, to actually reach in and pull the radio and badge off of Officer Fanone's vest.

The recording shows that Mr. Sibick was within reach of the officer beginning at second 45, and by second 47, he was pushed away – just from the sheer movement of the crowd - from the area where the officer and those surrounding him were located.  And this two-second period was not a calm two-second period where Mr. Sibick could slowly and deliberately look at the officer's body and reach in to grab something in particular.

It was a two-second period where people were massed back to front and side to side, the crowd moving back and forth in such a way that even a person with incredible dexterity could not have seen a police badge and radio, reacted instantly to that vision, reached in, and intentionally grasped the badge and radio from the officer's vest before they were pushed away by the movement of the crowd.

It appears, rather, that as Mr. Sibick reached in toward the officer, the badge and radio were in a place where his hand happened to be, and as he tried to grab the officer's vest (to pull him to safety, as he has claimed, or for some other unknown reason), the mass of people caused Mr. Sibick's body to begin to fall backward, such that Mr. Sibick closed his hand to grasp onto something as he fell.  As he closed his hand, it closed on the badge and radio, which had to be pressed against each other in order for both objects to end up in Mr. Sibick hand in that split second.  That backward falling force would explain how the badge and radio became ripped from the officer's vest.  Incidentally, Mr. Sibick was not wearing gloves, so it would have been difficult for him, without the "benefit" of gravity, to pull the badge and radio from their original location.

In summary, the video strongly undermines the narrative advanced by the government, and accepted by the Chief Judge and the Court of Appeals, that Mr. Sibick intentionally, by force and violence, took Officer Fanone's badge and radio from him.  Again, such a feat would defy even the best athlete or magician as the moment passed too quickly for Mr. Sibick to have been able to see, react, and intentionally reach in and grasp those specific two objects.

The Court will see the video for itself,[11] and defendant trusts that multiple reviews of the tape, stopped every so often in order to allow for a better viewing and analysis, will show that the claim that Mr. Sibick intentionally assaulted and/or robbed Officer Fanone of his badge and his radio (his "lifeline," as the government first described it in its detention memorandum, and as Chief Judge Howell continually repeated during the March 16, 2021 review of the magistrate-judge's order of release) is not supported by the evidence.

### Other Considerations

Aside from Mr. Sibick's alleged violence towards Officer Fanone, a significant consideration for Chief Judge Howell was whether the defendant essentially possessed the type of character that would engender confidence in his ability to abide by conditions of release pending trial.

The Chief Judge concluded that because of his evolving statements regarding the whereabouts of Officer Fanone's radio and badge, he could not be trusted to follow any pretrial court order.  This despite the fact that Mr. Sibick remained arrest free between January 6, 2021 and March 12, 2021, when he was first ordered to turn himself in before the initial hearing in Buffalo, New York, and then turned himself in **twice** at the direction of authorities, first on

---

[11] The file containing the recording is too large to send by email, and undersigned counsel will need to determine how to share it with the Court.  Furthermore, counsel is not certain that the video would be subject to the protective order, such that it should be filed, at least initially, under seal.  Before doing anything, counsel will await instructions from the Court on how he should provide the recording to the Court.

March 12, 2021 and then again on March 16, 2021, when he knew a judge had just ordered that he be detained pending trial.

A new factor that may or may not hold "legal" significance, but that defendant wishes to bring to this Court's attention, is Mr. Sibick's behavior during his incarceration these past six months.  While a number of his "unit mates" have been locked down or "sent to the hole" because of defiant or disruptive behavior on the unit, Mr. Sibick has been a model prisoner – so much so that some of his fellow inmates have accused him of trying to "cozy up" to the officers/guards.

He is one of five inmates on his unit who have been given a detail, which means that he is allowed to leave his cell to help clean the unit, bring food to the other detainees, and perform other tasks entrusted to those prisoners considered to be reliable and trustworthy.

His behavior on the unit has been so exemplary that a number of officers completed forms attesting to his professionalism and good conduct.[12]  And while officers are not ethically permitted to write letters on behalf of an inmate, defendant is attaching hereto forms completed by eight officers who have spent time around Mr. Sibick on his unit.  Several of the officers actually wrote, by hand, specific comments about Mr. Sibick.  And some of these officers have indicated to counsel, when counsel visited Mr. Sibick in person, that Mr. Sibick's behavior on the unit has been a great example to other inmates who may not be inclined to comply with directives (such as when inmates are told that it's time to go in their cells, or perform other tasks they may not want to perform).

This is exactly the type of conduct one could expect Mr. Sibick to display were he released by this Court pending trial.  Despite the way he has been portrayed and evaluated, he is

---

[12] Those forms are attached hereto as an exhibit.

a person who, despite some failings and mistakes in the past, would obey this Court's directives regarding any conditions of release.

### *Conclusion*

Defendant, in closing, asks this Court to review the videotape very carefully, and then schedule an in-person hearing on this motion.

Respectfully submitted,

/s/

Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626(facsimile)
E-mail:  sfbrennwald@cs.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by ECF, this 10th day of September, 2021 to the U.S. Attorney's Office, 555 4th Street, N.W., Washington, D.C.  20530, and to all counsel of record.

/s/

Stephen F. Brennwald