UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES | : |
| v. | : Crim. No. 21-CR-291-1 (ABJ) |
| THOMAS F. SIBICK | : |

**DEFENDANT THOMAS SIBICK'S MOTION TO MODIFY BOND**

Defendant Thomas F. Sibick, through undersigned counsel, Stephen F. Brennwald, pursuant to 18 U.S.C. § 3142, hereby moves this Court to reconsider his bond in light of the materials presented with this motion, and to find that there are conditions or combinations of conditions that will "reasonably assure … the safety of any other person and the community."[1]

Defendant submits that in light of the additional, new, information presented in the attached documents - information that was not available to the judge who ordered that Mr. Sibick be held without bond until trial, or to the appellate court that upheld that decision - there is no longer "clear and convincing evidence" that Mr. Sibick's pretrial detention is the only way to reasonably assure the safety of any other person and the community.

Specifically, this new information severely undercuts the strength of two of the four factors this Court must consider when deciding whether to release a defendant pending trial. These two factors are the history and characteristics of the person, and the nature and seriousness of the danger that would be posed by the person's release.[2]

In light of that new information, defendant submits that release on home incarceration to his parents' home, with constant GPS monitoring, will reasonably assure the safety of the

---

[1] 18 U.S.C. § 3142(f).
[2] This Court is extremely familiar with the four factors enumerated in 18 U.S.C. § 3142(g)(1)-(4), and the defendant will only describe them further to the extent necessary to elucidate his arguments. Moreover, Mr. Sibick will not address the other two factors – the nature and circumstances of the offense charged, and the weight of the evidence against the person – as the Court, at the last court hearing, made its view of the evidence abundantly clear.

1

community, especially where, as here, defendant's parents and others have agreed that there will always be another person at the home with Mr. Sibick, day and night.

All of these people have further agreed, in writing, that should Mr. Sibick ever attempt to leave his parents' home – admittedly a ludicrous idea - they will immediately call the police so that he can be picked up and returned to prison.

If, for some reason, that condition of release is still not enough to reasonably ensure the safety of the community, the Sibick family has agreed to pay an independent guard to literally guard the house twenty-four hours a day.[3]

Of course, no one who truly knows Mr. Sibick has any doubt whatsoever that he would abide by this Court's pretrial order, but in order to eliminate any possible concern that he may leave his parents' home or otherwise violate his conditions of release, the family will do whatever it takes to reassure everyone that his release on home incarceration will not pose any threat to anyone.

 In support of his motion, Mr. Sibick states as follows:

*Background*

Defendant is before this Court having been indicted in connection with events that occurred at the United States Capitol on January 6, 2021.

Mr. Sibick is charged in the indictment as follows:

**Count One**:  Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2);

**Count Three:**  Civil Disorder, in violation of 18 U.S.C. § 231(a)(3);

---

[3] This case presents an interesting situation where although there is not a risk of flight, ensuring that Mr. Sibick does not leave his parents' home will have the parallel effect of ensuring the safety of the community.

**Count Four:**  Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1);

**Count Six:**  Robbery, in violation of 18 U.S.C. § 2111;

**Count Eight:**  Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1);

**Count Nine:**  Disorderly and Disruptive Conduct in Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2);

**Count Ten:**  Impeding Ingress and Egress in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(3);

**Count Eleven:**  Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4);

**Count Twelve:**  Impeding Passage Through the Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(E); and

**Count Thirteen:**  Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

Counts Three, Four, Six, Eleven and Thirteen appear to relate to allegations that Mr. Sibick pulled a badge and radio from the vest of Officer Michael Fanone on the afternoon of January 6, 2021 – the alleged act that is the principal reason he has been detained without bond these past seven months.  (As was seen in the one-minute video recording played in court recently, that act – whatever characterization one gives it - took place over the course of a few seconds, and Mr. Sibick eventually fell backwards, disappearing from sight below the crowd, not to be seen again.)

Following the events at the Capitol, FBI agents and others reviewed footage from various sources, and they eventually determined that Mr. Sibick was one of the people who was outside the Capitol on the afternoon of January 6, 2021.[4]  Mr. Sibick's face could also be seen on a still shot taken from Officer Fanone's body-worn camera, and it showed him reaching in toward the officer.  That photo apparently led to his identification.

Following authorities' identification of Mr. Sibick, the FBI contacted him and asked him if he would agree to meet with them to discuss the events of that day.  He voluntarily agreed to do so, and over the course of time, beginning on January 27, 2021, Mr. Sibick spoke with the FBI four times, each time revealing more information, and sometimes modifying a prior statement, whether to add more information or to correct an earlier statement he had made.

He ultimately admitted that he came to be in possession of Officer Fanone's badge and radio, though he claimed that his possession of those items was the product of his having reached in to grab the officer's vest and pull him to safety.  (This Court has already made it crystal clear that it does not believe this statement, so the defendant will not pursue that claim, focusing, instead, on his history and characteristics, as well as on the nature and seriousness of any danger his release may present to the community.)

After the government decided that Mr. Sibick had engaged in criminal activity on January 6, 2021, it filed a sealed complaint against him on March 10, 2021.  An agent then instructed Mr. Sibick to turn himself in on March 12, 2021.  He promptly complied with that order.

---

[4] It is quite noteworthy that despite his initial presence in the tunnel on the West side of the Capitol, Mr. Sibick never returned to that tunnel after he was pepper-sprayed (by the police or by someone else in the crowd).  This is true despite his statement, posted on Instagram after he was sprayed, that he was going to get refreshed and "we're going, baby, we're going.  We're pushing forward now."  In fact, the only "going" or "pushing" Mr. Sibick did after posting that short video was to push his way out of the crowd, and to go back to his hotel room following his very brief interaction with Officer Fanone.  He then left his hotel room and flew home to Buffalo, New York.  He never went toward that tunnel again.

An initial hearing was held on that same day before a magistrate-judge in Buffalo, New York. At that hearing, the government asked the magistrate-judge to detain Mr. Sibick, arguing that his release would pose such a danger to the community that no conditions or combination of conditions could possibly be fashioned that would reasonably assure the safety of the community. It did not argue that Mr. Sibick was a flight risk.

Despite the government's request, and its detailed submission showing still images from Officer Fanone's body-worn camera, the magistrate-judge in Buffalo determined that there were conditions of release that would reasonably assure the safety of the community, namely, release to the home of Mr. Sibick's parents.[5]

(The magistrate-judge, apparently demonstrating his confidence in his bond decision, went so far as to refuse the government's request to stay his ruling pending the government's appeal. And, to his credit, Mr. Sibick did not violate the judge's order to stay at his parents' home.)

Following the government's filing of its appeal of Mr. Sibick's release, Chief Judge Howell (hereinafter "the reviewing court") scheduled a hearing for Tuesday, March 16, 2021.

Mr. Sibick, as well as his lawyer at the time, appeared at that hearing remotely. Following extensive argument, Chief Judge Howell reversed the magistrate-judge's decision to release Mr. Sibick, and ordered him held without bond pending trial. Likely because of the short turnaround time (four days) between the initial hearing and the hearing on appeal, the defense was not in possession of, and therefore could not present to the court, the letters that are attached to this motion from a host of individuals who have known Mr. Sibick for many years. Nor, obviously, could they have possessed the reports and information provided by officers and a case

---

[5] Mr. Sibick's father is a 32-year veteran of the United States Navy, and a dentist.

manager who have spent countless hours with Mr. Sibick while he has been imprisoned at CTF these past seven months. All of that information, therefore, is new, and/or was not available to be presented to the reviewing court on March 16, 2021.[6]

In any event, on the afternoon of March 16, 2021, following his detention hearing, Mr. Sibick once again obeyed an official order, this time not from the FBI but from a court, to turn himself in to authorities for the second time in four days. He followed this order[7] although he knew that he had just been ordered to remain in jail pending trial.[8] He has remained in jail since that time, a period of 7 months.

Mr. Sibick will not repeat herein all of the statements made by the reviewing court at the March 16, 2021, bond appeal hearing, or the arguments presented by counsel.

But it is important to note that at that hearing, the reviewing court asked the government whether it was arguing that Mr. Sibick was a flight risk. The government replied that it was not seeking detention on that basis.

The Court then asked: "So the only basis for pretrial detention being urged by the government here is under 3142(f)(1)(A)[9] **because he is charged with a crime of violence**?" (Emphasis added.)

---

[6] Many of these letters and documents were filed as an attachment to Mr. Sibick's motion to reopen his detention hearing, but defendant did not focus his argument in that motion on the content of the letters, but rather on his argument regarding the events depicted in a short video recording of the incident involving Officer Fanone.

[7] It is hard to fathom that someone – in this case Thomas Sibick – would disobey a court order to stay in his parents' house *after* he was released from a long period of pretrial custody (were this Court to release him) when he obeyed a court order to turn himself in *before* he was ever in custody in the first place. The decision to obey the reviewing court's order landed him in jail for months, yet he followed that court's order. The other decision, to stay in his parents' home were he to be released to home incarceration, would hardly be a difficult one to make, or to abide by.

[8] This second surrender by Mr. Sibick is much more significant, bail-wise, than his first, as he knew when he turned himself in on March 16, 2021, that he had been ordered to be held without bond until trial, not simply until a further court hearing.

[9] The bail statute allows the government to seek to hold a defendant without bond pending trial "in a case that involves … a crime of violence …." 18 U.S.C. § 3142(f)(1)(A). Of course, in order for the government to secure the detention of a person pending trial where that person is charged with a crime of violence, it must convince a court that there are no conditions or combinations of conditions that will "reasonably assure" (not "guarantee") the presence of the defendant in court and the safety of another person or the community. *Id.* The standard of proof

6

AUSA: "Yes, Your Honor."[10]

Following up, the Court inquired: "He [Sibick] also buried evidence … and got rid of other evidence… So is there any reason the government is not seeking detention also under 3142(f)(2)(B) for imposing a serious risk of **obstruction of justice**?"  (Emphasis added.)

AUSA: "Your Honor, the government determined that its strongest argument was under dangerousness, and that's why we moved the way we did."

The Court: "So you are not urging obstruction?"

AUSA: "That's correct."[11]

**The "if, may" Basis for Holding Mr. Sibick**

At the March 16, 2021, hearing, the government advanced a number of arguments in favor of Mr. Sibick's detention, as has already been thoroughly discussed in previous filings.

It also claimed that Mr. Sibick – whatever his motivation for his actions that day – had not "renounced that [violent behavior] …" Tr. 12.  (This is not true, as will be discussed below, and as is shown in a letter from the defendant that counsel will submit in the near future.)

Chief Judge Howell then volunteered to government counsel that Mr. Sibick's progression of truth in his statements were, according to the defense, "all the marks of a scared person, not a dangerous person."  The Judge then asked the government how his evolving statements would indicate a continuing danger.  The government responded that "the fact that he eventually came clean … doesn't, in any way, mean that he would not engage in some sort of dangerous or assaultive behavior in the future should the opportunity present itself." Tr. 13.

---

with respect to the "safety of the community" factor is the "clear and convincing evidence" standard.  18 U.S.C. § 3142(f)(2).

[10] Transcript of March 16, 2021, hearing (hereinafter "Tr.   ").

[11] 18 U.S.C. § 3142(f)(2)(B) allows a court to hold a defendant without bond upon motion of the government "or upon the judicial officer's own motion in a case that involves … a serious risk that such person will obstruct or attempt to obstruct justice …"  The government chose not to seek detention on that basis, and, interestingly, the reviewing court did not choose to invoke its own right to do so either.

In her written ruling denying Mr. Sibick's release, the reviewing court apparently seized on this thought, as she wrote, in summing up the bases for her order of detention: "The particular offense conduct at issue here, compounded by defendant's obstructive conduct and statements post-January 6, 2021, provide clear and convincing evidence that defendant ***may, if*** the opportunity presented itself, participate in further acts of politically motivated (sic) violence." Attachment to Order of Detention Pending Trial, at 3-4 (emphasis added).

This sentence, especially the "may, if" double-hypothetical language concerning a politically-motivated opportunity for violence at some future unnamed event, is at the heart of the reviewing court's decision to hold Mr. Sibick without bond.[12]

***"If"***

For the rationale of the reviewing court to play out (where Mr. Sibick would presumably present a danger to the community), some type of event similar to the one on January 6, 2021, would have to take place at some point in the future (and while Mr. Sibick is on release pending trial). That, as has been proven over the past several months, is unlikely to occur.

First, there have been a number of Trump rallies over the past several months, and the former president has continued to advance his conspiracy theories and factually-unproven (and in fact repeatedly contradicted, almost entirely by Republican voting officials) claims of voter fraud. Yet none of those rallies involved any violence at all, including against government officials, or any attacks on any government buildings. And no rally has called for an insurrection, a storming of the Capitol or the White House, or any other act of violence.

---

[12] This "may, if" rationale for holding Mr. Sibick posits two unlikely, and entirely hypothetical, occurrences – a future January 6-like event, and a decision by Mr. Sibick to violently participate in such an event despite his knowledge that this would be a mistake of colossal proportions.

8

Second, and more pertinently, the one rally that was scheduled for Saturday, September 18, 2021, in Washington, D.C., and where violence was anticipated, turned into an embarrassment for the organizers, as attendance was extremely low.

It is probative of any potential risk of future violence at such a hypothetical event (the posited "if" event) that not a single celebrity or official of consequence appeared at that September rally, likely because of the stigma that would attach to anyone who might participate in any event even remotely resembling the January 6 fiasco. Even Trump himself refused to attend the event, telling *the Federalist* on Thursday, September 16, that the event was "a setup."

Thus, the likelihood that another event – the "if" in the "may, if" hypothetical – remotely resembling the January 6 disaster will occur at any time during the next year or more (the time period by which this case will hopefully be resolved one way or another) is extremely remote, if not downright non-existent. No one, not even Trump, wants to bring that much "heat" on themselves.

*"May"*

In order for the risk of danger to play out, the "may" step of the hypothetical event would also have to occur, that is, a decision by Mr. Sibick – while on release, and presumably while wearing a GPS monitor – not only to leave his parents' home, but to travel to that "if" event, and then engage in violence.

A sober assessment of this hypothetical reveals that Mr. Sibick would have to choose to engage in all of these acts – leaving his parents' home, traveling to some event, and engaging in violence - knowing full well that the GPS unit would reveal his escape the minute he left the house. Then he would have to travel to wherever this hypothetical event was to take place. Then he would have to decide, despite being on pretrial release for the very same charge, to assault a

law enforcement officer, unlawfully enter a restricted area (wherever the rally might be held), or otherwise commit some crime that could result in his re-incarceration and detention for many months.

Lest the government respond by stating that Mr. Sibick may try to cut off his GPS monitor, the defendant proposes the following redundancy to reassure the Court and the government that there will not be an unreasonable risk of danger to the community were this release plan adopted: Mr. Sibick would be monitored, twenty-four hours a day, while at his parents' home, either by his father or mother, or by third persons in the event both of his parents had to leave their house for some reason. Moreover, these persons would agree (and have agreed), in writing, to immediately call the police were Mr. Sibick to leave the premises.

Undersigned counsel has obtained several signed letters from such individuals, including Mr. Sibick's parents, agreeing to this proposal. Undersigned counsel will submit all of the letters as an addendum once they have all been received.

### "Clear and Convincing Evidence of Danger"

The thought that Mr. Sibick would purposefully choose to violate his conditions of release by engaging in violence *knowing* he is on release in a federal case for allegedly having engaged in violence at a previous event is so preposterous as to rise to the level of absurdity.

The legal standard in the bail statute – proof of danger by clear and convincing evidence - requires much more than a "may, if" conjecture. It requires clear and convincing proof. That proof simply does not exist, especially in light of the letters (from the defendant, from those who know Mr. Sibick, and from jail officials who have supervised him for many hours a day for seven months) being submitted to this Court.

This intricate and frank analysis of the facts and the law unmasks the reality that such a hypothetical ("if, may") is not only speculative, but fantastical. It certainly comes nowhere close to establishing proof that is clear and convincing.

In this vein, it is instructive to note that in its argument to the reviewing court on March 16, 2021, the government confirmed to the Court its understanding that Mr. Sibick "doesn't appear to be a member of any of those [Proud Boys, Oath Keepers, Three Percenters] gangs…." Tr. 15.

This is important because evidence in cases involving these groups often includes information that the groups held regular meetings to discuss planning for an insurgency should Vice-President Mike Pence not succumb to Trump's pressure to refuse to accept various States' electoral slates.

Moreover, individuals in those groups allegedly met and practiced quasi-military maneuvers, discussed bringing weapons to the city or to remote sites, and demonstrated a somewhat high level of planning. Some carried zip ties and pepper spray, wore camouflage outfits and helmets, and otherwise seemed to prepare as if going to war.

None of that happened in Mr. Sibick's case. He did not meet with anyone to plan anything, he did not wear any tactical or other gear indicating any level of pre-planning, and he did not post any messages on social media ahead of the event calling for any violent action against anyone. Were it not for the fact that a number of speakers at the January 6 "rally" fomented the group to march on the Capitol and drove the crowd to a frenzy, he never would have left the original site of the rally.

Moreover, unlike many of the defendants charged in these January 6 cases, in the days and weeks following this event Mr. Sibick never boasted about having participated in the event,

having committed any breach of the Capitol (including putting his shoes on Speaker Nancy Pelosi's desk), or about any other act that took place outside the U.S. Capitol.

It is also significant that Mr. Sibick never posed with the badge or the radio belonging to Officer Fanone – something one would think he would do if he had intentionally grabbed those items as "trophies." The shield with which he did pose sometime on that afternoon was one that did not belong to Officer Fanone, and that others had passed around throughout the crowd. Admittedly that act (of posing) reflected a very poor choice on his part.

Finally, as noted earlier, Mr. Sibick is very remorseful at his involvement in the events of that day, and wishes he could turn back time.

What one has to understand about Mr. Sibick is that despite the way things may appear in retrospect, he was, at the time of this event, an assistant nursing home administrator who cared deeply for the well-being of the residents of "his" nursing home. He is a person who cares about people in general, and wants the world to be a place of harmony (thus his Instagram post, following the event, that "the people need to come together").

### *The Letters from CTF Officers and People Who Know Mr. Sibick*

As noted above, Mr. Sibick, at the March 16, 2021, bond hearing, was not in possession of any letters discussing his character, and his lack of dangerousness. Moreover, the officers and a case manager who have been in charge of housing Mr. Sibick during the past seven months – officers who have had a daily, and hourly, opportunity to see how he conducts himself in a very difficult and stressful environment, had not yet met their new prisoner.[13]

---

[13] The prison environment, for Mr. Sibick, has been much more stressful than it otherwise might have been because of some of the individuals who are housed in his particular unit. As undersigned counsel stated before, Mr. Sibick has asked, and been granted the "opportunity," to go to "the hole" at CTF. The hole, of course, is a place where no inmate wants to go. The fact that Mr. Sibick asked to go there should tell the Court a lot about what he endured when he was in the regular unit that houses the January 6 defendants. Unfortunately for him, he has been told by officials at CTF that he cannot remain in the hole forever, as there is really no correctional basis for him to stay there. Thus, Mr. Sibick will likely be transferred back to the regular January 6 unit fairly soon, much to his dismay.

Counsel submits that it is a powerful testament to his character that all seven of the officers who regularly interact with Mr. Sibick at CTF, as well as his case manager, agreed to provide this Court with "inside" information about him.

Unfortunately, because of Department of Corrections regulations, officers are apparently not permitted to write personal letters on behalf of a particular inmate. Rather, they are generally confined to filling out the forms that are attached hereto.

It is evident that all of these eight individuals think so highly of Mr. Sibick, however, that each one of them added a personal note of some kind at the bottom of the forms (and one even wrote a separate paragraph on Mr. Sibick's behalf). And the forms themselves show that each officer rated him as "excellent" or "outstanding" on their reports.

### *Letter from Major Moquet*

Perhaps the most informative letter is the one written by Major Douglas R. Moquet, an active duty Major and military prosecutor in the United States Air Force.

In his letter to this Court, Major Moquet, writing in his individual capacity so as not to violate ethical boundaries, describes his decades-long relationship with Mr. Sibick. He discusses their joint attendance at New York Military Academy, where both Major Moquet and Mr. Sibick earned leadership positions within the Corps of Cadets and were each "charged with the care and stewardship of over 300 lowerclassmen cadets." Moquet letter, at 1.

Major Moquet also explains how, when Mr. Sibick was a star lacrosse midfielder at the military academy, he would "lift[] team spirits out of many mid-game slumps." *Id*.

More importantly, Moquet emphatically asserts that his "knowledge of Mr. Sibick's character is sufficient to recommend his release pending trial." *Id*. at 2. He adds that he does not

13

believe that Mr. Sibick is a threat to the community, and he should know, having spent countless hours and days around Mr. Sibick.

The hours and days that Major Moquet spent with Mr. Sibick, which included witnessing Mr. Sibick's "true self" in a variety of often stressful circumstances, allowed him to present this Court with a true picture of who Mr. Sibick really is. With all of the major's intimate knowledge of Mr. Sibick's character, he still believes, despite the pending charges, that Mr. Sibick's release would not pose a danger to the community.

Because both men spent years in a military academy, they grew to know one another as well as two individuals can know each other. In other words, Major Moquet knew, and knows, the "real" Thomas Sibick, not the Thomas Sibick one may see at a religious service or in any other setting that is not truly probative of a person's innermost thoughts and true character.

And armed with all of that knowledge of the "real" Thomas Sibick, Major Moquet – a military prosecutor no less – strongly recommends to this Court that Mr. Sibick be released.

Many other individuals who have known Mr. Sibick over the years have also taken the time to write letters recounting their knowledge and experiences with him. And all share the same general information, i.e., that Mr. Sibick is a man of good character who cares for others and tries to do his best.

He is obviously not perfect, as this case demonstrates. But that one episode in his life should not outweigh the years of demonstrated proof of good character in many settings over the course of many years.

### *Mr. Sibick's Parents and Friends*

Mr. Sibick's parents have not written character letters for their son because counsel generally does not believe that courts give too much weight to letters written by close family members.

They have, however, written and signed letters agreeing that if this Court were to release Mr. Sibick on home incarceration, they would ensure that he was always supervised by at least one other person in the home, and that they would call the police if Mr. Sibick left the home without the permission of a pretrial services agent.

Finally, Mr. Sibick's father has indicated that if all of those safeguards are not sufficient to create "conditions or combinations of conditions" that would satisfy this Court that it would be reasonably safe to release the defendant pending trial, they will pay for a guard to watch the home and ensure that Mr. Sibick does not leave the premises without prior authorization.

Just musing about this last option hopefully lays bare the absurdity of thinking that Mr. Sibick would not obey this Court's order to remain confined in his parents' home were the Court to release him. But in order to ensure that there are no credible arguments against Mr. Sibick's release, his parents and family are willing to "put their money where their mouth is," if this is deemed to be the only way that the community could be "reasonably assured" of its safety.

### *Mr. Sibick's Prior Record*

In determining whether Mr. Sibick's prior record indicated that he would present an unreasonable risk of danger to the community, the reviewing court and the government discussed his six misdemeanor cases, including convictions for possession of cocaine (Mr. Sibick completed drug court), driving while impaired (a fine was paid), disorderly conduct (another fine), possession of marijuana (drug treatment classes and payment of a fine), attempted reckless

15

endangerment (payment of a fine), and failing to stop or respond to a police command (two years' probation that were successfully completed).

The last charge seemed to trouble the reviewing court for two reasons: First, because of the name of the charge – failing to stop or respond to a police command, and second, because it involved a charge (that was dismissed) of carrying a concealed weapon.[14] With respect to the first charge - the only one to which Mr. Sibick pleaded guilty in exchange for dismissal of the other charges - the defendant has already explained the circumstances of that offense. He asserted that when the police wanted him to pull over, he was in the far-left lane of a multi-lane highway, and that there was no safe place to pull over on the left side of the highway. Because of this, he kept driving, crossing over several lanes until he reached an exit, about a half-mile down the road.

But in evaluating the significance of that charge, one would think that an older charge of failing to stop or respond to a police command, especially in those circumstances, would be much less probative of any purported risk of non-compliance with a court order than proof that in 2021, the defendant *obeyed* a law enforcement officer's command to turn himself in on March 12, 2021.

More importantly, for this Court's purposes, Mr. Sibick then again obeyed another command, following the March 16, 2021, hearing, to turn himself in to authorities again. That order came from the reviewing judge, and Mr. Sibick followed that order – not six years ago, but this year.

---

[14] The logical disconnect of that charge, of course, is the fact that if Mr. Sibick was carrying a concealed weapon, how was the officer able to see it? Although Utah changed its laws concerning concealed weapons in 2021, it is unclear to undersigned counsel whether in 2015, when Mr. Sibick was stopped, the weapon had to be entirely concealed to give rise to a criminal charge or whether it was illegal to carry a partially concealed weapon. All that counsel knows is that that charge was dismissed as part of a plea bargain – something that might not ordinarily occur if a prosecutor believed they had a strong case against a defendant.

16

The foregoing juxtaposes one incident six years ago where the defendant failed to obey a command under questionable circumstances, and two very recent orders where Mr. Sibick immediately and fully complied with official orders to surrender his freedom.

What neither side mentioned during this discussion of Mr. Sibick's prior record is that in any of his prior contacts with a court, he never violated any period of probation or disobeyed a court order. One would think that this would be more relevant when discussing whether Mr. Sibick would comply with a court order setting conditions of pretrial release than his "failure to obey a police command" in 2015.

### *Mr. Sibick's Remorse*

For the record, Mr. Sibick does feel remorse for having been at the Capitol that day, and for having been at the mouth of the tunnel in the midst of an unruly crowd on the West end of the building. He also feels terrible that Officer Fanone was attacked by a group of people. He maintains that he did not attempt to rob or assault the officer, though he realizes that that belief won't change the Court's mind about that incident, but he never wished, nor would have wished, that anyone suffer any injuries on that day.

In addition to his remorse, he does renounce the conduct that was exhibited by the crowd that day – himself included - as well as the efforts of some to interfere with the functioning of the government.

It is also noteworthy that unlike quite a few defendants in these January 6 cases, Mr. Sibick never posted any messages to the internet calling for the overthrow of the government, for violence, for a revolution, or for any other illegal or criminal action against anyone.

Nor, as noted above, did he come to the nation's capital wearing military gear, camouflage clothing, bearing zip ties or handcuffs, or any other clothing or items indicating a premeditated plan to interfere with the vote certification process.

And again, as the government acknowledged at the March 16, 2021, hearing, he was not part of any group like the Oath Keepers, the Three Percenters, or any other group that is alleged to have conspired to engage in a revolution, a coup d'état, or an insurrection.

In fact, he was not even associated with, and did not know, the two men who have been charged in his case as co-defendants.

In short, he made a last-minute decision to go to Washington, D.C. to hear former president Trump because he thought and believed that that would be the last time he would have the opportunity to hear Donald Trump as President Trump (a belief he would not have held had he believed that there would be an attempt to stop the vote certification process).  He rues his decision to fly to Washington, D.C. today, and has spent the past seven months thinking of how his life would have been so different if he had just stayed home.

Given his horrific experience in becoming the suspect of serious crimes, his fear at being arrested and jailed, his actual arrest and incarceration, as well as his prolonged loss of liberty, with its attendant collateral consequences  (he has lost his job, the condominium he owned, and his belief that he will be able to become a nursing home administrator or engage in some respectable profession someday) it is truly inconceivable to believe that if he were released by this Court to home incarceration, he would risk his freedom by engaging in any conduct that would jeopardize his freedom.

*Conclusion*

There is not a shred of evidence in the record in this case that Mr. Sibick would not follow a court order were he "released" to home incarceration at his parents' home.

First, there is no evidence that in any of his prior cases (all misdemeanors), Mr. Sibick violated any pretrial or post-plea court order – because he did not.

As for this case, on both occasions when he was ordered to give up his freedom and surrender himself to the authorities, he complied, even though on the second occasion, he knew that he had just been ordered held without bond until trial.

It has been argued that his four-day period of compliance with his pretrial release did not prove he could be trusted on release pending trial because that period was so brief.

But the brevity of that period is not what is important here – what is important is the fact that he obeyed an order to surrender his freedom not once, but twice. That compliance is indicative of Mr. Sibick's character and honesty, and of the likelihood of his compliance were he released to home incarceration.

Defendant submits that it is infinitely more difficult to follow an order requiring one's surrender than it is to follow an order requiring one's release, albeit to home incarceration. And yet Mr. Sibick obeyed those orders to surrender each time.

Unfortunately for Mr. Sibick, no court (before this Court) ever learned about Mr. Sibick's true character as reflected in the many letters attached hereto. And no court was presented with the release conditions that have been proposed herein.

Defendant submits that this new information, and especially the letter from Major Moquet, offers compelling evidence that Mr. Sibick would not present a danger to the community were he released on home incarceration. Thus, defendant maintains that there are

19

conditions or a combination of conditions of release that would reasonably assure the safety of the community.[15]

In light of the foregoing, defendant Thomas Sibick asks this Court to order his release to home incarceration at his parents' home, and for any other relief that this Court deems just and proper.

Respectfully submitted,

/s/

Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626(facsimile)
E-mail:  sfbrennwald@cs.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by ECF, this 16th day of October, 2021 to the U.S. Attorney's Office, 555 4th Street, N.W., Washington, D.C.  20530, and to all counsel of record.

/s/

Stephen F. Brennwald

---

[15] Mr. Sibick will soon file an addendum that attaches letters from multiple companies that would be willing to hire Mr. Sibick were this Court to release him and allow him to work.  At this point, however, Mr. Sibick is merely asking that he be released on home incarceration.