IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA              CR No. 1:21-cr-00291-ABJ-1


                                      Washington, D.C.
v.                                    Tuesday, October 26, 2021
                                      9:30 a.m.


THOMAS F. SIBICK,


              Defendant.
- - - - - - - - - - - - - - - x
_____
      TRANSCRIPT OF BOND MOTION HEARING AND STATUS CONFERENCE
         HELD BEFORE THE HONORABLE AMY BERMAN JACKSON
                 UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the United States:     Cara A. Gardner, Esq.
                           Tara Ravindra, Esq.
                           DOJ-USAO
                           555 4th Street, NW
                           Washington, DC 20001
                           (202) 252-7009


For the Defendant:         Stephen F. Brennwald, Esq.
                           BRENNWALD & ROBERTSON, LLP
                           922 Pennsylvania Avenue, SE
                           Washington, DC 20003
                           (301) 928-7727


Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                      **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  Good morning, Your Honor.

3              This morning, we have Criminal Case No. 21-291-1,

4      the United States of America v. Thomas F. Sibick.

5              Appearing telephonically is our Pretrial Services

6      Agency officer.

7              Would you please identify yourself for the record.

8              THE PROBATION OFFICER:  Good morning, Your Honor.

9      Christine Schuck, Pretrial Services.

10             THE COURT:  Good morning.

11             THE DEPUTY CLERK:  Will counsel for the Government

12     please identify herself and her colleague for the record.

13             MS. GARDNER:  Good morning, Your Honor.  Cara

14     Gardner and Tara Ravindra on behalf of the United States.

15             THE COURT:  Good morning.

16             THE DEPUTY CLERK:  Defense counsel?

17             MR. BRENNWALD:  Good morning, Your Honor.  Stephen

18     Brennwald for Mr. Sibick.

19             THE COURT:  And Mr. Sibick is present.

20             THE DEFENDANT:  Yes, ma'am.

21             THE COURT:  All right.  Good morning, everybody.

22             Mr. Haley, can I just ask you a question.

23             THE DEPUTY CLERK:  Absolutely.

24             (Brief pause.)

25             THE COURT:  Okay.  We're here on a motion asking

3

1    me to reopen the detention order and the detention hearing

2    in this case.  It's Docket 83.  It was supported by a series

3    of letters, information received from the guards at the

4    Department of Corrections.  A number of these letters were

5    similar to the ones I received in connection with the last

6    motion.  So I'm not going to summarize them all for the

7    record, but I want to assure the defendant and defense

8    counsel and the Government that I read every single one of

9    them, and they're at Docket 84.  The Government filed an

10   opposition at Docket 87, and there was a reply filed under

11   seal at Docket 88.  I don't intend to go into the details or

12   the substance of it, but I may refer to it just in general

13   terms, and I hope that's appropriate.

14        The predicate question that we need to take up is

15   the legal basis for the defendant's motion.  I noted at the

16   last hearing that 18 U.S. Code Section 3142(f) provides that

17   a bond hearing may be reopened, before or after a

18   determination by the judicial officer, at any time before

19   trial if the judicial officer finds that information exists

20   that was not known to the movant at the time of the hearing

21   and that has a material bearing on the issue of whether

22   there are conditions of release that will reasonably assure

23   the appearance of such person as required and the safety of

24   any other person and the community.

25        The D.C. Circuit has held that under that section,

1    Section 3142(f)(2), a court was authorized to open the

2    detention hearing when previously non-existent, material

3    information was brought to light.  That's United States v.

4    Peralta, 849 F.2d 625 at 622 [sic] from the D.C. Circuit in

5    1988.  In that case, the new information was the court's

6    suppression ruling against the defendant, which increased

7    the likelihood of his conviction and that he would flee if

8    not detained and, therefore, someone who was not previously

9    detained was.

10           In United States v. Lee, 451 F. Supp. 3d at -- 1

11   at Page 5 from this District in 2020, a District Court judge

12   quoted the rule and went on to say that, New and material

13   information consists of something other than a defendant's

14   own evaluation of his character or the strength of the case

15   against him; instead, it must consist of truly changed

16   circumstances, something unexpected, or a significant event.

17   And the court got that language from a case out of the

18   Southern District of New York, United States v. Esposito,

19   354 F. Supp. 3d 354, 359, though I don't think the statute

20   has the word "unexpected" in it.

21           The court went on to say, Moreover, and

22   significantly for present purposes, previously unavailable

23   information that has no material bearing on the factors that

24   must be considered to establish the propriety of pretrial

25   detention aren't important unless that new information casts

1    a different light on any of those factors.  And it points

2    out that Black's Law Dictionary defines "material" as having

3    some logical connection with the consequential facts or of

4    such a nature that knowledge of the item would affect a

5    person's decision-making; significant; essential.  And in

6    that case, this was one of the first bond review hearings

7    based on coronavirus and the court found that it was worthy

8    of consideration.

9             The Government has provided a few opinions from

10   other Districts in United States v. Dillon, 938 F.2d 1412,

11   out of the First Circuit; and the Fifth Circuit case, United

12   States v. Hare, 873 F.2d 796, found that letters from

13   supporters in the community weren't really previously

14   non-existent.  And the Government also points to United

15   States v. Martin, 2015 WL 1738362 from the Northern District

16   of California in 2005 [sic], which rejected the notion that

17   the fact that the defendant had completed a course while he

18   was detained would qualify as new evidence that had a

19   material bearing on the decision.  That court said,

20   Defendant's interpretation misunderstands the purpose of the

21   statute, which is to allow parties to present unknown

22   information that increases the chances the defendant appears

23   for their criminal hearing, or decreases the danger the

24   defendant poses to an individual or the community as a

25   whole.  Allowing defendant to reopen detention hearings to

1    present evidence regarding classes he took while in custody

2    doesn't serve this purpose.  Moreover, the court was

3    concerned that anybody could just take a course and then

4    file a motion and said that would lead to judicially

5    inefficient practices and is, therefore, erroneous.

6         I don't think there's any dispute that I may

7    reopen the hearing upon the showing described in subsection

8    (f).  While I was unpersuaded by the arguments about the

9    video at the last hearing that it changed anything, it was

10   because I felt that some of the other information that was

11   being presented to me in connection with the defendant and

12   the last motion called into question the notion that there

13   were no conditions that would protect the community, I

14   invited the parties to address the issue in writing again.

15         What I was not sure about, and what I asked you to

16   brief was, is the converse of Peralta true?  Yes, you can

17   reopen if there's new information.  But am I prohibited from

18   doing so otherwise, particularly if we're talking about

19   releasing a person from detention as opposed to detaining

20   someone who wasn't detained before, as in Peralta?  In other

21   words, does the Court lack the inherent power to review or

22   modify a detention determination in its discretion?  And I'm

23   not sure that either side pointed me to law on that

24   question.  I did find a case from another court in this

25   District that cited a 10th Circuit opinion, United States v.

1     Worrell, W-O-R-R-E-L-L, at 2021 WL 2366934 from June of

2     2021.   The court felt that the defendant's health condition

3     didn't have material bearing on the detention order, and he

4     quoted a case from the 10th Circuit, United States v.

5     Cisneros, 328 F.3d 610 at 614, that said, Reconsideration is

6     permissible under this section only when there is new

7     information that would materially influence the judgment

8     about whether there are conditions of release which will

9     reasonably assure that the defendant will not flee and will

10    not harm any other person or the community.

11            So before we get to whether the information

12    presented constitutes new information and how it bears on

13    the prediction that I'm supposed to make at this point about

14    the defendant, I do want to hear argument on the question

15    about whether I have to make the finding under Section

16    3142(f) to go forward or whether I can review a detention

17    order at any time, given my supervisory powers over this

18    case.

19            So Mr. Brennwald, do you want to address that.

20            MR. BRENNWALD:   Thank you, Your Honor.

21            Two things.   Number one, we would argue that the

22    Court has inherent power as the judicial officer assigned to

23    the case to review material that has come in.   As I argued

24    in my reply, he didn't have a chance to get this letter from

25    Major Moquet before the hearing before Chief Judge Howell on

1    March 16.  So we do consider that new evidence.  The other

2    thing that's significant and that I don't know if it's had

3    the impact on the Court that it had on me is the new

4    information -- it -- there's -- I don't think there can be

5    any question that it's new that Mr. Sibick's diagnosis is

6    completely different.

7              THE COURT:  All right.  Mr. Brennwald, I'm not

8    saying I disagree with you about any of that, and I --

9              MR. BRENNWALD:  Okay.

10             THE COURT:  -- am going to hear with you -- from

11   you --

12             MR. BRENNWALD:  Okay.

13             THE COURT:  -- on that.

14             MR. BRENNWALD:  Okay.

15             THE COURT:  I'm just trying to find out right

16   now --

17             MR. BRENNWALD:  Right.  I mean, I --

18             THE COURT:  -- do I have to hang my hat on Section

19   3142(f) or do I have broader authority?  I'm not saying I

20   don't think I can.  I just really want to know, because it

21   was surprising to me how little authority there is out

22   there --

23             MR. BRENNWALD:  Right.

24             THE COURT:  -- and the statute doesn't say "only

25   if."

```
 1                MR. BRENNWALD:  Right.

 2                THE COURT:  It just says "if."

 3                MR. BRENNWALD:  Right.

 4                THE COURT:  So I want to know what your reading of

 5       the law is about just the legal standard that governs us

 6       this morning, and then I will give you ample opportunity to

 7       argue what the facts show this morning.

 8                MR. BRENNWALD:  Okay.  Thank you.

 9                I don't have any cases.  The Court cited the cases

10       that it looked at, Cisneros and Worrell, but I think the

11       fact that the language is not "only if" but "if" would imply

12       that the Court has some discretion.  I wish I had something

13       more substantive --

14                THE COURT:  Okay.

15                MR. BRENNWALD:  -- to provide to you, but I think

16       that Congress knows how to make things clear when they want

17       to make them clear, you know?  You have languages that say

18       "may" or "must," things like that.  So I would argue to the

19       Court that the Court does have the authority to do that, but

20       I wish I had something --

21                THE COURT:  All right.

22                MR. BRENNWALD:  -- substantive.  I did spend time

23       looking for it and, like the Court said, there's --

24                THE COURT:  It's really not there, I don't think.

25                MR. BRENNWALD:  Right.  So this might be a case of
```

1    first impression.

2              THE COURT:  Okay.  All right.  Thank you.

3              Does the Government want to address that issue?

4              And, Ms. Ravindra, Mr. Haley informed me that you

5    have a conflict this morning.  If you have to leave, just

6    go.  Don't worry about it.

7              MS. RAVINDRA:  Thank you, Your Honor.

8              THE COURT:  All right.

9              MS. GARDNER:  So Your Honor, the Government's

10   position is that, under the plain language of the statute,

11   Your Honor does need to make a finding under 3142(f)(2).  We

12   hadn't briefed Peralta and Worrell, so I can't necessarily

13   speak to those, but the Government's position is that Your

14   Honor is limited to the plain language of the statute.

15             THE COURT:  All right.  It seems odd to me that a

16   court would never have the authority to review the

17   justification for someone to be locked up.  It just doesn't

18   sit well with me.  I understand your position, and the

19   statute says what it says and the cases have been generally

20   accepting that assumption, though it seems to me that there

21   -- I know, certainly, during the pandemic, I got bond review

22   motion after bond review motion after bond review motion and

23   I'm not sure every one put it under 3142(f).

24             But the next question is, if you assume that the

25   test does apply and we have to satisfy that showing to

1    revisit the case here, is -- the issue is whether there's

2    material that was unavailable before that has a material

3    bearing on the bond question.  And to me, the second part of

4    that tends to merge with the underlying, fundamental

5    question asked by the Bail Reform Act which is essential,

6    given the presumption of innocence, and that is, has the

7    Government carried its burden, given this new information,

8    to show by clear and convincing evidence that there are no

9    conditions or combination of conditions that would assure

10   the safety of the community?

11           So I'll start with you, since you're up first.

12   Why is it that the material isn't worthy of consideration as

13   new?  And if I'm going to consider it, why doesn't it have a

14   material bearing on the outcome?

15           MS. GARDNER:  So I'll start with the various

16   letters that Mr. Sibick presented from members of the

17   community; from friends and family.

18           MR. BRENNWALD:  Your Honor, could I ask

19   Ms. Gardner to take her mask off --

20           THE COURT:  Yeah, I'm having trouble.  I think

21   the --

22           MS. GARDNER:  Yeah.

23           THE COURT:  -- court might -- reporter might.  I

24   think --

25           MS. GARDNER:  Sure.

 1              THE COURT:  -- when you're at the microphone, you

 2      probably --

 3              MS. GARDNER:  Is that better?

 4              THE COURT:  -- should -- that is better.

 5              And it was probably even worse for you,

 6      Mr. Brennwald.  So you should take yours off when you get up

 7      there --

 8              MR. BRENNWALD:  Okay.

 9              THE COURT:  -- also or use the one at counsel

10      table.  Okay.

11              MS. GARDNER:  And so just to be clear, would Your

12      Honor like me to first address whether or not the

13      information is new or are we --

14              THE COURT:  I need both halves.  So you can --

15              MS. GARDNER:  Okay.

16              THE COURT:  You can address them together.

17              MS. GARDNER:  Sure.

18              So regarding whether or not it's new information,

19      the letters themselves -- and there's -- there -- as Your

20      Honor noted, there's various courts from various

21      jurisdictions who have held that letters of that nature are

22      not new information.  I know that the defense argued that,

23      well, there was only a matter of four days, and so it wasn't

24      sufficient time in order to get those letters.  As Your

25      Honor pointed out at the last hearing and there was a

1    conversation that Your Honor had with defense counsel about

2    it that he could have asked for a continuance and,

3    certainly, that would have been granted in order to get

4    whatever letters the defense wanted to present to the Court

5    during the detention hearing.  So the Government's position

6    on whether or not those letters are new is that they're

7    information that was known to the defendant or was in the

8    defendant's control, and so it's not new information, and

9    that's supported by -- I couldn't find a cite for D.C., but

10   there's various jurisdictions who have held that that's not

11   the kind of information that is new.

12           Regarding -- the other thing that the defense has

13   brought to Your Honor's attention is the various letters

14   from -- or I shouldn't say letters; they're more like

15   documents -- the review documents from the Department of

16   Corrections regarding Mr. Sibick's behavior in prison as

17   characterized as being a model inmate.  And regarding those

18   letters -- I mean, I suppose they could be, you know -- I

19   think there's a fair argument that those pieces of

20   information were not something that was known at the

21   detention hearing because they didn't yet exist.  The

22   question, then, is whether or not they are material to Your

23   Honor's determination.  And the Government's argument

24   regarding that is I was under the understanding that Your

25   Honor had considered them at the last hearing that we had

1    and mentioned them when making your ruling, you know?  Your

2    Honor certainly could consider them again.  I do not think

3    that in the balance of things that that information

4    outweighs the rest of the factors.  I think that in the

5    balance, there is still -- that it weighs in favor of

6    detention.  So that's -- and I'd refer to other arguments

7    that we've made previously and that we make in our motion,

8    as well.

9          THE COURT:  All right.  I'm going to give a -- the

10   defense a chance to argue, unless there's anything else you

11   want to add to what you've got in your submissions.  I've

12   read everything that you've submitted.

13         MS. GARDNER:  (Indicates negatively.)

14         THE COURT:  Okay.

15         MS. GARDNER:  Thank you, Your Honor.

16         THE COURT:  Mr. Brennwald, you know, I've read

17   what you've said, as well.  So you don't necessarily need to

18   repeat it all.  I do find the criminal history more

19   troubling now than I did before now that I have more detail

20   about what underlie each of the issues.  So you know, I want

21   you to address the factors in general, and then I have some

22   questions about the suitability of what you're proposing and

23   what kind of conditions we can -- you would suggest that I

24   fashion.

25         MR. BRENNWALD:  Yes, Your Honor.

1          To talk about the prior criminal convictions, what
2     I realized -- and I'm sorry I'm a little bit slow here on
3     the uptake, but I -- what I realized after talking to his
4     parents quite a bit and looking at the record is Mr. Sibick
5     was one person before 2016, in that area, and a different
6     person after that.  Now, I realize that there is this
7     January 6th incident that came in the middle just recently,
8     but literally things changed for him in -- after he came
9     back from Utah.  So that -- the incident with the speeding
10    on the motorcycle happened in 2015.  He bought that
11    motorcycle, as I put in my motion, after having test driven
12    it, and three months later he moved back to Buffalo.  After
13    that, he enrolled in school.  He literally, like -- he had
14    gone out to Utah basically to find himself, so to speak.  He
15    was 28, 29 years old and he, you know -- he went out west,
16    you know?  Go west, young man, and he did that.  He came
17    back and then he started school when he came back in 2016
18    and he got his MBA by 2019.  So he was actually a changed
19    person in the sense that he decided that he had to settle
20    down, buckle down, and go to school and get a degree, and he
21    did, and an MBA is not something that's that simple to get,
22    especially with his mind racing as it was.
23          And so there were no criminal convictions from
24    2016, '17, '18, '19, '20 at all; no incidents.  That's a
25    huge change in his life.  His parents saw a big change.  He

1    got his own place; he had a girlfriend; he got stable; and

2    he got a job as a nursing home assistant administrator.  He

3    literally was on track to finally grow up.  It took him a

4    while, but he finally grew up.  So I think that, kind of,

5    explains the difference between his life before when he was

6    riding a motorcycle too fast, when he was out in the quarry

7    shooting, and making calls to his ex-girl- -- or girlfriend

8    at the time's father and then one call to the mother.

9    There's just a shift in his life, 2000 -- end of 2015 and

10   then beyond that when he just got on track and started going

11   to school and got a graduate degree.

12           And then we have this incident in -- on January

13   6th.  And what I tried to put in my motion and make it

14   clear -- and I had to scramble because, like I said, I

15   talked to Mr. Sibick on Saturday afternoon because I got the

16   motion from the Government -- I received it Friday

17   evening -- actually, I couldn't even open it until Saturday

18   morning.  For some reason, I couldn't open it.  But I went

19   to see him right away and we talked for several hours, and I

20   knew he'd had health -- or mental health issues.  I knew

21   that, and I knew about the Adderall.  What I didn't know was

22   that there was a new diagnosis that I put in my motion and

23   new medication and that it had changed his mindset, and I

24   think that's critical for this motion because I spoke to --

25   it turns out -- so his mother is here.  Her sister, Diane

1     Cicatello, his aunt, is a pediatrician with -- I don't think
2     she has a specialty in mental health, but she's focused on
3     that a lot, and we spent some time talking about him and
4     going back to his childhood and how he was always
5     rambunctious.  He always wanted to be the best, kind of,
6     reflected in the New York Military Academy when he, you
7     know, was a star midfielder on the lacrosse team; he always
8     wanted to be the hero; he always wanted to be the good guy
9     that people thought was great; and he failed repeatedly,
10    disappointed his parents.
11         So we talked for an hour.  And he called her
12    January 6th afterwards.  He didn't call her because of this.
13    He -- because of the event.  He called her because it was
14    her birthday.  But he was hyper and talking fast, and she
15    told me -- she said, like, he was in a manic phase at that
16    point, and she told me -- she says, I always thought that he
17    had the diagnosis that I put in my motion, but nobody else
18    wanted to think that.  They just wanted to think he had the
19    other diagnosis, and so he never got the proper care.
20         And now -- so there's two things, I think, are
21    important for the Court on a bond motion.  Two things.
22    Number one is the mental health diagnosis and the fact that
23    he's so much better now than he was before; number two, his
24    political thought process has changed a lot.  I'm not saying
25    he's become liberal at all; I'm not saying he's an Elizabeth

1    Warren fan, but his mindset's changed to the point where he

2    had to get out of that unit that he was in.  I don't know if

3    the Court saw this, and I was trying to link an article that

4    I read two weeks ago and I couldn't find it, but there was

5    an article that was written.  I think it was written by

6    Spencer Hsu of the Washington Post -- I'm not sure -- H-S-U

7    -- who described what I've known for months, is that that

8    unit at CTF is radicalizing the people who are there.  And

9    I'm not trying to be overly dramatic, but literally there

10   are people there on their tablets looking at podcasts by the

11   folks one would suspect one would follow if you have that

12   mentality.  And the fact -- I think the Court may have --

13   may know this, but every night at 9:00 o'clock, the Court --

14   the folks there stand up and sing the Star-Spangled Banner.

15   I don't know if the Court's heard that before, but that's

16   what happens --

17           THE COURT:  I heard it in the news.  I hadn't

18   heard it from anybody with personal knowledge.

19           MR. BRENNWALD:  I -- you can -- I have personal

20   knowledge.  I was on the phone with Mr. Sibick a month ago

21   and we talked and, literally in the middle -- a minute -- in

22   the middle of our talk, he said to me, I have to put the

23   phone down.  I'll be right back.  They'll be angry if I

24   don't go over there.  Literally.  It's, like, this herd

25   mentality.  So he put the phone down, and I can hear them

1    all singing and they're shouting, most of them off key, but

2    they're literally singing the song.  It was almost cult-like

3    or, maybe, it was cult-like.  It was pretty scary, frankly.

4    And then he came back and then we got back to our discussion

5    and, you know, he was -- he's trying to get along.  He's

6    going along to get along.  His biggest fear is, If I don't

7    get out, how -- what do I do?  Because he's in the hole.  He

8    doesn't want to go back up there.  He shouldn't have to be

9    in the hole because he's trying to avoid a radical unit.

10            But my point is -- as far as this Court's analysis

11   is, he's not the same person who was there on January 6th

12   deluded by claims of stolen elections and doing whatever,

13   you know, angry, shouting, and in a manic phase.  I mean,

14   he's just not that person anymore.  And so the question is,

15   does that make him less dangerous?  And I get that it's not

16   something that we can analyze scientifically.  Mental health

17   -- I mean, mental health is not just some vapor and smoke

18   floating in the air.  It is actually a chemical process, but

19   it's not like a broken bone where you can look at an MRI and

20   see it.  So people have a hard time accepting medication's

21   changes on a person's mind, but he's definitely a different

22   person, and that to me tells me -- that combined with the

23   political distancing he's trying to achieve by getting out

24   of there -- literally getting out of there -- I mean,

25   getting out --

1          THE COURT:  All right.  Well, let me ask you a

2     couple questions --

3          MR. BRENNWALD:  Sure.

4          THE COURT:  -- with respect to that.  One of the

5     things that was troubling about some of the prior criminal

6     incidents is the presence of firearms.  Are there any

7     firearms in the home --

8          MR. BRENNWALD:  No.

9          THE COURT:  -- and is the -- the custodian

10    surrender any if there are?

11         MR. BRENNWALD:  There are no firearms in the home

12    and there won't -- there will not be any firearms in the

13    home.  His father's here.  He would be living with his

14    father and mother.  He's here.  He would like to say some

15    words, but that's up to you.  But there will not be --

16         THE COURT:  Well, I did read your letter.

17         And it may or may not be necessary for him to say

18    something, but I'll give him a chance if he needs to.

19         I guess another question is, as you say, he came

20    here fired up about the stolen election.  Where was he

21    getting his information?  Was he on Facebook?  Twitter?  Is

22    he just watching the news?  What were the inputs?  Because

23    if he's released, we may have to not have them.

24         MR. BRENNWALD:  Right.  I get that.  Can I ask

25    him?  I mean --

```
 1              THE COURT:  Sure.

 2              MR. BRENNWALD:  -- I have an idea, but I don't

 3      want to guess.

 4              THE COURT:  All right.  No, you should give me the

 5      most accurate information possible.

 6              (Brief pause.)

 7              MR. BRENNWALD:  I thought it might have been OANN

 8      or Newsmax or other people, but it wasn't.  It was Fox News.

 9              THE COURT:  All right.  Well, are we willing to

10      put that aside for a while?

11              THE DEFENDANT:  Yes, Your Honor.

12              (Brief pause.)

13              MR. BRENNWALD:  I had nothing to do with his

14      writing his letter, by the way.  I didn't suggest it.  I

15      know I should have probably suggested it, but I didn't.  I

16      didn't suggest --

17              THE COURT:  I --

18              MR. BRENNWALD:  -- the contents --

19              THE COURT:  -- think most defense attorneys would

20      probably tell people not to write letters like that --

21              MR. BRENNWALD:  Right.

22              THE COURT:  -- pretrial.

23              MR. BRENNWALD:  Exactly.

24              THE COURT:  So --

25              MR. BRENNWALD:  And I was worried about putting it
```

1    in the record because apparently there's been articles --

2    there have been articles in the Buffalo News.  His father

3    just told me about one now.  I made the news last time we

4    were here.  I apparently made the news again this time.  And

5    the -- I like to read the comments sections of articles

6    because then you see --

7                THE COURT:  No --

8                MR. BRENNWALD:  -- what people are thinking.

9                THE COURT:  -- they're very not worth reading.

10               MR. BRENNWALD:  Right.  So I was called a liar.  I

11   was called everything in the book.  But, you know, he was

12   literally watching Fox News and, you know, in a manic phase

13   that day -- well, over a period of days actually, you know,

14   because mania lasts typically two or three days.

15               THE COURT:  And I want to be sensitive about the

16   next set of questions because, obviously, everybody is

17   entitled to their political views and entitled to get their

18   news from where they want to get it and entitled to their

19   opinions, but one of the things you raised for me as a sign

20   that this can't possibly happen again is that September 17th

21   fizzled out and there weren't really people here, but one

22   person who was here --

23               MR. BRENNWALD:  That was his father.

24               THE COURT:  -- was the proposed custodian.

25               MR. BRENNWALD:  Right, right.

```
 1                    THE COURT:  And I understand that you do a lot of
 2         things when you love your children, and --
 3                    MR. BRENNWALD:  Right.
 4                    THE COURT:  -- I see it in that context --
 5                    MR. BRENNWALD:  Right.
 6                    THE COURT:  -- but he said some pretty strong
 7         things.  And so I want to make sure that I'm not taking the
 8         defendant out of one strident environment and putting --
 9                    MR. BRENNWALD:  Right.
10                    THE COURT:  -- him in another one.
11                    MR. BRENNWALD:  So one of the things I read in the
12         Post that his father said was that they weren't getting
13         seafood to eat or salmon or something.  I forget what it
14         was.  And, you know, he -- he's -- his mom cries all the
15         time when I talk to her; right?  We had dinner last night
16         and she had a hard time.  The father keeps it in, but I saw
17         him -- I've seen him cry, too.  They're just devastated by
18         their son being in prison and seeing him here.
19                    The mother is to the left of the political
20         spectrum.  She's -- they're -- we were talking last night
21         about, How can two people who have different views stay
22         together?  And -- but his father -- I'll tell you this.  I
23         think this is important.  When we were finishing up our
24         dinner last night and the topic of -- I was asking them, you
25         know, How do you guys get along when, you know, one of you
```

1   is a Republican and one of you is a Democrat, especially in

2   today's climate?  He pointed to me, and he was very

3   emotional when he said it.  He said, I remember when Ronald

4   Reagan and Tip O'Neill had completely different views of how

5   to solve the country's problems and yet, unlike today, they

6   could sit down and talk.  They could go to dinner together.

7   He then pointed to Antonin Scalia and Ruth Bader Ginsburg

8   and how, although they were diametrically opposed on the

9   law, they were close friends reportedly.

10          So I am confident that he will not be -- well,

11  first of all, if he's not allowed to watch any TV or

12  anything like -- anything that would inflame any thoughts, I

13  am sure the father has no problem with that.  His father

14  just wants his son home for now until we -- and we can fight

15  the case or dispose of it however that is, but I'm confident

16  -- and you can ask him.  And he's a -- he is a reasonable

17  guy.  I mean, he and I -- if I didn't -- if we didn't talk

18  politics, I would never know that our views were divergent.

19  I would never know that.  And he's very rational.  He's

20  reasonable.  He deals with people all the time of all -- on

21  all sides of the spectrum.  So I don't think that's an

22  issue --

23          THE COURT:  Well, and I don't have -- obviously, I

24  have no problem with his views of --

25          MR. BRENNWALD:  Right.

1              THE COURT:  I'm close to very many people who are

2       very active in the Republican Party.  That's --

3              MR. BRENNWALD:  Right.

4              THE COURT:  -- different from calling the

5       detention of the January 6th defendants a disgrace to our

6       country --

7              MR. BRENNWALD:  Right.

8              THE COURT:  -- compared to other, you know -- I

9       just want to make sure that there's a respect for these

10      proceedings.

11             MR. BRENNWALD:  Right.  I don't think that people

12      -- I don't -- people who, you know -- I've been doing this

13      36 years.  I don't think people who are coming at it like he

14      is from the outside, never having had a son in this system

15      here, understand that CTF, while a prison and while a place

16      where you're basically confined -- you can only go so far

17      this way; so far that way -- it's better than the D.C. Jail

18      where many other people are -- like 1,100-and-some people in

19      the D.C. Jail compared to 400-and-some in CTF -- and the

20      parents of the people in D.C. Jail aren't crying about, This

21      is unfair, for a lot of reasons that I don't think I should

22      get into, but from his point of view, you know, he has

23      higher expectations, I guess, for his son and for what

24      should happen, and I get that, but it seems -- I'll just use

25      the word -- privileged to make comments like, Well, you

```
 1    know, he should have some nice things, like this one
 2    defendant who wanted the vegan food in the jail, you know
 3    what I mean?  It's just -- people just have a little, kind
 4    of, warped perception of what jail is like sometimes.  But I
 5    -- I'm sure the Court will be --
 6              THE COURT:  All right.  Well, why don't you ask --
 7              MR. BRENNWALD:  -- reassured --
 8              THE COURT:  -- Mr. Sibick to come up --
 9    Dr. Sibick.  I apologize.
10              (Brief pause.)
11              All right.  Sir --
12              MR. SIBICK:  Thank you, Your Honor.
13              THE COURT:  -- can you just put your name on the
14    record.
15              MR. SIBICK:  Dr. Eugene Sibick.
16              THE COURT:  All right.  Good morning.
17              MR. SIBICK:  Good morning.
18              THE COURT:  I understand that you've been to this
19    court before and --
20              MR. SIBICK:  Yes, ma'am.
21              THE COURT:  -- you've come to D.C. on September
22    17th and it's all out of an abiding love for your son.  I --
23              MR. SIBICK:  Correct.
24              THE COURT:  -- understand that.  I see that.  I
25    want to make sure that if I release him to your custody that
```

1    you understand that if he leaves the house or he violates

2    his conditions, you're the one who has to make the call, and

3    you're the one who has to send him back to the place that

4    you don't want him to be.  Do you understand that?  And are

5    you willing to accept that responsibility?

6              MR. SIBICK:  I understand that, and I am willing

7    to accept that.

8              THE COURT:  All right.  And I was going to ask if

9    you're willing to surrender all firearms in the house, but

10   you don't have any; is that correct?

11             MR. SIBICK:  No, there's none in the house at the

12   moment.

13             THE COURT:  Okay.  And nothing even just, you

14   know, under lock and key --

15             MR. SIBICK:  No.

16             THE COURT:  -- a military relic or whatever?  All

17   right.

18             MR. SIBICK:  No.

19             THE COURT:  And you're -- I'm not going to order

20   -- I could just imagine the Washington Post if I order that

21   he not watch Fox News.  I'm just going to say that you all

22   turn off the talk shows, the political news, period.  No

23   MSNBC either.  Okay?  The whole thing.

24             MR. SIBICK:  I haven't really --

25             THE COURT:  It's too --

```
 1                MR. SIBICK:  -- watched any news since this has

 2      happened --

 3                THE COURT:  Okay.

 4                MR. SIBICK:  -- to be honest with you, other than

 5      the articles in the Buffalo News that Mr. Brennwald alluded

 6      to.

 7                THE COURT:  All right.  I think it just has to be,

 8      kind of, a calm environment, and I'm looking to you to make

 9      sure that that's part of the conditions that he lives under.

10                (Brief pause.)

11                MR. SIBICK:  I'm sorry.

12                THE COURT:  That's okay.

13                MR. SIBICK:  I'll do anything I need to do --

14                THE COURT:  Okay.

15                MR. SIBICK:  -- to get him home where he

16      belongs --

17                THE COURT:  All right.  I understand.

18                MR. SIBICK:  -- in the interim here.

19                THE COURT:  Okay.  All right.  I'm going to let

20      you --

21                MR. SIBICK:  Thank you.

22                THE COURT:  -- take a second and go back and sit

23      with Mrs. Sibick.

24                MR. SIBICK:  Thank you.

25                THE COURT:  And I also appreciate your appearance
```

1    here, and I can see the emotion on your face from here

2    through all the plexiglass.

3              MR. SIBICK:  He -- I -- if I may add --

4              THE COURT:  All right.

5              MR. SIBICK:  -- not only are my -- his father and

6    his mother here, his two out of three brothers were here

7    last time --

8              THE COURT:  I remember that.

9              MR. SIBICK:  -- at the beginning of the month.

10   The fourth one would have been here, but he is somewhere

11   under the Atlantic with the U.S. Navy, and he has a lot of

12   support back home.

13             THE COURT:  All right.

14             MR. SIBICK:  Thank you.

15             THE COURT:  All right.  Thank you.

16             All right.  Mr. Brennwald, is there anything else

17   you want to add?

18             MR. BRENNWALD:  I just want to reiterate that

19   Mr. Sibick has gone to extraordinary lengths to separate

20   himself from the toxic environment that he was in in that

21   unit, and for a person to literally go to the hole at their

22   own request -- not because the jail wanted him there;

23   because he just wanted to get away from that environment --

24   I don't know what else that says about him other than that

25   he's trying to stop dealing with people like that and he's

1    trying to just live his life and do the best he can.

2             THE COURT:  Okay.  Thank you, Mr. Brennwald.

3             The Court of Appeals upheld the trial court's

4    original application of the 3142 factors, and I think

5    everyone needs to understand that I'm not ruling that either

6    the Chief Judge or the Court of Appeals erred in any way.

7    His detention to date was not, as has been asserted

8    publicly, a disgrace to our country.  The alleged attack on

9    Officer Fanone, who was performing his sworn duty as a law

10   enforcement officer guarding the citadel of our democracy,

11   was.  But I find that the record before me now includes

12   information that was not known to the movant at the time of

13   the hearing and that does have a material bearing on the

14   issue that I have to decide and that every judge has to

15   think about every day which is whether there are conditions

16   of release that will reasonably assure the appearance of the

17   person as required and the safety of any other person and

18   the community.  So I'm going to grant the motion.  There

19   will be conditions.

20            Not everything the defense has presented is

21   entirely new.  One fact is that he turned himself in the

22   second time after Judge Howell's order.  She obviously

23   didn't know that at the time she issued her order, but that

24   is the minimal expectation.  And while I do understand from

25   defense counsel that the letters from the community could

1    not have been gathered in the short period of time

2    available, I'm not hanging my hat solely on the information

3    from friends and family about the defendant's positive

4    qualities, some of which may have been available at the

5    time.

6           In any event, as I said at the last hearing when I

7    reviewed the defendant's history and characteristics and

8    even the letters -- because his colleague from military

9    school was quite candid about the ups and downs -- that it's

10   been a mixed and complicated picture.  Mr. Sibick is

11   intelligent; he's well educated; he's loyal; he can be

12   caring to others; he's respected and well liked at the

13   nursing facility where he was employed.  He obviously comes

14   from a good family and a good upbringing, but that also cuts

15   in both directions, because at all points in his record,

16   including on January 6th, he knew better.  It's true that

17   the previous offenses were largely misdemeanors, but the

18   record is not insignificant.  There is a lot of conduct that

19   the best that you could say about it is that it's

20   irresponsible, and you could say worse things about it

21   because it either frightened or truly endangered other

22   people.  And there was a pattern that emerged that he seemed

23   to get himself on track and then fall off.  A lot of letters

24   have this underlying theme of, I knew him at that point when

25   I really thought he had gotten it together, but -- and so it

1    all seemed to involve a certain level of impulsivity and

2    lack of self-control and ups and downs.

3           And I had written a lot of this before I got the

4    defendant's sealed pleading.  I'm very glad to hear that the

5    defendant thinks that with an appropriate diagnosis, he has

6    a handle on it now.  And this new approach and this

7    medication is certainly new information.  I don't think I

8    can say, Okay.  Well, that means he's an all new person;

9    he's all fixed now.  He's at day one.  It's a process.  But

10   at least you know the road you're on, and it sounds like

11   you're committed to it.  And I do think it's worth noting,

12   and notwithstanding what people have to say about CTF, that

13   he experienced this breakthrough with the care and the

14   assistance of the medical professionals there.

15          I was going to say before I got the new submission

16   from your letter that if I release you, you might want to

17   give some really serious thought to using this opportunity

18   about working with a trained professional about how to turn

19   things around.  You made good strides before.  I know rehab

20   wasn't easy, but it all needs to stick.  You're 36 now.  And

21   you're facing trial for a set of extremely serious charges

22   that could involve the imposition of extremely serious

23   penalties.

24          But given the submission that I got, I'm going to

25   insist that you comply with the new medical regimen and you

1    participate in continued therapy which generally today can

2    be provided through video or telehealth means, but if that's

3    not possible, then you can seek the approval of the Pretrial

4    Services Agency to attend regularly scheduled appointments,

5    as long as we're talking about a licensed therapist or a

6    medical professional.  We're not doing any kind of

7    off-the-wall therapy.

8              I find that we do know things now that we did not

9    know before.  The Government has scoured hours and hours of

10   videotape -- CCTV, body-worn camera video, open-source

11   video -- to get to the bottom of exactly what happened to

12   this officer.  And while you know from the last hearing

13   exactly what I think it shows that this defendant did, we do

14   know that it doesn't show that he was involved before or

15   after the offense that was alleged.  The Government has also

16   spent considerable time reviewing social media, and we do

17   now know that your case does not involve the sort of threats

18   and violent language or promises to return that have weighed

19   heavily in favor of detention in other cases.  These new

20   circumstances bear on the nature and circumstances of the

21   offense and the weight of the evidence.  If it was

22   appropriate in Peralta to pay attention to the fact that the

23   evidence -- the case got stronger when a motion to suppress

24   was denied, this is the converse of that, and I think it's

25   important.

 1          As for the history and characteristics of the

 2    defendant, I think the information that we have from the

 3    guards is in a different category from the information in

 4    the Martin case that the defendant completed a course while

 5    he was detained.  I haven't seen comments like the ones we

 6    received from the guards very often at all, and they tell us

 7    something about this defendant's character that we didn't

 8    know before.  And this is particularly true, given the new

 9    and unique and unbelievably troubling information about the

10    toxic environment and the pressure this defendant tells me

11    he has had to resist to be someone that gained the trust and

12    support of the jail officials.  And he's not just asking me

13    to take his word for it -- which I wouldn't have the

14    information or the ability to substantiate -- that it's been

15    tough.  He's shown me by his actions; by the choice to

16    isolate himself and endure more harsh conditions than what

17    he would be exposed to, to separate himself from the other

18    January 6th defendants, and that their treatment has been so

19    difficult for him.  It certainly raises serious, serious

20    questions about the manner in which they're housed together.

21          We also have the medical information.

22          And finally, what I have before me is a written

23    submission from the defendant himself that expresses a

24    degree of understanding about the wrongfulness of certain

25    events of that day and remorse for his own participation.

 1    And while he didn't waive his right to contest the

 2    allegations concerning his possession of the officer's badge

 3    and radio that he has a constitutional right to contest and

 4    continues to do, many individuals do not express remorse

 5    publicly at this stage in the proceedings.  So that's new

 6    and it's different.

 7          And all of those bear on the nature and

 8    seriousness of the danger to the community that his release

 9    would pose, which is one of the 3142(g) factors.

10          In sum, given the information we have now that was

11    not available before, and giving you the benefit of the

12    doubt which I think you've earned, I believe you deserve a

13    chance, and giving people the benefit of the doubt is what

14    the Constitution and the Bail Reform Act require.

15          Please understand, Mr. Sibick, that there will

16    only be one chance.  If you violate my conditions, that will

17    be an indication that my trust was misplaced and your

18    impulse control places the community at risk.  I believe you

19    are sincere when you are shaking your head "no" to me, but

20    I'm just letting you know that I'm generally more lenient on

21    the front end than I am the second time I run into people.

22          Therefore, the motion will be granted, and you

23    will be released to the third-party custody of your parents

24    to be confined at the start 24/7 to their home with the

25    following conditions:

1    It means you must not violate any federal, state,

2    or local law while on release.

3    You must cooperate in the collection of a DNA

4    sample, if that's required.

5    You must advise the Court and Pretrial Services

6    officer or supervising officer in writing before making any

7    change of residence or telephone number.

8    You have to appear in court as required and, if

9    convicted, have to surrender to serve a sentence that I may

10   impose.

11   You're going to be placed in the custody of your

12   father, Dr. Eugene Sibick, to live at that home.

13   You must submit to supervision under the U.S.

14   Pretrial Services Office for the Western District of New

15   York and report as they direct.  You're to contact them

16   within 24 hours for additional reporting instructions after

17   you get home.

18   You are to surrender any passport, if you haven't

19   already done so, to the Clerk of Court for the Western

20   District of New York through the Pretrial Services Agency.

21   You are not to obtain a passport or other

22   international travel documents if you don't have one.

23   You are to abide by the following conditions which

24   is to stay away from D.C., and also, stay away from any

25   political rallies except for court or business or meetings

1    with your attorney.

2            Any travel outside the Western District of New

3    York would have to be approved by the Court other than to

4    come here to this courtroom.

5            And you are to reside at -- the address will be in

6    the order.  I'm not going to read it out loud into the

7    record.

8            It is a condition of your release that you

9    continue your medical or psychiatric treatment, to obtain

10   health treatment, to remain compliant with the medical

11   regimen, and to execute any releases that enable Pretrial

12   Services to ensure your compliance with this condition.

13           You're barred from possessing a firearm, and there

14   may be no firearms in the home.

15           And you are basically participating in the

16   following location restriction program which is called home

17   incarceration:

18           You are restricted to a 24-hour-a-day lockdown at

19   your residence except for medical necessities and court

20   appearances.

21           You will have to submit to location-monitoring

22   technology at the direction and under the supervision of the

23   Pretrial Services Office.

24           And you have to pay all or part of the costs of

25   that location monitoring based on your ability to do so as

1    determined by Pretrial Services.

2              You must report as soon as possible to Pretrial

3    Services any contact with law enforcement, including arrests

4    or questioning or traffic stops.

5              You must not watch any political television

6    programs.

7              And I'm not sure it's necessary, but I would

8    consider adding, if I hear that you've been on social media

9    at all, a condition where you're given a tablet and a phone

10   that is monitored by Pretrial Services.  I'm not going to do

11   that right now, but you may not use any social media,

12   including Parler, Gab, Reddit, Facebook, Instagram, Discord,

13   Twitter, Snapchat, TikTok, or any similar platforms, as I

14   don't think they do much to help anybody right now.

15             I see you nodding your head.  I'm going to ask --

16   actually ask you to acknowledge, Mr. Sibick, that you're

17   going to abide by these conditions of release.  You're going

18   to have to sign it in writing, but I just want to hear it

19   from you right now.

20             THE DEFENDANT:  Yes, Your Honor.  Yes.

21             THE COURT:  All right.  Okay.

22             MR. BRENNWALD:  Your Honor, can I ask for just a

23   clarification?

24             THE COURT:  Yes.

25             MR. BRENNWALD:  And I've heard different answer --

```
1        I've gotten different answers from different Pretrial
2     Services officers.  Even inmates at the jail get to go on a
3     rec for two or three hours a day outdoors.  I'm not asking
4     that he be allowed to leave the premises of his parents'
5     house.  But will he be allowed to go outside on the patio or
6     in the yard to get fresh air?  I don't think it's --
7              THE COURT:  Yes, he can go in his parents' yard.
8              MR. BRENNWALD:  Okay.  Just --
9              THE COURT:  And --
10             MR. BRENNWALD:  He'll stay within the cloture of
11    the --
12             THE COURT:  Yes.
13             MR BRENNWALD:  All right.
14             THE COURT:  And if there comes a time that there
15    is an employment opportunity that involves going to a fixed
16    address for regular hours as opposed to, I'm going to do
17    landscaping and Lord knows where I'm going to be on any
18    given day --
19             MR BRENNWALD:  Right.
20             THE COURT:  -- but if it's, I'm going to leave at
21    X hour and I'm going to go to this place and I'm going to
22    come back at that hour --
23             MR BRENNWALD:  Right.
24             THE COURT:  -- he can give that information to
25    Pretrial Services and they can seek my approval to modify
```

1     this to permit his departure for employment --

2              MR. BRENNWALD:  Okay.

3              THE COURT:  -- but right now he's going to start

4     out just --

5              MR. BRENNWALD:  Right.

6              THE COURT:  -- being there and working on the

7     issues that you talked about in your motion.

8              MR. BRENNWALD:  I have -- I had three letters from

9     different people who said that they would offer him

10    employment.  I did not submit those because I thought it was

11    -- it would be presumptuous to get to that point when we're

12    not even at Point A yet.  So I have them, but I think it

13    would be better for him -- this is my own opinion; he can do

14    what he wants, I guess -- but better for him to get settled

15    in the house, get the therapy going there -- and not just at

16    the jail, but there -- and then at some point once he's

17    stable with everything in place -- and I guess I can talk to

18    the family about it, but I'm just -- I'm trying to not rush

19    things also --

20             THE COURT:  All right.  I think that's --

21             MR. BRENNWALD:  -- but he --

22             THE COURT:  -- fine.  If there comes a time that

23    you want to modify the conditions because he has something

24    to do, then you can file -- you know how to file a motion to

25    do that.

```
 1              MR. BRENNWALD:  It might be mentally healthy for

 2    him to actually have something to do all day rather than sit

 3    at home --

 4              THE COURT:  True.

 5              MR. BRENNWALD:  -- but I didn't want to be

 6    presumptuous.  So -- but --

 7              THE COURT:  All right.

 8              MR. BRENNWALD:  -- I do have those.

 9              THE COURT:  I think Ms. Schuck is preparing the

10    order.  It's somewhat different than something -- what we

11    discussed previously.

12              Ms. Schuck, do you have everything you need?

13              MR. BRENNWALD:  Your Honor, can I step back and

14    talk to the mother for a second?

15              THE COURT:  Yes.

16              THE PROBATION OFFICER:  Yes, Your Honor.

17              THE COURT:  Okay.  So we need to await that being

18    provided to us.  I mean, he is present here in the

19    courtroom, Ms. Schuck.  Do -- so do we want him to sign it?

20              THE PROBATION OFFICER:  Yes, Your Honor, and I'm

21    about to send it over in less than a minute.

22              THE COURT:  Okay.  All right.  We'll wait for

23    that.

24              Mr. Brennwald?

25              MR. BRENNWALD:  Your Honor, his mother asked --
```

1    they're fairly religious.  They were -- she was asking if he

2    would be allowed to go with them once a week in their

3    supervision to church and come back.

4              THE COURT:  Yes, he can attend religious

5    ceremonies with his parents.

6              MR. BRENNWALD:  Thank you.

7              MS. SIBICK:  Thank you.

8              (Brief pause.)

9              MR. BRENNWALD:  Your Honor, could we approach the

10   bench --

11             THE COURT:  Yes.

12             MR. BRENNWALD:  -- off the record perhaps?

13             THE COURT:  Sure.

14             (Bench conference off the record.)

15             THE COURT:  All right.  Mr. Haley, you can let us

16   know -- we're going back on the record -- when you get the

17   information from Ms. Schuck.

18             In the meantime, we do need to set a status

19   hearing for the next appearance in this case which this

20   defendant may participate in by video.  We have a status

21   conference already set for 2:00 p.m. on November 29.  And so

22   I think that should be the date.  And the question is,

23   what's your position with respect to the Speedy Trial Act

24   between today and the 29th when we've already got a status

25   conference set in the case?

 1              MR. BRENNWALD:  Your Honor, we don't object to the

 2      waiver of the Speedy Trial Act -- or the tolling of the

 3      Speedy Trial Act --

 4              THE COURT:  All right.  So --

 5              MR. BRENNWALD:  -- clock between now and the next

 6      hearing.

 7              THE COURT:  -- the defendant and you can

 8      participate in that hearing by video on the 29th.

 9              And I'll exclude the time between today -- or

10      between -- I'm not sure if we excluded it after our last

11      hearing, but from the last hearing at which it was excluded,

12      too, until the 29th, given, again, all this -- the volume of

13      the discovery and the defendant's agreement.

14              I think what happens, Mr. Haley, is that he gets

15      taken back to the jail before he's released.  He's not

16      released from court --

17              THE DEPUTY CLERK:  That is correct.  He's released

18      from the facility, Your Honor.

19              THE COURT:  Okay.

20              (Brief pause.)

21              MR. BRENNWALD:  I just explained to him he can go

22      out in the yard and things like that, and he literally just

23      expressed -- he says, As long as I can shovel the snow,

24      which is obviously a huge thing in Buffalo.  So he's --

25              THE COURT:  Well --

```
 1                  MR. BRENNWALD:  Shoveling on the driveway.

 2                  THE COURT:  -- feel free.  You can come back to

 3       D.C. if we ever get any again and shovel it around here, but

 4       that would be -- I'm sure it would be greatly appreciated, a

 5       point when your parents shouldn't be picking up those

 6       shovels anymore.

 7                  MR. BRENNWALD:  Your Honor, thank you for your

 8       time.  I know this was --

 9                  THE DEPUTY CLERK:  We're not --

10                  MR. BRENNWALD:  We're not on the record?

11                  THE DEPUTY CLERK:  We're not -- I want to make

12       sure I get the correct speedy trial date first, Your Honor.

13                  MR. BRENNWALD:  Okay.

14                  THE COURT:  Okay.  I can pull up the docket, too.

15                  THE DEPUTY CLERK:  We had excluded it, it

16       appeared, from --

17                  THE COURT:  Until the bond hearing -- the first

18       bond hearing, but I don't remember what we did between then

19       and the next hearing.

20                  THE DEPUTY CLERK:  We excluded -- on September

21       28th, we excluded until October 1.  Let me see.  On

22       October 1, we excluded from October 1 to October 25.

23                  THE COURT:  Okay.  So that's today.  So then we'll

24       exclude it from today until November 29th.

25                  (Brief pause.)
```

1           Oh, 25 was Monday.  That was when we thought we

2    were having a status conference and Mr. Brennwald thought we

3    were having a motions hearing.  So we need to go back to the

4    25th, which was Monday, until --

5           THE DEPUTY CLERK:  So we're going to go nunc --

6    all right.  So the 25th.  That's fine.  Okay.

7           (Brief pause.)

8           You know what?  I can do this.  One second, Your

9    Honor.

10          (Brief pause.)

11          THE PROBATION OFFICER:  I apologize.  This is

12   Pretrial Services.  I just want to confirm that the

13   documents did go through.

14          THE COURT:  Yes, we did receive them, Ms. Schuck.

15          THE PROBATION OFFICER:  Okay.

16          THE COURT:  I was signing them.  John was printing

17   them out.  He's about to swear the defendant and the

18   third-party custodian and we're about to conclude, but thank

19   you for checking on us.

20          THE PROBATION OFFICER:  Thank you so much.

21   Sometimes Outlook can be a little fickle.

22          THE COURT:  Yeah, no, and I appreciate your being

23   on the call and your quick turnaround.

24          THE DEPUTY CLERK:  Mr. Sibick, please raise your

25   right hand.  I will get you to sign these in a minute.

1            Do you solemnly affirm and truly declare that you

2   will well and truly follow the conditions of your release as

3   set forth by the Court this date?

4            THE DEFENDANT:  Yes, sir.  Yes, sir.

5            THE DEPUTY CLERK:  Okay.

6            (Brief pause.)

7            MR. BRENNWALD:  Your Honor, speaking of -- this

8   doesn't have to be on the record.

9            (Discussion held off the record.)

10            THE DEPUTY CLERK:  Mr. Sibick's father,

11   (indicating.)  This is where you're going to sign,

12   (indicating.)

13            (Brief pause.)

14            You're going to sign here, (indicating) and you're

15   going to put today's date.

16            MR. SIBICK:  (Indicating.)

17            THE DEPUTY CLERK:  Okay.  Dr. Eugene Sibick,

18   please raise your right hand.

19            Do you solemnly affirm and truly declare that you

20   will well and truly discharge your responsibility as

21   third-party custodian and to advise the Court if the

22   defendant violates the terms and conditions of his release?

23            MR. SIBICK:  I do.

24            THE COURT:  All right.  Dr. and Mrs. Sibick, I

25   think there is truth to the old saying that you're only as

1    happy as your unhappiest child.  And so I hope you all have

2    a safe trip back to New York and that everybody stays

3    healthy and that this continues to go well.

4              MS. SIBICK:  Thank you.

5              MR. SIBICK:  Thank you, Your Honor.

6              THE COURT:  Okay.  All right.

7              THE DEPUTY CLERK:  All rise.  This Honorable Court

8    now stands in recess until return of court.

9              (Proceedings concluded at 10:50 a.m.)

10              * * * * * * * * * * * *

11              **CERTIFICATE OF OFFICIAL COURT REPORTER**

12   **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

13   **that the above and foregoing constitutes a true and accurate**

14   **transcript of my stenographic notes and is a full, true and**

15   **complete transcript of the proceedings to the best of my**

16   **ability, dated this 4th day of November 2021.**

17                              **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                             **Official Court Reporter**
18                           **United States Courthouse**
                             **Room 6722**
19                           **333 Constitution Avenue, NW**
                             **Washington, DC 20001**

20

21

22

23

24

25