UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES | : |
| v. | : Crim. No. 21-CR-291-1 (ABJ) |
| THOMAS F. SIBICK | : |

**DEFENDANT THOMAS SIBICK'S MOTION
FOR MODIFICATION OF CONDITIONS OF RELEASE**

Defendant Thomas F. Sibick, through undersigned counsel, Stephen F. Brennwald, submits the following Motion for Modification of Conditions of Release, asking that the Court modify his release conditions from home confinement to an 8:00 a.m to 8 p.m. curfew, seven days a week, and in support thereof, states as follows:

*Procedural Background*

Thomas Sibick was arrested on March 12, 2021 and charged with offenses arising out of the events that occurred on January 6, 2021, at the United States Capitol.

He was held without bond from March 12, 2021 until October 26, 2021, when this Court modified his bond, granting him release on his personal recognizance with the stipulation that he remain in 24-hour-a-day home confinement. The Court allowed him to leave the home for medical and court appointments, as well as for other activities specifically approved by the Court. ECF No. 89.

On November 2, 2021, the Court clarified its October 26, 2021 ruling.

Following Mr. Sibick's filing of a motion to modify his conditions of release on January 26, 2022, the Court approved his "release for the purpose of specific employment activities at specific locations and times if and when such activities have been verified and approved by Pretrial Services. Min. Order, Feb. 28, 2022.

On April 6, the Court, in another minute order, ruled that "defendant may be permitted by the U.S. Probation Office for the Western District of New York to leave his residence between 9:00 am and 5:00 p.m. on weekdays to attend verified job interviews or to perform work at specified times and specified locations paid or unpaid that has been verified and approved by the Probation Office in advance." The Court added that "[a]s of today's date, what has been verified and approved is that he may leave his residence between 9:00 am and 5 pm on Monday through Friday beginning on April 11, 2022 through April 29, 2022 to perform work at the address that has been supplied to the Probation Office." Finally, the Court stated that "[a]ny extension of this arrangement or work at any other address or under or under any other individual's supervision must be verified and approved by the Probation Office before the work may begin; the Probation Office is authorized to approve additional verified employment without seeking the Court's permission each time."

Since this Court's ruling on April 6, 2022, the defendant has located full-time, paid, employment, and has already worked for three weeks. His hours of employment are from 10:00 a.m. to 6:00 p.m., Monday through Friday. He has been allowed by the Pretrial Services officer to leave his residence at 9:00 a.m., and he is required to return home by 6:30 p.m. He is not allowed to deviate from the route from his parents' home to his place of employment, even to stop and get a coffee or to buy a banana or sandwich in a store on the way to or from work.

Since his release to go to work, however, several issues have arisen. First, before he began employment, he asked his supervising officer whether he could go to a store to buy work clothes. This rational request was denied. The officer told Mr. Sibick that his father should go clothes shopping for him, and bring the clothes back home for Mr. Sibick to try on. If the clothes

didn't fit, the officer stated, the father could simply return them and repeat the process over and over until properly-fitting clothing was located.

In addition, Mr. Sibick has not been allowed to stop at a store to pick up any grocery items on his way to or from work, such as a sandwich or other food, as he must go straight to work and back. He cannot even stop to get a coffee or snack at a convenience store.

Moreover, now that Spring is here, and everyone is outside exercising (and Mr. Sibick is no longer getting exercise by shoveling snow), he is not allowed to go for a jog, or for a walk in the neighborhood with his parents.

On weekends, he cannot help the person who had asked him for help renovating several properties, though the work still needs to be done, the person is elderly, and Mr. Sibick is more than willing to spend weekends helping his friend by doing construction or light home improvement work.

In sum, although he is already allowed to leave his home five days a week from 9:00 a.m. to 6:30 p.m., he is severely restricted in his ability to engage in any routine tasks or activities. He submits that these restrictions are not "the least restrictive conditions" that the law requires be imposed with respect to a defendant's pretrial release.

### *The Legal Standard*

This Court well knows that pursuant to 18 U.S.C. § 3142(c)(1)(B), it must impose the least restrictive conditions of release that are necessary to reasonably assure the appearance of the person as required, as well as the safety of any other person and the community.

The question is thus whether allowing Mr. Sibick to be "out" of his parents' home for an extra hour in the morning, and an extra hour and a half after work (i.e., 8:00 a.m. to 8:00 p.m.) in order to allow him to accomplish various lawful tasks such grocery shopping, clothes shopping,

buying coffee at a coffee shop, having dinner with his parents and/or friends, or going for a walk or a jog in his neighborhood (this is not an exhaustive list), would create an "unreasonable risk" of danger to the community.

The answer is obviously "no."

Since his release nearly seven months ago, Mr. Sibick has faithfully attended all of his mental health therapy sessions. He has not left home in the morning before the appointed time, and he has always returned no later than his present "curfew" of 6:30 p.m.

In nearly seven months of release (from October 26, 2022 to May 17, 2022), he has not once violated a single condition of release.

This Court, having seen his compliance, has progressively granted him more liberty, and Mr. Sibick truly appreciates the increasing trust the Court has placed in him.

As he indicated at a recent hearing, the last thing he wants to do is violate any terms of his release. In fact, he does not even want to come close to the line between lawful and unlawful behavior. That is why he has always asked his supervising officer for permission to do a particular activity rather than assume that whatever it is he was contemplating doing, and that seems obviously reasonable to Mr. Sibick, would be acceptable. Surprisingly, the supervising officer has often decided that any such proposed activity, such as buying clothes for work, or stopping at a grocery store to pick up some food items or toiletry items on his way to or from work, is unreasonable and unacceptable.

Mr. Sibick submits that given his record of extreme compliance, his demonstrated responsibility at work, his faithful adherence to his mental health counseling, and the fact that, despite having many chances every day to deviate from his strict release conditions, he has never

done so, it is more than appropriate to allow him to leave his home every day between 8:00 a.m. and 8 p.m. so that he can engage in various lawful and appropriate activities.

Again, the list presented above – grocery shopping, stopping for coffee or food, clothes shopping for work, going for a jog, or a walk with his parents, or sitting outside at a restaurant with his parents or friends – is not exhaustive.  It is difficult to list every lawful activity that one might undertake from time to time in the course of a day (stopping at a drug store to get toothpaste, picking up clothes at a dry cleaner, buying a part for his motorcycle, which is his method of transport to work these days, etc…), which is why Mr. Sibick is now proposing a curfew of 8:00 a.m. to 8 p.m., rather than attempt to list a dozen or more possible activities he has not yet foreseen the need to engage in.

Whether one calls this a curfew or a modification of his home confinement, or whether it would be more proper to term his release "home detention with a curfew," or to release him on high intensity supervision with a curfew, there is no discernable reason that he shouldn't be given more responsibility with respect to his release conditions, given his perfect compliance to date.  And there is no discernable reason to believe that he would violate any such terms, again given his prior compliance.

This Court, in its many years on the bench, has seen defendants violate their conditions of release in all manner of ways:  Testing positive for an illegal substance; violating a curfew; absconding from a halfway-house; being arrested for a new crime, failing to report as directed, whether in person or by phone, contacting an alleged victim despite an order not to do so, failing to charge a GPS device, etc…   There are indeed many ways to violate one's conditions of release.

Mr. Sibick, after nearly seven months, has not violated a single condition of release, even once. He has not come close to doing so. ***And there is no rational, factual, basis to believe that he would do so if he were allowed to be "out" during the hours he proposes***.

After the hell that he went through while at CTF (both in and out of "the hole"), the last thing Mr. Sibick wants is to engage in any conduct that could risk sending him back to that nightmarish place of confinement.[1]

Moreover, what Mr. Sibick proposes does not risk placing him in situations that would unnecessarily and unreasonably tempt him to commit a crime.

Stopping for coffee on his way to work is not a risk-creating activity. Nor is stopping at a Target or Macy's to try on some new pants or shirts for work. Nor is going for a jog in his neighborhood. Nor is having dinner with his parents at a local restaurant. Nor is helping his friend on a Saturday or Sunday (after church) with the renovation of several properties. Nor is stopping at a CVS to buy some toothpaste or deodorant.

He is already restricted from using any device to access any political content, and he has taken this Court's directive seriously. In fact, every way in which he has conducted himself since his release has been above reproach.

As counsel noted in a prior hearing, before Mr. Sibick located full-time employment, he was taking a bus from his parents' home to his therapist's office, and was on his own throughout the trip there and back. Those trips involved a 10-minute walk from his home to the nearest bus stop, a 20 to 30-minute bus ride, an 10 or 15 minute wait at a transfer station, and another 15 or 20 minute ride on the metro to the stop nearest the therapist's office. Thus, during those trips, he

---

[1] To be clear, that description does not stem from the conduct of the officers and guards at the jail, but from the treatment he received from others.

was literally "on his own" for over an hour each way. Yet he never decided to get off a bus or train and go somewhere he wasn't allowed to go, thereby skipping a therapy session.

Even now, on his way to and from work, he has never "snuck in" a trip to a nearby grocery store to pick up a banana or a granola bar or other snack. He has faithfully adhered to all of his conditions of release, no matter how unreasonable they might appear to be, because those were his conditions of release, and because he values his freedom more than anything else.

If that repeated experience with freedom did not lead him to "go on the run" or to, for some unknown reason, assault anyone (since the goal of the statute is to protect any other person and the community from violence), there is no rational reason to believe that Mr. Sibick would present an unreasonable risk to anyone or to the community if he were allowed a little more freedom to do things for himself -shop, buy groceries, etc., i.e., activities of daily living that his parents shouldn't have to do for him.

To restate the crux of the issue here, this Court must determine whether release on a curfew, or on some other form of release (high intensity supervision with a curfew, home detention with a curfew, rather than home confinement) would present an unreasonable risk to the community. And there is no reason *at all* to believe that it would.

To be clear, the Pretrial Services Agency will not recommend any such modification, just as they opposed this Court's initial release of Mr. Sibick, believing that his release would create an unreasonable risk to the community. It clearly has not. But, of course, the Agency is not clairvoyant, and is in no better position to evaluate any risk than is this Court. It is simply, and understandably, risk-averse. But that is not the legal standard that this Court must apply when deciding whether to release an accused.

The government, as well, strenuously opposed Mr. Sibick's release in October of 2021, arguing that he would present an unreasonable danger to the community if released. Again, that has proven not to be the case.

The arguments and positions advanced by the government and by pretrial services were without merit then, and they have proven to be even more hollow as time has gone by, given Mr. Sibick's spotless conduct over the past seven months.

*Conclusion*

The bottom line is this: Mr. Sibick is not a danger to anyone, and his release as proposed, from 8:00 a.m. to 8 p.m., seven days a week, will not change that fact. That proposed release schedule also has the virtue of coming closer to the bail law's requirement that any conditions of release be "the least restrictive conditions" necessary.

WHEREFORE, in light of the foregoing, defendant asks this Court to grant the foregoing relief, and for any other relief this Court may deem just and proper.[2]

Respectfully submitted,

/s/

Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C. 20003
(301) 928-7727
(202) 544-7626(facsimile)
E-mail: sfbrennwald@cs.com

---

[2] Because any proposed Order could encompass a number of possible scenarios, it is impractical to submit such an order with this motion. Defendant is confident that any Order will reflect the Court's decision, including any specific conditions or limitations the Court deems appropriate.

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a copy of the foregoing was sent by ECF, this 16th day of May, 2022 to the U.S. Attorney's Office, 555 4th Street, N.W., Washington, D.C. 20530, and to all counsel of record.

/s/

Stephen F. Brennwald