**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-291-1-ABJ** |
| **THOMAS SIBICK,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant, Thomas Sibick, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced the interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars' in losses.[1] Sibick has been convicted of assaulting Metropolitan Police Officer Michael Fanone, and stealing his badge and radio, while the officer fought for his life against members of the violent mob on the Lower West Terrace of the Capitol.

For the reasons set forth herein, the government requests that this Court sentence Sibick to a term of incarceration of 71 months—which is the top of the Sentencing Guidelines range for

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021 and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Sibick's offenses, as calculated by probation—three years of supervised release, at least $7,500.79 in restitution, and the mandatory $100 special assessment. As explained below, this Court should impose a substantial prison sentence in this case that takes into account the extent of Sibick's violent criminal conduct on January 6. Such a sentence reflects the gravity of Sibick's conduct, as well as his criminal history.

## I.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 191, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

On January 6, 2021, hundreds of rioters unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. This occurred as Congress was certifying the Electoral College vote for the 2020 presidential election.

***Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building***

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.

Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the LWT. As explained *infra*, Sibick was in the thick of that violence, working his way to the front of the mob to personally and forcefully contribute to it.

### B.    Sibick's Role in the January 6, 2021 Attack on the Capitol

#### *Sibick's Approach to the Lower West Terrace*

Sibick enthusiastically participated in the violent effort to breach the Capitol while Congress was certifying the results of the 2020 Presidential Election. By 3:00 p.m., Sibick made his way illegally on to the Capitol grounds and into the mob gathering on the West Plaza of the Capitol. He trumpeted his participation in the riot on social media by posting a "selfie" video on Instagram depicting himself in the mob near the inauguration ceremony stage of the lower west terrace. The video pans the crowd with the caption "Wildest experience of my life!!" Sibick then filmed himself screaming, "Just got tear-gassed, but we're going, baby, we're going! We're pushing forward now!"

 

**Still shots from Exhibit 1: Sibick Instagram Video at 00:10 and 00:22**

Sibick also posted a photo to Facebook of himself holding a police riot shield.



**Exhibit 2: Facebook Photo of Sibick with Capitol Police Riot Shield**

***Sibick's Actions on the Lower West Terrace***

Sibick made his way from the West Plaza to the inaugural platform of the Lower West Terrace. There, Sibick entered the tunnel at 3:08 p.m., and swiftly moved towards the police line. See Exhibit 3.





**Still Shots from Exhibit 3: LWT Tunnel CCTV footage at 03:07:49 p.m. and 03:08:06 p.m.**

The timing of Sibick's entry is significant; rioters inside the tunnel had just called for a "shield wall," comprised of stolen police riot shields, which they turned on the members of the

beleaguered police line. Exhibit 4, Political Trance, at 18:00 -18:30. It was then that Sibick rushed

to the front, to add his weight to the pushing throng trying to enter the Capitol. See Exhibit 4,

Political Trance, at 18:42; Exhibit 5, Defendant Cantwell Cellphone, at 5:22.



**Still Shot from Exhibit 4: Political Trance video at 18:42**



**Still Shot from Exhibit 5: Defendant Cantwell video at 5:22**

After a few minutes pushing at the front of the police line, Sibick turned around, moved to

the mouth of the tunnel, and exited around 3:11 p.m. See Exhibit 3, at 3:10:55 p.m.



**Still Shots from Exhibit 3: LWT Tunnel CCTV footage at 03:10:55 p.m.**

An open-source video posted on YouTube showed Sibick after exiting the tunnel. *See* Exhibit 6, Just Another Channel at 00:10. In the video, an individual thanked Sibick for "his service" as he left the tunnel, and Sibick stated "Let's go. Let me just get refreshed."



**Still Shot from Exhibit 6: Just Another Channel video at 00:10**

Approximately eight minutes later, at 3:19 p.m., Sibick was refreshed enough to rejoin the fight. After Officer Fanone was pulled into the crowd and violently attacked with a taser by rioter Daniel Rodriguez, Sibick joined the attack by robbing the officer of his MPD-issued radio and badge. See Exhibit 7, Officer Fanone's Body Worn Camera and Exhibit 8, Annotated and Slowed

7

Version of Officer Fanone's Body Worn Camera.





**Still Shots from Exhibit 7: Officer Fanone Body Worn Camera at 15:19:23**



**Still Shots from Exhibit 8: Annotated and Slowed Officer Fanone Body Worn Camera at 15:19:25**

### *Officer Fanone's Injuries*

Officer Fanone sustained significant and painful injuries on January 6, 2021. He

experienced excruciating pain each time Rodriguez repeatedly applied a taser to the back of his neck. Officer Fanone can be heard screaming on his body-worn camera, Exhibit 7, on three separate occasions—at minute markers 15:19:15, 15:19:17, and 15:19:21-22. The tasing caused burn marks to the back of Officer Fanone's neck that resulted in scarring.



**Exhibit 9**: **Picture of Officer Fanone's Neck**

After Officer Fanone was escorted back to the police line, his body-worn camera depicts him collapsing at 15:21:09, followed by another officer announcing, "Officer down!"



**Still Shot of Exhibit 7: Officer Fanone's Body Worn Camera at 15:21:46**

Other officers dragged Officer Fanone's limp body inside the Capitol building. One of the officers yelled "We need a medic! We need EMTs now!" as Officer Fanone's unconscious face

is slumped over his chest, making it visible in the body-worn camera.



**Still Shot of Exhibit 7: Officer Fanone's Body Worn Camera at 15:22:08**

Officers continued to carry Officer Fanone, as his MPD partner arrived and started talking to Officer Fanone—"Mike, stay in there buddy. Mike, it's Jimmy, I'm here."



**Still Shot of Exhibit 7: Officer Fanone's Body Worn Camera at 15:22:51**

In the footage, Officer Fanone's partner opened Fanone's vest to help him breathe. One officer addressed Officer Fanone—"Come on, wake up, brother. Talk to me man." Officer Fanone's partner also continued to try to revive him: "Come on, Mike. Come on, buddy, we're going duck hunting soon." Another officer asked, "Fanone, Fanone, you alright, brother?"

At time stamp 15:23:32 in the BWC footage, nearly two and a half minutes after his initial collapse, Officer Fanone regains consciousness. His first words are, "Did we take that door

back?" 



*Sibick's Actions After the Assault*

MPD officials were able to recover the data for the use of Officer Fanone's radio on January 6. The data showed that the emergency button was pressed at 2:37 p.m. and 3:37 p.m.

| Date and Time | Subscriber WACN | Subscriber System | Subscriber ID | Subscriber Alias | Event | Event Description |
|---|---|---|---|---|---|---|
| 01/06/2021 02:37:56 PM | BEE00 | 445 | 1108789 | 6845 FANONE | 8 | Emergency Alarm |
| 01/06/2021 02:37:58 PM | BEE00 | 445 | 1108789 | 6845 FANONE | 21 | Emergency Indication |
| 01/06/2021 03:37:13 PM | BEE00 | 445 | 1108789 | 6845 FANONE | 8 | Emergency Alarm |
| 01/06/2021 03:37:13 PM | BEE00 | 445 | 1108789 | 6845 FANONE | 21 | Emergency Indication |

**Exhibit 10: Radio Calls Fanone Radio January 6, 2021**

Officer Fanone's body-worn camera showed Sibick taking the radio at 3:19 p.m. As shown on body-worn camera in the screenshots above, by 3:21 p.m., Officer Fanone had been escorted back to the police line where other officers pulled him to safety, and Officer Fanone then collapsed, seemingly unconscious.

Accordingly, Sibick pressed the emergency call button on the radio approximately 18 minutes after stealing the radio and 16 minutes after Officer Fanone was pulled to safety by other officers. In no scenario was Sibick attempting to raise assistance for the officer who had fallen victim to the riotous mob, as he later claimed to the FBI.

*Sibick's Statements After January 6*

<u>Statements on Social Media</u>

On January 7, 2021, Sibick posted a video to Instagram to "reflect on the events that

occurred at the nation's Capitol yesterday." See Exhibit 1, Instagram video, at 00:25. He bemoaned being "very worried for America," because "the system is broken." While he recognized the violence, he wrote that people stormed the Capitol because they were "failed by the same government" as the people who rioted during the summer of 2020. See Exhibit 1, Instagram video, at 00:55. He took no responsibility for his part in the violence.



**Still shot from Exhibit 1: Sibick Instagram Video at 00:58**

<u>Law Enforcement Interviews</u>

After tipsters sent the FBI the Instagram video of Sibick at the Capitol as well the Facebook photo of Sibick posing with a riot shield, agents interviewed Sibick on January 27, 2021. At that time, the agents were not aware that Sibick had participated in the attack of Officer Fanone. During the interview, Sibick acknowledged being in Washington, D.C. at Capitol on January 6, 2021. Sibick described witnessing an officer being pulled down the steps, hit with a flagpole, and beaten

in an attempt to get the officer's gun. Sibick described how the individuals were unable to get the gun because of the "plastic piece on top of the holster," and that he heard the attackers saying to "get his gun and kill him." Sibick claimed that he attempted to reach the officer and pull him away but was unable to do so and feared for his own life and that of the officer. Sibick stated that he decided to leave at the point because of the violence he witnessed. When shown the photo of himself holding the riot shield, Sibick said that the shield had been passed through the crowd and Sibick asked someone to take a picture of him with it before giving the shield to another member of the crowd.

Sibick called one of the agents on February 2, 2021, to tell him that he planned to email the agent more information about the assault he witnessed. When asked, Sibick said that he did not have anything different to add to his prior interview, what he had previously described was accurate, and that he had not participated in the assault on the officer in any way.

FBI agents reinterviewed Sibick on February 23, 2021, after watching Officer Fanone's body-worn camera and observing Sibick in close proximity to Officer Fanone. After the agents showed Sibick still shots from the body-worn camera, Sibick admitted to grabbing the officer's badge and radio, but claimed that he had reached in to try to help the officer, and that he remembered the badge coming off as he reached for him. Sibick claimed he pressed the "emergency orange button" once he had possession of the radio to get help for the officer. Sibick then changed his story several times in describing what happened to the badge and radio after he had possession of it:

First, Sibick stated that he dropped the badge and radio right away and left. Then, when asked if he saw anyone pick up the radio and badge, Sibick said that he carried the radio and badge

with him when he left and dropped them in a trash can on Constitution Avenue. Sibick stated that he thought about giving the items to an officer but was afraid of being arrested.

Later in the interview, Sibick stated that he needed to "recant" his statement about what happened to the radio and badge. He stated that he brought the items to his hotel room and then back to his home in Buffalo, NY. Sibick stated that the day after he returned to Buffalo, he was on his way to take the items to the FBI, however, he was afraid of being arrested and instead, threw them in a dumpster on North Street in Buffalo, NY. On February 24, 2021, Sibick clarified to agents that he disposed of the radio and badge in a dumpster located on the back alleyway of the Lenox Hotel at 140 North Street, Buffalo, NY.

Sibick then changed his story a fourth time after an agent sent Sibick a ruse email on February 25, 20201 stating that the security cameras at the Lenox Hotel were going to be checked to confirm Sibick's statement that he disposed of the badge and radio in the dumpster. On February 26, 2021, Sibick called the agent stating that he was distraught and "wanted to do the right thing." Sibick stated that he did not dispose of the badge in the dumpster behind the Lenox Hotel. Rather, he had buried the badge in his backyard. Sibick stated that he purchased a metal detector to find the badge, which he then dug up, and wanted to return. He stated that he had actually thrown away the radio, however. Later that night, Sibick met the agent and gave him a bag containing Officer Fanone's badge (#3603), covered in mud. A photo of the recovered badge is depicted below.



**Exhibit 11: Officer Fanone's Badge, retrieved from Sibick**

## II.   THE CHARGES AND PLEA AGREEMENT

On December 1, 2021, a federal grand jury returned a superseding indictment charging

Sibick with:

- Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2); Civil Disorder in violation of 18 U.S.C. § 231(a)(3);

- Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1); Robbery, in violation of 18 U.S.C. § 2111;

- Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1);

- Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2);

- Impeding Ingress and Egress in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(3);

- Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4);

- Impeding Passage Through the Capitol Grounds and Buildings in violation of 40 U.S.C. § 5104(e)(2)(E); and

- Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F).

On March 3, 2023, Sibick pled guilty to one count of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) (Officer Michael Fanone) and two counts of Theft in violation of 18 U.S.C. § 661 (Officer Fanone's badge and radio). He now faces sentencing on these charges.

## III.    STATUTORY PENALTIES

As noted by the plea agreement and the U.S. Probation Office, Sibick faces up to 8 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Assaulting, Resisting, or Impeding Certain Officers. Sibick faces up to 5 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than one year for each count of Theft.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

Offense Level:

The Government agrees with the Sentencing Guidelines calculation set forth in the PSR. In the PSR, the Probation Office calculated Sibick's offense level for the Assault count as 24, applying the following calculations:

Assaulting, Resisting, Impeding Certain Officers:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Assault Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(3)(B) | Victim Sustained Serious Bodily Injury | +5 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| U.S.S.G. § 3E1.1(a) & (b) | Acceptance of Responsibility | - 3 |
| **Total Offense Level:** | | **24** |

*See* PSR ¶¶ 63-79; Plea Agreement at ¶ 5(A). The PSR notes that the theft counts are grouped with the assault count for guidelines purposes because the offense level is determined largely on the

basis of the total harm or loss, and the theft counts are "part of a single criminal episode or transaction involving the same victim." The government agrees but has laid out the calculation of the guidelines ranges for the theft counts below for the Court's benefit.

Theft:

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1 | Theft Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(1)(A) | Loss $6,500 or less | +0 |
| U.S.S.G. § 2B1.1(b)(3) | Theft from the person of another | +2 |
| U.S.S.G. § 2B1(b)(16)(A) | Conscious/Reckless Risk of Serious Bodily Injury | +2 |
| U.S.S.G. § 3A1.2(b) and (c) | Victim was a Government Officer | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| U.S.S.G. § 3E1.1(a) & (b) | Acceptance of Responsibility | - 3 |
| **Total Offense Level:** | | **15** |

Per the Plea Agreement, Sibick reserved the right to challenge the application of U.S.S.G. § 2A2.2(b)(3)(B) and § 2B1.1(b)(16)(A) solely on the grounds that his offense conduct may not have directly caused any portion of the serious bodily injury suffered by Officer Fanone. Plea Agreement at ¶ 5(A). For the reasons set forth below, the facts of this case firmly support the application of the enhancement.

Enhancements for Serious Bodily Injury:

Sibick has objected to the government's and the Probation Office's determination that the five-level enhancement for serious bodily injury applies to the Assault count and a two-level enhancement for conscious/reckless risk of serious bodily injury applied to the Theft count. He is wrong.

Under U.S.S.G. § 1B1.3(a)(1)(B), specific offense characteristics in Chapter Two shall be determined, "in the case of a jointly undertaken criminal activity (a criminal plan, scheme,

18

endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were— (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Under that definition, scope of the agreement, furtherance, and reasonable foreseeability are "independent and necessary elements of relevant conduct." *United States v. Patton*, 927 F.3d 1087, 1094 (10th Cir. 2019)*.* The definition applies whether or not a conspiracy is charged, *United States v. Patton*, 927 F.3d 1087, 1094 (10th Cir. 2019)*; see also* U.S.S.G. § 1B1.3 cmt. 3(A), and the Court "may consider any 'explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.'" *United States v. Egbert*, 562 F.3d 1092, 1097 (10th Cir. 2009)(citing U.S.S.G. § 1B1.3 cmt. 3(B)).

*United States v. Bassil*, 932 F.2d 342 (4th Cir. 1991) is highly instructive on this point. There, the defendants, prison inmates at Lorton Reformatory, took part in an extemporaneous riot that injured several prison guards. They were convicted of resisting and assaulting a correctional officer with a dangerous weapon, in violation of D.C. Code Ann. §§ 22–505(a) & 505(b), rioting while carrying a dangerous weapon, in violation of 18 U.S.C. § 13 (assimilating Va. Code Ann. § 18.2–405), and injuring a person during a riot in violation of 18 U.S.C. § 13 (assimilating Va. Code Ann. § 18.2–414). Id. at 344.

One defendant argued on appeal that the district court erroneously increased his offense level under § 2A2.2(b)(3)(A) because his assault did not cause bodily injury. *Id.* at 235. The Fourth Circuit applied relevant conduct principles in rejecting that claim. "While it may be uncertain

whether the chair thrown by Brown caused a specific injury, it is undisputed that Brown participated in and aided a riot in which assaults occurred that caused bodily injuries." *Id*. at 346. "Because he is accountable for this harm under the Guidelines, *see* U.S.S.G. § 1B1.3, the increase in Brown's offense level was warranted." *Id*.

That reasoning applies with full force here. Sibick participated jointly in a riot, whether orchestrated or not, with hundreds of other rioters, and more directly, with many dozens inside and directly outside the Lower West Terrace Tunnel.  Injuries to the officers in those locations not only occurred but were readily foreseeable to all of the nearby rioters, and particularly those who witnessed their fellows drag Officer Fanone from the tunnel and assault him. Sibick was one of those rioters who not only witnessed the assault on Officer Fanone at close range but joined in by depriving him of at least one item he could have used to defend himself: his police radio. After seeing Officer Fanone pulled out of the tunnel (where Sibick would have observed intense fighting between rioters and officers), seeing the officer surrounded by the mob, hearing defendant Rodriguez's taser deploy and the officer scream (which can be heard on Exhibit 7 at 15:19:15), and *then* deciding to reach in and not only assault the officer, but take his lifeline to safety after these various assaults, it is reasonably foreseeable that the officer would have suffered serious bodily injury. Sibick's criminal acts furthered the common criminal enterprise, and he should be responsible for its results.

<u>Criminal History:</u>

The U.S. Probation Office calculated Sibick's criminal history as category II, with which the parties agree. PSR ¶ 81-87; Plea Agreement ¶ 5(B) Accordingly, Sibick's Guidelines imprisonment range, if this Court applies the enhancements under U.S.S.G. § 2A2.2(b)(3)(B) and

U.S.S.G. § 2B1(b)(16)(A)—as it should—is 57 months to 71 months. PSR ¶ 145.

## V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

By operation of 18 U.S.C. § 3553(a), this Court must consider, *inter alia*, the nature and circumstances of the offense,  § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the recommended sentence.

### A.     Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

The nature and circumstances of Sibick's crimes weigh heavily towards a significant term of incarceration. As described in thorough detail above, Sibick's repeated assaults against police officers on the LWT mark him as one of the most violent rioters who attacked the Capitol on January 6.

Here, Sibick's behavior is unquestionably cruel, grabbing at police in the midst of the officer's struggle to survive and removing his badge and radio. While the evidence does not suggest pre-planning, Sibick's felonious conduct during and after the riot underscores his dangerousness. The fact that Sibick was willing to lie, on multiple occasions, to federal agents in

the midst of one of the largest investigations in our nation's history should cause grave concern. Sibick's participation in a mob assault on Officer Fanone caused meaningful pain and suffering.

Here, a sentence at the top of the applicable Guidelines range is appropriate for two reasons. First, the assault and two theft counts group because they "involve the same victim and the same act or transaction," U.S.S.G. § 3D1.2(a) and/or because they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan, § 3D1.2(b). That means that the total offense level was not increased at all because of the thefts, even though the thefts represented "harms" that were distinct from the assault. Second, Sibick's repeated lies to the FBI agents about what he did with the stolen items was a significant aggravated factor in this case, even if it did not raise to the level of obstructive conduct under U.S.S.G. § 3C1.1.

## B. Sibick's History and Characteristics

Sibick's criminal history contains six prior arrests, at least five of which resulted in a conviction. PSR ¶ 81-87. Most troublingly, Sibick has a prior arrest for second degree aggravated harassment in New York in 2010 (PSR ¶ 83) and a conviction for failure to stop or respond for a police command in Utah in 2015, the latter of which also included a dismissed charge for carrying a concealed loaded firearm (PSR ¶ 86). While none of these arrests or convictions involve serious violent felonies, they do belie a lack of respect for law enforcement and a reckless disregard for the well-being of others.

The government recognizes that Sibick has been cooperative with law enforcement officials by voluntarily returning the badge he buried in his backyard and voluntarily surrendering himself when he was made aware of the warrant for his arrest. However, he also repeatedly lied to

law enforcement officials about what happened to the badge and radio he stole, and only told the truth about what happened to the badge when threatened with the possibility that his lie would be discovered.  His post-assault behavior thus lacked meaningful remorse, and weighs in favor of a lengthy sentence.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Sibick's criminal conduct, assaulting a police officer who was in the course of performing his official duties, and stealing his badge and radio—his lifeline in his time of need—is the epitome of disrespect for the law. He eagerly and tenaciously participated in a violent mob bent on obstructing Congress from certifying the election results. His conduct was one spoke in a wheel that caused the historic events of January 6, 2021. His attempts to minimize, explain, and initially hide his conduct rather than taking full responsibility for what he did only exacerbated that danger. Police officers were overwhelmed, outnumbered, and in some cases, including Officer Fanone's case, in serious danger. A lengthy sentence by this Court is needed to promote respect for the law.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. *See United States v. Kyle Young,* 21-cr-291-3, Sent. Hearing Tr. 62:14-18 ("There is possibly no greater factor that this Court must consider. What happened on January 6 and the effort to keep that spirit alive a year and a half later is the utter antithesis of what America stands for. It is the pure embodiment of tyranny and authoritarianism. So, yes, deterrence has to be a factor in this sentence even today.")

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of the recommended sentence. His conviction in this case for assaulting a police officer in the context of a violent attack on the democratic process is significantly more serious than his prior convictions. As his prior convictions and prison sentences did not deter his criminal conduct on January 6, the need for specific deterrence supports the government's recommendation for a lengthy term of imprisonment.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

---

[4] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

*States*, 551 U.S. 338, 349 (2007). Accordingly, courts must give "respectful consideration to the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007 "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original).

Here, while the Court must balance all the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.

### F. Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Sibick and others like him committed on January 6 are unprecedented. Mechanical comparison to assault cases in other non-January 6 contexts would be a disservice to the magnitude of what the riot entailed and signified, because these crimes defy comparison to other obstructive and assaultive conduct in other contexts. January 6 police officer assault cases that have already proceeded to sentencing provide helpful reference points.

Among those January 6 defendant sentenced for assault on police, several are comparable to the present case, as their assaultive conduct was primarily centered in and around the Lower West Terrace.[5] However, Sibick's co-defendants, Kyle Young and Albuquerque Head, are

---

[5] *United States v. Duke Wilson*, 21-cr-345 (defendant sentenced to 51 months by Judge Lamberth for violating 18 U.S.C. § 1512(c)(2) and § 111(a)(1) when he assaulted officers in the Lower West Terrace tunnel; defendant had criminal history category of I); *United States v. Robert Palmer*, 21-cr-328 (defendant sentenced to 63 months by Judge Chutkan for violating 18 U.S.C. §111(a)(1) and (b) when he threw various objects at officers defending the Lower West Terrace tunnel and deployed the contents of a fire extinguisher at the police line; defendant had criminal history category of I and pled guilty early in the investigation although he did lose credit for acceptance

Sibick's closest comparators.

In *United States v. Kyle Young*, 21-cr-291-3 (ABJ), the defendant assaulted officers in the LWT tunnel by throwing a speaker and jabbing a pole toward the police line. Young also held a strobe light toward the police officers trying to fend of the rioters in the tunnel and handed a taser to another rioter, who eventually repeatedly applied the taser to the back of Officer Fanone's neck. Young then assaulted Officer Fanone by restraining his wrist and holding it away from his body at a pivotal moment in the attack on the Officer, amid chants to kill the officer with his own gun. Finally, Young assaulted Officer M.M., another officer who had been pulled into the crowd. All of these actions were taken in the presence of Young's minor son, who was with him that day on the grounds of the Capitol. Young pled guilty to one count in violation of 18 U.S.C. § 111(a). This Court imposed an 86-month sentence on Young.

In *United States v. Albuquerque Head*, 21-cr-291-2 (ABJ), the defendant assaulted officers in the LWT tunnel multiple times by striking the police line with a riot shield. He also used a shield to press his weight against police officers on the front line in an effort to forcibly push them back. Officer Fanone took the brunt of Head's efforts. In the moments that followed, as Officer Fanone

---

of responsibility due to comments on social media); *United States v. Marcus Maly*, 21-cr-178-3 (Judge Mehta sentenced the defendant to 72 months after he was convicted at trial of two counts of 18 U.S.C. § 111(a)(1) and (b), one count of 18 U.S.C. § 231, and five misdemeanors, for, among other things, spraying officers at the Lower West Terrace with OC spray and fighting officers in the tunnel); *United States v. Tristan Stevens*, 21-cr-40-2 (Judge McFadden sentenced the defendant to 60 months for multiple counts of 18 U.S.C. § 111(a)(1) for participating in heave-hos against the police line in the tunnel and using a riot shield to strike at officers in the tunnel); *United States v. Robert Morss*, 21-cr-40-5 (Judge McFadden sentenced the defendant to 66 months after a stipulated trial, which included conviction for one count of Robbery in violation of 18 U.S.C. § 2111, one count of Assaulting a Law Enforcement Officer in violation of 18 U.S.C. § 111(a)(1), and one count of Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), for his violence on the West Plaza police line and in the Lower West Terrace tunnel.)

and his fellow officers pushed back the violent mob to the mouth of the tunnel, Head wrapped his arm around Officer Fanone's neck and emitted a sickening yell to his fellow rioters—"I've got one!" Head forcibly dragged Officer Fanone into the riotous mob, isolating him as the crowd violently assaulted the officer. Head continued to restrain Officer Fanone while another rioter, Daniel Rodriguez, applied a taser to the base of the officer's skull. Head only let go when Officer Fanone reacted with enough force to free himself from Head's grip. This Court imposed a 90-month sentence on Head.

Like Young and Head, Sibick's actions involved assaulting Officer Fanone on the Lower West Terrace, which resulted in serious injuries. However, Sibick's role in the attack on officers in the tunnel and his assault on Officer Fanone himself was less injurious than Young and Head's. And while Sibick has a criminal history, it is less serious and lengthy than both of his co-defendants'. Yet, Sibick's guidelines calculations includes a base level enhancement for obstruction of the FBI's investigation, whereas his co-defendants' guidelines did not reflect that enhancement. The sentence the government is requesting here reflects these differences.

Accordingly, the instant recommendation does not constitute an unwarranted sentencing disparity.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness

Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[6] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; § 3663(b); § 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct

---

[6] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[7] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the

---

[7] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.

Sibick should also be required to pay restitution for the injuries he caused to Officer Fanone. Because Sibick's assault on Officer Fanone was the same as the one this Court addressed in *United States v. Head and Young*, 21-CR-291 (ABJ), the government incorporates by reference its supplemental restitution memorandum from that case (21-CR-291, ECF No. 173-1), which discusses the standards applicable to restitution in a case where, as here, multiple defendants caused harm. See also, *United States v. Peter Schwartz, et. al.*, 21-cr-178 (APM), ECF No. 231 (government's response to Court's order regarding apportioning restitution payment to a defendant "unless there was evidence that [the defendant] contributed to the property damage in some proximately causal way."). While the government withdrew its supplemental restitution request for Head and Young because their respective plea agreements did not provide sufficient notice, there is no such impediment here, because the plea agreement contemplates that Sibick will pay some or all of the $96,927 the Metropolitan Police Department paid for Officer Fanone's medical bills and leave. ECF No. 190, at ¶ 12. Because the defendant in this case engaged criminal conduct in tandem with of hundreds of other defendants in other cases, and most specifically with the other three defendants who attacked Officer Fanone (Rodriguez, Head, and Young) the Court has discretion to apportion restitution and hold Sibick responsible for his individual contribution to the victim's total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that

comports with the defendant's relative role in the causal process that underlies the victim's general losses"). This Court has already found that defendant Rodriguez is jointly and severally liable for the entire amount of MPD's losses accrued due to Officer Fanone's medical and leave expenses. See, *United States v. Daniel Rodriguez*, 21-cr-246 (ABJ), ECF No. 202. If the Court concludes that Sibick is responsible for a lower share of those expenses than other defendants, it should impose restitution for that lower amount, proportionate to his "relative role."

Applying these principles to this case leads to the conclusion that Sibick should be required to pay restitution in the following amounts: $2,000 in restitution, paid to the Architect of the Capitol, $5,500.79 to the MPD, the employer of Officer Fanone, for the value of the radio that was stolen and never recovered, and some amount that represents Sibick's "relative role" in the injuries suffered by Officer Fanone, payable to the MPD. *See* 18 U.S.C. § 3664 (j)(1) ("If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation.") The plea agreement contemplates both of these restitution payments. Plea Agreement ¶ 12.

## VII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 71 months, three years of supervised release, at least $7,500.79 in restitution, plus the amount the Court determines represents Sibick's relative role in the injuries sustained by Officer Fanone, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
ACTING UNITED STATES ATTORNEY

BY:    __/s/_____
KIMBERLY L. PASCHALL
Assistant United States Attorney
National Security Section
D.C. Bar No. 1015665
601 D St, N.W.,
Washington, D.C. 20001
202-252-2650
Kimberly.paschall@usdoj.gov

32