UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | : | |
| v. | : | Crim. No. 21-291 (ABJ) |
| THOMAS F. SIBICK | : | |

## PRELIMINARY MEMORANDUM IN AID OF SENTENCING[1]

COMES NOW Defendant, Thomas F. Sibick, through undersigned counsel, Stephen F. Brennwald, Brennwald & Robertson, and submits the following Memorandum in Aid of Sentencing.  Defendant argues herein that under the unique circumstances of his case, a sentence of home confinement – taking into account the nearly eight months he already spent in prison under very difficult circumstances - followed by a period of supervised release and an order of restitution, would constitute a sentence that is sufficient, but not greater than necessary, to accomplish the goals enumerated in 18 U.S.C. § 3553(a).[2]

---

[1] Defendant submits this preliminary memorandum with the expectation that it will be supplemented by Monday, July 24, 2023.  Counsel has attempted to address, in this memorandum, almost all of the more complex issues this Court must decide so that it will be able to begin its analysis of the case prior to submission of the final memorandum.  Defendant needs more time to engage in a proper discussion of the "unwarranted sentencing disparities" factor, as well as to flesh out the general §3553(a) factors.  But again, almost all of defendant's arguments are included herein.  In addition, defendant is attaching several significant letters to this filing, though it will add a few others shortly.

[2] The government, for its own reasons, recommends a sentence at the top of the guideline range it believes applies to this case –  57 to 71 months in prison.  The probation office recommends, for reasons that are more sound but that still erroneously contemplate a five-level enhancement for serious bodily injury, a sentence of 48 months in prison (with additional stipulations).  Neither the government's sentencing memorandum nor the probation office's sentencing recommendation addresses the extreme conditions of Mr. Sibick's confinement prior to his October 26, 2021, release.  Nor do they sufficiently take into account the mental disease or defect from which he was suffering on January 6, 2021, that was exacerbated by the prescription of a medication – Adderall – that was contraindicated.  Moreover, neither document acknowledges the "minor" nature of the assault when compared to what is typically considered an assault (punching, kicking, etc.) under the relevant statute.  Finally, neither the government nor the probation office had the benefit of having read the very compelling letter written by Mr. Sibick in advance of sentencing, or any other letter addressing the sentencing issues this Court must address.

*Background*

*The "Assault" Plea*

Mr. Sibick is before this Court after having pled guilty to one count of Assaulting, Resisting, *or* Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1), and two counts of Theft, in violation of 18 U.S.C. § 661.

His case, when compared with other January 6 defendants, is unique in that while the "111" charge falls under what is typically viewed as a statute prohibiting "assault," and assault is generally considered to be an act that involves violence (hitting, punching, kicking, etc…), the Statement of Offense clarifies that Mr. Sibick's involvement with respect to this count related solely to his "physical contact … in order to forcibly remove Officer Fanone's badge and police radio…." *Statement of Offense*, at 4.

It did not remotely involve the same type of conduct as that undertaken by other individuals who interacted with the officer that day, or with other officers in general. These individuals, as the Statement of Offense references, "tased, kicked, punched, pushed, grabbed, and hit [the officer] with objects…." *Id*. As a result, and quite fairly, they received lengthy prison sentences. Mr. Sibick did none of those things.

Mr. Sibick was factually able to admit his guilt to this crime because the language in the statute uses several verbs, two of which apply to his actions toward the officer that day. Specifically, 18 U.S.C. § 111(a)(1) states that whoever "(1) forcibly assaults, resists, opposes, *impedes*, intimidates, or *interferes*

with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties…[shall be punished as provided in the statute]."

The government and the defendant agreed, in plea discussions, that Mr. Sibick's conduct constituted "impeding" and/or "interfering" with Officer Fanone, and the Statement of Offense reflects this agreement, in part by omitting the word "assault" from any language referencing Mr. Sibick's behavior.

Mr. Sibick's removal of the two objects from the officer's vest – which the officer likely did not even notice or feel at the time, given the commotion - did not cause the officer any physical pain at all, nor even involve a touching of the officer himself.  Rather, it involved removing two items from the officer's vest.  And a review of the body-worn camera footage from Officer Fanone's camera, as well as video footage from a camera elsewhere, confirms the speed at which this incident took place - lasting at most two seconds - after which Mr. Sibick fell to the ground backwards, presumably with the objects in his hands, never to be seen on camera again.

As noted above, other defendants did physically assault the officer, and cause him to suffer extreme pain.  Moreover, those defendants, as far as defendant can tell, did not express true remorse.  If anything, one or more of those defendants may have issued a perfunctory apology.  Mr. Sibick, on the other hand, has been devastated by his actions that day, and expressed his remorse to this Court early on in a letter he sent to the Court.

The unrepentant defendants who actually assaulted Officer Fanone rightly received significant sentences.  But their conduct bore no relation to what Mr. Sibick did, and Mr. Sibick did not know any of these other individuals beforehand – or during or after this incident.  He did not speak with them before they undertook their own actions, or afterward, and he in no way conspired with them or acted in concert with them in any way.  This will be discussed later in the "unwarranted disparity" portion of this memorandum as well as in the guideline enhancement section.

### *Mental Health as a Precipitating Factor*

Mr. Sibick's case is also unique because on the day he took Officer Fanone's badge and radio, he had taken Adderall, a drug that had been prescribed to treat Attention Deficit Hyperactivity Disorder ("ADHD").  Unfortunately, as experts at the D.C. Department of Corrections realized in the summer of 2021, Mr. Sibick did not "have" ADHD.  Instead, he suffered from another disease this Court was made aware of prior to the bond hearing on October 26, 2021.

This misdiagnosis created a serious problem for Mr. Sibick because Adderall is contraindicated for people who suffer from Mr. Sibick's condition, as it can, and did in Mr. Sibick's case, cause that person to become manic, or aggravate any mania.

Thus, on January 6, 2021, Mr. Sibick was under the influence of a legally-prescribed chemical compound that aggravated his mental health, rather than

helped it.  When Mr. Sibick grabbed Officer Fanone's badge and radio, he had no idea that he was suffering from that particular mental disorder.

For years, starting in his childhood, he was continuously diagnosed with ADHD.  Unfortunately, that diagnosis was incorrect, [3] and on January 6, it turned what was already an emotionally-charged environment into one that was temporarily out of control.

Mr. Sibick's aunt, Diane Cicatello, MD, has written a letter to this Court that discusses her "real-time" interaction with Mr. Sibick the very evening of January 6, right after all of the events of that day had concluded.  She is thus the best "earwitness" to Mr. Sibick's actual mental state that day, and her background as a physician lends her opinion a great deal of credence, as she is a development and behavioral pediatrician, regularly facing a host of mental health scenarios in her practice that are informative of the opinions expressed in her letter to this Court.

Her letter describes how Mr. Sibick called her to wish her happy birthday. He then described to her what had happened that day, and she could hear the mania in his voice, as she witnessed it in real time.  That fact – that a trained mental health professional had a conversation with someone who was involved in the events of January 6, 2021, right after those events occurred, is also very unique.

---

[3] In an effort to avoid having to file two separate memoranda, one original and one redacted, defendant is not specifying that diagnosis here.  This Court, however, is aware of the correct diagnosis from past submissions to the Court in connection with the defendant's hearing on October 26, 2021.

Dr. Cicatelli obviously knows Mr. Sibick very well, including how he normally speaks and relates stories.  Because of this knowledge, she is able to inform this Court that Mr. Sibick "sounded anxious with pressured frenzied speech" and that when she asked him where he was, he "laughed maniacally."

She then describes how he shared what he had witnessed that day, and how he did not know what to think of what had just happened.

"Thomas sounded anxious with pressured frenzied speech and when asked where he was he laughed maniacally asking if I knew what had gone out that day. When I said no, he began to recount what he had witnessed. I am a physician, was at work all day an came home to have dinner with family not knowing what had occurred at the capital, nor knowing my nephew had traveled there. Though I cannot recall Thomas's words verbatim, his message was clear and stands out in my memory. He described it as the most wild experience of his life. He told about the crowd storming the capital being overwhelming and sucking him in. He reported how he saw a cop being mistreated by others, felt compelled and tried to help but couldn't. He shared he was confused about how to think about what he just experienced, communicating he went to hear the President speak and had no idea that this event would erupt the way it did. He sounded scared, indicated he had no idea what he was getting himself into when he made the impulsive decision to come to Washington and that he was upset about what he witnessed. He said he was alone there, without a plan of what to do and where to go next. He indicated he was staying alone in a hotel…."

Dr. Cicatello describes how she believed that he was experiencing a manic episode both at the Capitol and even before he impulsively left Buffalo to come to Washington, D.C. despite the fact that he was supposed to be at work at a highly desirable internship on January 6.

Again, it is unique that a mental health professional would have a conversation with someone who had just participated in the events of January 6, 2021, and noticed the ***unusual*** mania that the person's speech displayed.

Thankfully, his misdiagnosis was corrected while Mr. Sibick was incarcerated at the D.C. Department of Corrections Central Treatment Facility, and since that time, he has been on the road to recovery.  It is hard to know whether Mr. Sibick would have gone to Washington, D.C. on that day but for this misdiagnosis, and the resulting use of medication that was contraindicated for his true condition.  But there is no doubt that that medication severely and negatively impacted him throughout the day.

Mr. Sibick's mania, and subsequent and sudden mood change, is amply evident in the Instagram video the government has shared with this Court as a sentencing exhibit.  In the first part of the video, one witnesses the manic way in which Mr. Sibick was speaking.  Later, Mr. Sibick's voice is notably somber and subdued.  It is chilling to see the juxtaposition of his moods in that recording.

There is no doubt, based on this evidence, that Mr. Sibick's mental state played a central role in his actions on that day.  If it were just a matter of someone's moods, however, one might dismiss them as just a part of who Mr. Sibick is.  The wrongful diagnosis and the prescription of incorrect medication, however, are unique factors that directly impacted Mr. Sibick's behavior on January 6, 2021, and must be factored into any decision regarding punishment for those actions.

### *Mr. Sibick's Sincere Contrition*

This Court has sentenced quite a few defendants charged in connection with the events of January 6, 2021.  Even more relevant are the sentencings

involving defendants who have been convicted, by way of guilty pleas or trials, of assaulting law enforcement officers.

Aside from the vast differences between the conduct of Mr. Sibick and the behavior of most defendants in "111 assault cases" (including defendants who used weapons, or their hands, to actually physically assault or harm a police officer), this Court is also quite familiar with the lack of true remorse expressed by many defendants who have come before it for sentencing.

Unfortunately many defendants who decided to plead guilty to §111 offenses are not really sorry for their actions.  Some refuse to apologize outright, while others offer only a half-hearted apology – a mere mouthing of insincere words.

In some cases, defense counsel apologize on behalf of their clients although their clients are truly not sorry.

This case is very different, as Mr. Sibick's letter to this Court clearly demonstrates.

Counsel has literally never read a letter that better demonstrates a defendant's clarity of thought, as well as sorrow, regarding the gravity of that defendant's actions.

To be perfectly clear, undersigned counsel did not contribute to Mr. Sibick's letter in any way whatsoever.  He did not tell Mr. Sibick what he should write, or advise him to say one thing or another.  The letter came straight from Mr. Sibick's heart and mind.

Counsel received the letter from Mr. Sibick by email, and read it with relief and satisfaction.  Relief that Mr. Sibick truly does understand the wrongfulness of his actions (which counsel already knew), and satisfaction that Mr. Sibick sees the world – at least insofar as the events of January 6, 2021 and the 2020 election are concerned – very clearly despite having been surrounded by misinformation and strong partisan views on a regular basis for many years.

Undersigned counsel urges this Court to carefully read Mr. Sibick's letter, as counsel knows it will, and give it the weight it deserves.  Mr. Sibick has made a remarkable change in his life since he received his correct mental health diagnosis and has begun cognitive behavioral therapy.

Because he sees January 6 for what it was, he is not a threat to re-offend in the future.

### *Mr. Sibick's Pre-Release Unusually Difficult Conditions of Imprisonment*

As this Court will recall, Mr. Sibick was arrested on or about March 14, 2021, and held without bond until the Court released him to home confinement (not personal recognizance or third party custody) on October 26, 2021.

During the early months of his incarceration, Mr. Sibick was struggling a great deal with his confinement, as he was not being properly medicated. Eventually, as noted above, a doctor at the Correctional Treatment Facility arrived at a new diagnosis for Mr. Sibick, and he finally received proper medication.

Unfortunately, Mr. Sibick suffered greatly because he was in a jail unit with other defendants accused as part of the January 6 events.  Many of those

defendants were rabid Trump supporters who insisted on the loyalty and allegiance of everyone in that unit.  This included nightly singing of the national anthem.

Inmates were also angry because Mr. Sibick did not believe that the former president had won the 2020 election.  This enraged the others in the unit.

As if that weren't enough, some of the inmates constantly complained that the guards were treating them badly although Mr. Sibick had no problem at all with the guards and over time tried to be around the guards than around his fellow inmates.  Because Mr. Sibick was a compliant prisoner – unlike a few of the folks in that unit – some inmates thought that this meant that he was somehow in league with those guards, and was "a rat."

There came a point when Mr. Sibick could literally no longer mentally cope with the stress of being in that unit and around those inmates, and he begged the prison to put him in "the hole."  This would normally be the last place any prisoner would want to go.  But anything was better, in Mr. Sibick's eyes, than being around idealistic zealots who mentally tormented him.  He was actually grateful when the prison permitted him to go into "administrative segregation" ("AS") despite there being no correctional basis to do so.

Mr. Sibick then spent about two months in AS before this Court released him on October 26, 2021.

It is important to note here that when a person is sent to the hole, it is usually for 7 or 14 days, and it is always against that inmate's wishes (unless the

inmate is charged with a sex offense, in which case the inmate seeks the safety of the unit from others who relish the chance to stab and/or kill that inmate).

Some inmates may spend 30 days in the hole in extreme circumstances.

Mr. Sibick, as noted, spent *two months* there, though it was clearly breaking him mentally.  Counsel saw Mr. Sibick several times during that time period, and he personally witnessed Mr. Sibick decompensating.  Specifically, Mr. Sibick would cry during legal visits, and say that he couldn't take it anymore.  He was very depressed, and felt an overwhelming sense of hopelessness.

This is to be expected, as inmate segregation has been shown to lead to self-harm, anxiety, depression, paranoia, and/or aggression.

Finally, before he went to the hole, Mr. Sibick spent almost every hour in his cell because of Covid restrictions.  So in addition to spending two months in the hole, Mr. Sibick spent the prior nearly six months in near-lockdown because of the jail's Covid policy.

This is all to say that although Mr. Sibick has "only" spent about seven and a half months in prison to date (plus another 21 months in home confinement), that time should count for at least twice the actual calendar days he was incarcerated, due to the extremely harsh conditions of his confinement.

### *The Scene Inside and Outside the Capitol that Afternoon*

As this Court surely has discerned, having presided over a number of January 6 cases by now, there were varying levels of participation and action by

11

different people, and groups of people, at the Capitol on that day, both on the grounds outside the building, and inside the Capitol itself.

Some, as has been shown in numerous video recordings, were prepared for battle, wearing military-style outfits, carrying different types of weapons (guns, sticks, batons, flagpoles that were used as weapons, pepper or bear spray, etc.) and implements of battle (zip ties, rope, etc…).

Many of the individuals had also posted messages in various social media platforms *before* January 6 indicating that it was time for a civil war, and that they would not accept the official results of the election that were certified by the 50 States.

It is fair to say that the crowd, generally, was very angry about the outcome of the election, and strongly disagreed with certification of the votes by various State officials.  Some in the crowd had resolved not to allow a peaceful transfer of power to a new administration.

However, it is equally clear that while some in the crowd were prepared for a physical battle, others went there to shout, scream, and protest the official results of the election.  And others were simply caught up in the testosterone-laden actions of the overall crowd, acting in ways they likely never thought they would.

This included Mr. Sibick.  While he did not enter the Capitol, he did, for a three minute-period, stand outside the temporary tunnel that had been erected on the lower West terrace for the upcoming inauguration, then make his way toward

the front of the group in the tunnel, then exit the tunnel fairly quickly after he and others were tear-gassed.

The government argues that for a time, Mr. Sibick was at the forefront of the group of people inside the tunnel helping other rioters push against the police line inside.  Mr. Sibick adamantly denies this.

In his Statement of Offense, which was carefully worded to comport with Mr. Sibick's admitted conduct, the defendant agreed that he "joined the rioters in the lower west terrace archway who were pushing against the police line."  But while he joined them by being present, he did not join them in exerting any effort to push up against the police line.  In fact, some of the video recordings of the events inside the tunnel show some spatial gaps between certain people at various points in time, belying the notion that everyone inside the tunnel was participating in the pushing action of others.  In any event, none of the videos show Mr. Sibick confronting any police officers or pushing up against their bodies or shields inside the tunnel.

While this may seem like semantics, it is not.  Mr. Sibick asserts that he did not join in pushing any officers, though he did slowly move from the back of the crowd toward the front.  When he got to the front of the line, as noted, he and others were soon tear-gassed, and rightfully so.  That caused Mr. Sibick to yell, "let me out! let me out!" as he retreated to the cleaner air outside of the tunnel.

After he had exited, and while still in a manic phase, he did say "let's go, let me get refreshed" and "just got tear-gassed, but we're going, baby, we're

going. we're pushing forward now." These statements were pure bravado, however, as he never did go back inside of that tunnel after his initial 3-minute foray inside.

Mr. Sibick was also not among the fairly small number of people who used violence to break windows or push open doors so that they, and others behind them, could gain entry to the building.

He was also not among the many people who shouted various chants at the police officers who were attempting, often in vain, to keep the crowd from entering further into the Capitol building once the crowd had breached the perimeter.

He was not among the crowd of people who threw flagpoles, stolen police shields, chairs, and other objects towards police officers. While he did pose with a police shield at one point, that was after someone had literally handed him the shield and suggested that he be photographed holding the shield.[4]

Mr. Sibick also did not spray any officers with any substances, as some rioters did. He also was never overtly hostile and demonstrative toward the police, or aggressively screaming in their faces.

During his time outside the Capitol, he also did not incite others to commit any unlawful acts.

---

[4] Most of the people there that day seemed to grasp the historicity of that day, though not in the way they should have.

Despite this, he did, over a period of two seconds, reach out towards Officer Fanone, and for reasons still unknown to him, grab the officer's badge and radio.  He did not do so to obtain a "trophy," as he threw the radio away sometime after the day's events and later buried the police shield in his parents' back yard. He also did not post any pictures of himself with those items afterward.  He also did not mention his possession of those items to his aunt, Dr. Diane Cicatello, during their nearly-contemporaneous phone call that afternoon.

He also did not grab Officer Fanone's body, or attempt to punch, kick, or otherwise hurt the officer.  He grabbed objects that were attached to the officer's body.

Mr. Sibick's actions that day are puzzling, even to him.  He has wanted to believe that he reached towards Officer Fanone to help him, and even said that to his aunt that day.  He later repeated that claim to the police.

Interestingly, his aunt has indicated to counsel that Mr. Sibick has always wanted, since childhood, to be the hero in any given situation, and "save the day."

Perhaps neither we, nor Mr. Sibick, will never know what he was thinking when he did what he did, as he was in a drug-aggravated mania that afternoon. But whatever the cause of his actions, including his use of prescribed Adderall, he has learned an extremely hard lesson when one considers that 1) he was inside or around the tunnel for no more than 3 minutes, and 2) was involved with Officer Fanone for no more than two seconds that day.

### *Analysis of Sentencing Factors*

15

As this Court knows, pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), not only are the United States Sentencing Guidelines no longer mandatory, they are not even presumptively reasonable.  In determining an appropriate sentence, this Court must consider the factors delineated in 18 U.S.C. § 3553(a), and impose a sentence that:

1)  reflects the seriousness of the crime;

2)  promotes respect for the law;

3)  provides just punishment;

4)  deters criminal conduct;

5)  protects the public from further crimes, and

6)  provides the Defendant with any necessary educational or vocational training, medical care, or other correctional treatment.

In addition, this Court must also consider

1)  the nature and circumstances of the offense;

2)  the history and characteristics of the defendant;

3)  the kinds of sentences available;

4)  the sentencing range;

5)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and

16

6)  the need to provide restitution to any victims of the offense.

***Dispute as to a Sentencing Guideline Enhancement***

Before addressing the 3553(a) factors, defendant notes that he does not agree that his guideline offense level for the assault charge should be increased by five levels pursuant to U.S.S.G. § 2A2.2(b)(3)(B) (Victim Sustained Serious Bodily Injury).

In fact, the parties' dispute concerning this factor threatened to derail the plea negotiations in this case for many months.  Ultimately, while the government would not relent in its insistence that even under the facts of this case the enhancement applied, it finally agreed to "allow" Mr. Sibick to contest this enhancement at sentencing.  He does so now.

Preliminarily, defendant points out that this enhancement could only arguably apply with respect to Officer Michael Fanone.  None of the other officers who were remotely near Mr. Sibick that day suffered any *serious bodily injury* that Mr. Sibick could have contributed to or somehow be found to be responsible for.

In addition, the reason the analysis in this case is more complicated than normal is because the government is proceeding on a type of "vicarious liability" argument, rather than on a claim that Mr. Sibick directly caused the serious bodily injury suffered by the officer.

It is clear that Mr. Sibick did not directly cause Officer Fanone's "serious bodily injury."  Thus, the analysis shifts to whether Mr. Sibick can be found

indirectly responsible for the officer's injuries under the "jointly undertaken criminal activity" standard found in the relevant guideline.

Thus, in advancing its claim that Mr. Sibick's offense level should be increased by five levels because of the injuries suffered by Officer Fanone, the government states (correctly) that under U.S.S.G. § 1B1.3(a)(1)(B), the serious bodily injury enhancement applies only "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy...." *Id*.

That guideline further specifies that the defendant is accountable only for such "conduct (acts and omissions) of others that was: (i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity." *Id*.

The government also correctly notes that, as the guideline states,[5] a defendant does not have to be charged in a conspiracy for the enhancement to apply. *United States v. Patton*, 927 F.3d 1087, 1094 (10th Cir. 2019).

Nevertheless, for the enhancement to apply the Court must still find that the defendant jointly undertook criminal activity with others, and that any activity undertaken by others in concert with Mr. Sibick was reasonably foreseeable. The

---

[5] U.S.S.G. § 1B1.3(a)(1)(B).

statute, in that sense, is "forward-looking" as it asks what a non-directly-offending defendant could have foreseen someone else doing.

In this case, the question is whether Mr. Sibick could have foreseen that his own removal of the badge and the radio from Officer Fanone's desk would in some way assist, or work in concert with, Daniel Rodriguez's tasing of Officer Fanone, as it was Rodriguez's tasing that caused the officer's serious bodily injury.

As will be discussed below, however, Mr. Sibick took the badge and radio *after* Rodriguez had already tased the officer, such that Sibick's actions had nothing to do with Rodriguez's action in tasing, and thereby causing, Fanone's serious bodily injury. Thus, the "forward-looking" looking nature of the enhancement matters, as will be further elucidated below.

The government is correct that the Court can consider an explicit "or implicit agreement fairly inferred from the conduct of the defendant and others." *United States v. Egbert*, 562 F.3d 1092, 1097 (10th Cir. 2009), citing Comment 3(B) of the foregoing guideline.

Thus, even if he did not know Mr. Rodriguez, or Kyle Young or Albuquerque Cosper Head, Mr. Sibick could still be vicariously liable for their actions ("the conduct of others")[6] if he explicitly or implicitly jointly undertook criminal activity with them, engaged in conduct that was *in furtherance of* that

---

[6] Application Note 3 to U.S.S.G. § 1B1.3.

joint criminal activity and that was *reasonably foreseeable* in connection with that criminal activity.

In support of its vicarious liability theory, the government points to *United States v. Bassil*, 932 F.2d 342 (4th Cir. 1991).  Its reliance on *Bassil* is misplaced, as its reading of *Bassil* is overly general, and ultimately inapplicable to the facts of this case.

The government states that in *Bassil*, "the defendants, prison inmates at Lorton Reformatory, took part in an extemporaneous riot that injured several prison guards."  *Gov. Memo*. at 19.  While this is technically correct, that description implies that there was a general riot at the prison, such that anyone in the area who may have participated in any way should, like the government argues here with respect to Sibick, be liable for the actions of any other inmate.

But that is not what happened in *Bassil*.  As the opinion explains, "correctional officers at the Lorton Reformatory responded to a disturbance *in the B-wing of Dormitory Three*."  *Id*., at 344.  (Emphasis added.)

That crucial distinction makes it clear that the inmates who participated in the riot were not just inmates from the general population of the prison who might have been out in a common area of the jail, such as a courtyard (or, in this case, outside the lower West side of the Capitol) at the time of the riot.

Rather, they were inmates who were all housed in **_one wing of one dormitory building_**.[7]  That proximity and "familiarity" presents a very different picture of the relationship of the inmates to each other than one might otherwise infer from a description that merely presents the inmates as "prisoners at the Lorton Reformatory."

It is clear from the narrative in *Bassil* that the inmates all joined each other in resisting the commands of the officers in that particular wing of dormitory three on that day after an inmate had been assaulted by two other inmates.  Officers who responded to the disturbance ordered the two inmates suspected of the assault to be removed from that dormitory.  The other inmates refused to allow this to happen, and engaged in physical confrontations with several officers who were later backed up by about another dozen officers.

These inmates obviously slept in the same wing of the same dorm, ate in that same dorm, showered in that dorm, and were together on a constant basis when not out in the "rec. yard."  They were not disparate groups of inmates from various dorms or various parts of Lorton (or here, various parts of the country).

In other words, the dormitories at Lorton, and each wing of a particular dormitory, were small enough that unless an inmate had just recently arrived from another facility or had arrived to begin serving a sentence following a sentencing

---

[7] As counsel recalls from his many, many visits to Lorton in the 80's and 90's, dorms typically had a capacity of between 40 to 80 inmates if fully occupied.  There were multiple facilities at Lorton, of course (Youth Center, Youth Center II, the Modular Facility, Central, Max, and more), each with varying capacity. But most dorms had a limited capacity.

hearing, that inmate knew every other inmate in that dorm, especially in that wing of the dorm. This is clear in how the inmates reacted to the commands of the guards.

Because the government discusses the facts in *Bassil* in overly broad terms ("inmates at the Lorton Reformatory" instead of "inmates in the B-wing of Dormitory Three"), it incorrectly extrapolates the holding in *Bassil* to the even larger group of rioters who were anywhere near Officer Fanone the afternoon of January 6, 2021, even if those rioters didn't know each other, did not explicitly or implicitly plan to do anything together, but just happened to individually take actions that affected the same officer.

In Mr. Sibick's case, he had never heard of, nor obviously met, any of the other individuals who interacted in any way with Officer Fanone that day. And there were dozens of people in this group of individuals, as the officer was pulled out of the tunnel and through a large crowd to a position that appears to be dozens and dozens of feet away from the mouth of the temporary tunnel.

Importantly, Mr. Sibick was not one of those individuals who participated in pulling the officer out of the tunnel and through the crowd.

Had Mr. Sibick been in that line of individuals who collectively pulled and pushed the officer out into the crowd, it could at least have been said that Sibick had implicitly joined in whatever activity those rioters were engaging in. Even then, however, it would have been highly debatable, at the very least, whether all or any of these other individuals could have reasonably foreseen that Daniel

Rodriguez would receive a taser from Kyle Young, that Mr. Young would then instruct Mr. Rodriguez on the use of that taser,  and that Rodriguez would then use the taser against Officer Fanone.  But Sibick was not in that group of individuals who pulled Officer Fanone out of the tunnel in any event, so that argument is irrelevant.

The fact that Mr. Sibick took the officer's badge and radio ***after*** the officer had already been tased is also critically significant in the context of this enhancement.  As noted above, the enhancement is forward-looking, i.e., it asks this Court to determine whether another person's future actions would have been reasonably foreseeable to the person who could have foreseen them – here, supposedly Mr. Sibick.

But Mr. Sibick literally interacted with Officer Fanone for a period of two seconds, on his own, when he reached in and ended up with the officer's badge in one hand, and his radio (which he ended up holding by the antenna, not the body of the radio) with his other hand.

And again, this was ***after*** Fanone had already been tased by Daniel Rodriguez, such that any actions undertaken by Sibick did not assist or enable Rodriguez in any way to commit the act that caused Fanone's serious bodily injury.

 Other individuals' grabbing and pulling of the officer, causing the officer to have to struggle to try to keep from having his gun stolen, or from being

dragged further into the crowd, undoubtedly added to the physical strain on Officer Fanone's body, including his heart.

But Mr. Sibick's two-second action in removing the badge and the radio, while illegal, happened so fast that it did not in any way add to the strain Officer Fanone was under during this entire event. The two items were "simply" quickly removed from whatever had attached them to the officer's vest, and it is very likely that Fanone never even knew that it happened until later.

*Comparison of This Case with Examples in the Application Notes*

In evaluating whether the five-level enhancement applies, this Court can further look to the 10 examples listed in Application Note 4 to U.S.S.G. § 1B1.3.

Defendant will not engage in an exhaustive comparison of each example with the facts in Mr. Sibick's case. He maintains that a general reading of the examples clearly shows why Mr. Sibick cannot be held liable for the actions of Kyle Young or Daniel Rodriguez in tasing Officer Fanone.

All of the examples describe scenarios where the defendants knew each other, or of each other's activities, and performed some act that was designed to help the overall goal of a known group of individuals

Defendant agrees that it is theoretically possible for people who don't know each other to spontaneously participate in an activity that is designed to help each other achieve some unlawful objective, but that is not what happened here.

When Mr. Sibick quickly reached toward Officer Fanone and pulled off his badge and radio, he did not do it to help anyone else commit any act against that

officer, nor did his actions have that effect, especially as it relates to Fanone's serious bodily injury.  That injury had already occurred, and Mr. Sibick in no way helped to bring it about.

For these reasons, the five-level enhancement is inappropriate under the circumstances of this case.

*Removal of the Officer's "Lifeline"*

The government argues, as it did from the beginning of this case in Buffalo, that Mr. Sibick's removal of the officer's radio took away his "lifeline to safety," thereby preventing the officer from calling for help.

But this argument, and those words, while "catchy," completely misrepresent the facts on the ground that afternoon.  Officer Fanone was surrounded by, or right next to, many officers when he was dragged out of the tunnel and into the crowd.  Other officers already knew, therefore, that he needed help.  They were unable to provide that help, however, because of the large size of the crowd in the tunnel.[8]  And as various video recordings show, there were no other available officers to come to Officer Fanone's rescue even had he been able to call for help on his radio.  Many other officers already knew that Fanone needed help but could do nothing about it.

Ultimately, it was the actions of a number of people in the crowd that finally protected Officer Fanone from any further confrontations, and literally

---

[8] Mr. Sibick had already exited the tunnel by then, and had no part in the actions of the crowd at that time.

physically moved him back into the safety of the tunnel where other officers attended to him.

Defendant is not in any way minimizing his actions, or denying responsibility for what he did.  What he did was criminal, and beyond the pale. But he can no longer remain silent and go along with the false notion that has been repeatedly invoked in this case that he caused some general harm to Officer Fanone by "depriving him of his lifeline."  That is just factually incorrect, even though what Sibick did in removing the items was illegal, wrong, and completely unacceptable.

Finally, even if this Court were to somehow find that Mr. Sibick can be held vicariously liable for the prior conduct of Daniel Rodriguez, he argues that the five-level enhancement grossly overstates any remote culpability he may have for Officer Fanone's serious bodily injuries.

The enhancement clearly applies where a person directly causes a serious bodily injury, and a five-level enhancement is obviously appropriate in that context.  It also applies "merely" where someone helps another person cause a serious bodily injury. And even if it applies in a case, such as here, where a person (Sibick) undertakes an action that takes place *after* a serious bodily injury has already been inflicted (what counsel would call a "brain twister"),  it would be inappropriate to punish such a person by imposing a sentence that invokes a guideline range that is many years more than would be warranted without the enhancement.

Without that enhancement, Mr. Sibick faces a guideline range of 33 to 41 months. – a difference of 24 months to 30 months.

### *Enhancement for Obstructing or Impeding Administration of Justice*

Defendant Sibick is not permitted, under the plea agreement, to argue whether this enhancement should apply.  This Court, however, must make an independent determination as to whether it applies, and that analysis must include consideration of the language and examples of covered and non-covered conduct discussed in the various Application Notes.

### *Analysis of 3553(a) Factors*

### *The Proposed Sentence Would Reflect the Seriousness of the Crime*

To be Supplemented.

### *The Proposed Sentence Must Also Promote Respect for the Law, Provide Just Punishment to Mr. Sibick, and Deter Criminal Conduct, both by him and by Others.*

To be Supplemented.

### *The Need to Protect the Public from Further Crimes.*

To be Supplemented.

### *The Court's Duty to Provide the Defendant with any Necessary Educational or Vocational Training, Medical Care, or Other Correctional Treatment.*

To be Supplemented.

### *The Need to Avoid Unwarranted Disparities*

To be Supplemented.

### *Conclusion*

To be Supplemented.

Respectfully submitted,

/s/

_____

Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626 (facsimile)
E-mail:  sfbrennwald@cs.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by email, this 20th day of June, 2023, to all counsel of record.

/s/

_____

Stephen F. Brennwald