UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                                      :

    v.                                          : Crim. No. 21-291 (ABJ)

THOMAS F. SIBICK                                   :

## SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING[1]

COMES NOW Defendant, Thomas F. Sibick, through undersigned counsel, Stephen F. Brennwald, Brennwald & Robertson, and submits the following Memorandum in Aid of Sentencing.  Defendant argues herein that under the unique circumstances of his case, a sentence of home confinement – taking into account the nearly eight months he already spent in prison under very difficult circumstances - followed by a period of supervised release and an order of restitution, would constitute a sentence that is sufficient, but not greater than necessary, to accomplish the goals enumerated in 18 U.S.C. § 3553(a).[2]

### *Background*

### *The "Assault" Plea*

---

[1] Modifications/supplemental language is included herein in bold type, for ease of identification and reading.  Subject headings included in defendant's preliminary sentencing memorandum are also in bold type, but they are also italicized for the sake of distinction.

[2] The government, for its own reasons, recommends a sentence at the top of the guideline range it believes applies to this case –  57 to 71 months in prison.  The probation office recommends, for reasons that are more sound but that still erroneously contemplate a five-level enhancement for serious bodily injury, a sentence of 48 months in prison (with additional stipulations).  Neither the government's sentencing memorandum nor the probation office's sentencing recommendation addresses the extreme conditions of Mr. Sibick's confinement prior to his October 26, 2021, release.  Nor do they sufficiently take into account the mental disease or defect from which he was suffering on January 6, 2021, that was exacerbated by the prescription of a medication – Adderall – that was contraindicated.  Moreover, neither document acknowledges the "minor" nature of the assault when compared to what is typically considered an assault (punching, kicking, etc.) under the relevant statute.  Finally, neither the government nor the probation office had the benefit of having read the very compelling letter written by Mr. Sibick in advance of sentencing, or any other letter addressing the sentencing issues this Court must address.

Mr. Sibick is before this Court after having pled guilty to one count of Assaulting, Resisting, *or* Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1), and two counts of Theft, in violation of 18 U.S.C. § 661.

His case, when compared with other January 6 defendants, is unique in that while the "111" charge falls under what is typically viewed as a statute prohibiting "assault," and assault is generally considered to be an act that involves violence (hitting, punching, kicking, etc…), the Statement of Offense clarifies that Mr. Sibick's involvement with respect to this count related solely to his "physical contact … in order to forcibly remove Officer Fanone's badge and police radio…." *Statement of Offense*, at 4.

It did not remotely involve the same type of conduct as that undertaken by other individuals who interacted with the officer that day, or with other officers in general.  These individuals, as the Statement of Offense references, "tased, kicked, punched, pushed, grabbed, and hit [the officer] with objects…." *Id*.  As a result, and quite fairly, they received lengthy prison sentences.  Mr. Sibick did none of those things.

Mr. Sibick was factually able to admit his guilt to this crime because the language in the statute uses several verbs, two of which apply to his actions toward the officer that day.  Specifically, 18 U.S.C. § 111(a)(1) states that whoever "(1) forcibly assaults, resists, opposes, *impedes*, intimidates, or *interferes* with any person designated in section 1114 of this title while engaged in or on

account of the performance of official duties…[shall be punished as provided in the statute].”

The government and the defendant agreed, in plea discussions, that Mr. Sibick's conduct constituted "impeding" and/or "interfering" with Officer Fanone, and the Statement of Offense reflects this agreement, in part by omitting the word "assault" from any language referencing Mr. Sibick's behavior.

Mr. Sibick's removal of the two objects from the officer's vest – which the officer likely did not even notice or feel at the time, given the commotion - did not cause the officer any physical pain at all, nor even involve a touching of the officer himself.  Rather, it involved removing two items from the officer's vest.  And a review of the body-worn camera footage from Officer Fanone's camera, as well as video footage from a camera elsewhere, confirms the speed at which this incident took place - lasting at most two seconds - after which Mr. Sibick fell to the ground backwards, presumably with the objects in his hands, never to be seen on camera again.

As noted above, other defendants did physically assault the officer, and cause him to suffer extreme pain.  Moreover, those defendants, as far as defendant can tell, did not express true remorse.  If anything, one or more of those defendants may have issued a perfunctory apology.  Mr. Sibick, on the other hand, has been devastated by his actions that day, and expressed his remorse to this Court early on in a letter he sent to the Court.

The unrepentant defendants who actually assaulted Officer Fanone rightly received significant sentences.  But their conduct bore no relation to what Mr. Sibick did, and Mr. Sibick did not know any of these other individuals beforehand – or during or after this incident.  He did not speak with them before they undertook their own actions, or afterward, and he in no way conspired with them or acted in concert with them in any way.  This will be discussed later in the "unwarranted disparity" portion of this memorandum as well as in the guideline enhancement section.

### *Mental Health as a Precipitating Factor*

Mr. Sibick's case is also unique because on the day he took Officer Fanone's badge and radio, he had taken Adderall, a drug that had been prescribed to treat Attention Deficit Hyperactivity Disorder ("ADHD").  Unfortunately, as experts at the D.C. Department of Corrections realized in the summer of 2021, Mr. Sibick did not "have" ADHD.  Instead, he suffered from another disease this Court was made aware of prior to the bond hearing on October 26, 2021.

This misdiagnosis created a serious problem for Mr. Sibick because Adderall is contraindicated for people who suffer from Mr. Sibick's condition, as it can, and did in Mr. Sibick's case, cause that person to become manic, or aggravate any mania.

**The following articles discuss this phenomenon:**

**https://www.healthline.com/health/adderall-for-bipolar-disorder.**

**https://www.clearvuehealth.com/e/can-someone-with-bipolar-and-adhd-take-adderall-9BrixQ/**

**In addition, according to the Centers for Medicare and Medicaid Services ("CMS"), the maximum daily dose is 40mg a day.  Mr. Sibick was prescribed that maximum dose, as confirmed by medical records obtained from "MyHealth 360" that counsel has reviewed and concern Mr. Sibick's treatment in 2020 through January 27, 2021.**

**That fact alone should inform this Court's understanding of Mr. Sibick's mental state on January 6, 2021, having been prescribed the maximum dosage of the wrong medicine.**

Thus, on January 6, 2021, Mr. Sibick was under the influence of a legally-prescribed chemical compound that aggravated his mental health, rather than helped it.  When Mr. Sibick grabbed Officer Fanone's badge and radio, he had no idea that he was suffering from that particular mental disorder.

For years, starting in his childhood, he was continuously diagnosed with ADHD.  Unfortunately, that diagnosis was incorrect, [3] and on January 6, it turned what was already an emotionally-charged environment into one that was temporarily out of control.

Mr. Sibick's aunt, Diane Cicatello, MD, has written a letter to this Court that discusses her "real-time" interaction with Mr. Sibick the very evening of

---

[3] In an effort to avoid having to file two separate memoranda, one original and one redacted, defendant is not specifying that diagnosis here.  This Court, however, is aware of the correct diagnosis from past submissions to the Court in connection with the defendant's hearing on October 26, 2021.

January 6, right after all of the events of that day had concluded.  She is thus the best "earwitness" to Mr. Sibick's actual mental state that day, and her background as a physician lends her opinion a great deal of credence, as she is a development and behavioral pediatrician, regularly facing a host of mental health scenarios in her practice that are informative of the opinions expressed in her letter to this Court.

Her letter describes how Mr. Sibick called her to wish her happy birthday. He then described to her what had happened that day, and she could hear the mania in his voice, as she witnessed it in real time.  That fact – that a trained mental health professional had a conversation with someone who was involved in the events of January 6, 2021, right after those events occurred, is also very unique.

Dr. Cicatello obviously knows Mr. Sibick very well, including how he normally speaks and relates stories.  Because of this knowledge, she is able to inform this Court that Mr. Sibick "sounded anxious with pressured frenzied speech" and that when she asked him where he was, he "laughed maniacally."

She then describes how he shared what he had witnessed that day, and how he did not know what to think of what had just happened.

"Thomas sounded anxious with pressured frenzied speech and when asked where he was, he laughed maniacally asking if I knew what had gone out that day. When I said no, he began to recount what he had witnessed. I am a physician, was at work all day an came home to have dinner with family not knowing what had occurred at the capital, nor knowing my nephew had traveled there. Though I cannot recall Thomas's words verbatim, his message was clear and stands out in my memory. He described it as the most wild experience of his life. He told about

the crowd storming the capital being overwhelming and sucking him in. He reported how he saw a cop being mistreated by others, felt compelled and tried to help but couldn't. He shared he was confused about how to think about what he just experienced, communicating he went to hear the President speak and had no idea that this event would erupt the way it did. He sounded scared, indicated he had no idea what he was getting himself into when he made the impulsive decision to come to Washington and that he was upset about what he witnessed. He said he was alone there, without a plan of what to do and where to go next. He indicated he was staying alone in a hotel…."

Dr. Cicatello describes how she believed that he was experiencing a manic episode both at the Capitol and even before he impulsively left Buffalo to come to Washington, D.C. despite the fact that he was supposed to be at work at a highly desirable internship on January 6.

Again, it is unique that a mental health professional would have a conversation with someone who had just participated in the events of January 6, 2021, and noticed the ***unusual*** mania that the person's speech displayed.

Thankfully, his misdiagnosis was corrected while Mr. Sibick was incarcerated at the D.C. Department of Corrections Central Treatment Facility, and since that time, he has been on the road to recovery.  It is hard to know whether Mr. Sibick would have gone to Washington, D.C. on that day but for this misdiagnosis, and the resulting use of medication that was contraindicated for his true condition.  But there is no doubt that that medication severely and negatively impacted him throughout the day.

Mr. Sibick's mania, and subsequent and sudden mood change, is amply evident in the Instagram video the government has shared with this Court as a sentencing exhibit.  In the first part of the video, one witnesses the manic way in

which Mr. Sibick was speaking.  Later, Mr. Sibick's voice is notably somber and subdued.  It is chilling to see the juxtaposition of his moods in that recording.

There is no doubt, based on this evidence, that Mr. Sibick's mental state played a central role in his actions on that day.  If it were just a matter of someone's moods, however, one might dismiss them as just a part of who Mr. Sibick is.  The wrongful diagnosis and the prescription of incorrect medication, however, are unique factors that directly impacted Mr. Sibick's behavior on January 6, 2021, and must be factored into any decision regarding punishment for those actions.

**Defendant finally notes that removing Mr. Sibick from the community at this time, especially from his steady and extremely supportive mental health treatment, would be detrimental to him and to the community. Continuity of care is extremely important in the treatment of individuals with mental illness, and that includes interaction with a trusted therapist Mr. Sibick has been seeing for months.**

**Although the Bureau of Prisons does offer mental health services to some degree, confinement is not only harmful to a person's psyche, but is also disruptive of any ongoing care that has been occurring in the community. This cannot be overstated.**

**This is another reason defendant submits that the sentence he suggests to this Court would be fair and appropriate.**

*Mr. Sibick's Sincere Contrition*

This Court has sentenced quite a few defendants charged in connection with the events of January 6, 2021.  Even more relevant are the sentencings involving defendants who have been convicted, by way of guilty pleas or trials, of assaulting law enforcement officers.

Aside from the vast differences between the conduct of Mr. Sibick and the behavior of most defendants in "111 assault cases" (including defendants who used weapons, or their hands, to actually physically assault or harm a police officer), this Court is also quite familiar with the lack of true remorse expressed by many defendants who have come before it for sentencing.

Unfortunately, many defendants who decided to plead guilty to §111 offenses are not really sorry for their actions.  Some refuse to apologize outright, while others offer only a half-hearted apology – a mere mouthing of insincere words.

In some cases, defense counsel apologize on behalf of their clients although their clients are truly not sorry.

This case is very different, as Mr. Sibick's letter to this Court clearly demonstrates.

Counsel has literally never read a letter that better demonstrates a defendant's clarity of thought, as well as sorrow, regarding the gravity of that defendant's actions.

To be perfectly clear, undersigned counsel did not contribute to Mr. Sibick's letter in any way whatsoever.  He did not tell Mr. Sibick what he should

write or advise him to say one thing or another.  The letter came straight from Mr. Sibick's heart and mind.

Counsel received the letter from Mr. Sibick by email and read it with relief and satisfaction.  Relief that Mr. Sibick truly does understand the wrongfulness of his actions (which counsel already knew), and satisfaction that Mr. Sibick sees the world – at least insofar as the events of January 6, 2021, and the 2020 election are concerned – very clearly despite having been surrounded by misinformation and strong partisan views on a regular basis for many years.

Undersigned counsel urges this Court to carefully read Mr. Sibick's letter, as counsel knows it will, and give it the weight it deserves.  Mr. Sibick has made a remarkable change in his life since he received his correct mental health diagnosis and has begun cognitive behavioral therapy.

Because he sees January 6 for what it was, he is not a threat to re-offend in the future.

### *Mr. Sibick's Pre-Release Unusually Difficult Conditions of Imprisonment*

As this Court will recall, Mr. Sibick was arrested on or about March 14, 2021, and held without bond until the Court released him to home confinement (not personal recognizance or third-party custody) on October 26, 2021.

During the early months of his incarceration, Mr. Sibick was struggling a great deal with his confinement, as he was not being properly medicated. Eventually, as noted above, a doctor at the Correctional Treatment Facility arrived at a new diagnosis for Mr. Sibick, and he finally received proper medication.

Unfortunately, Mr. Sibick suffered greatly because he was in a jail unit with other defendants accused as part of the January 6 events.  Many of those defendants were rabid Trump supporters who insisted on the loyalty and allegiance of everyone in that unit.  This included nightly singing of the national anthem.

Inmates were also angry because Mr. Sibick did not believe that the former president had won the 2020 election.  This enraged the others in the unit.

As if that weren't enough, some of the inmates constantly complained that the guards were treating them badly although Mr. Sibick had no problem at all with the guards and over time tried to be around the guards than around his fellow inmates.  Because Mr. Sibick was a compliant prisoner – unlike a few of the folks in that unit – some inmates thought that this meant that he was somehow in league with those guards and was "a rat."

There came a point when Mr. Sibick could literally no longer mentally cope with the stress of being in that unit and around those inmates, and he begged the prison to put him in "the hole."  This would normally be the last place any prisoner would want to go.  But anything was better, in Mr. Sibick's eyes, than being around idealistic zealots who mentally tormented him.  He was actually grateful when the prison permitted him to go into "administrative segregation" ("AS") despite there being no correctional basis to do so.

Mr. Sibick then spent about two months in AS before this Court released him on October 26, 2021.

It is important to note here that when a person is sent to the hole, it is usually for 7 or 14 days, and it is always against that inmate's wishes (unless the inmate is charged with a sex offense, in which case the inmate seeks the safety of the unit from others who relish the chance to stab and/or kill that inmate).

Some inmates may spend 30 days in the hole in extreme circumstances.

Mr. Sibick, as noted, spent *two months* there, though it was clearly breaking him mentally. Counsel saw Mr. Sibick several times during that time period, and he personally witnessed Mr. Sibick decompensating. Specifically, Mr. Sibick would cry during legal visits, and say that he couldn't take it anymore. He was very depressed and felt an overwhelming sense of hopelessness.

This is to be expected, as inmate segregation has been shown to lead to self-harm, anxiety, depression, paranoia, and/or aggression.

Finally, before he went to the hole, Mr. Sibick spent almost every hour in his cell because of Covid restrictions. So, in addition to spending two months in the hole, Mr. Sibick spent the prior nearly six months in near lockdown because of the jail's Covid policy.

This is all to say that although Mr. Sibick has "only" spent about seven and a half months in prison to date (plus another 21 months in home confinement), that time should count for at least twice the actual calendar days he was incarcerated, due to the extremely harsh conditions of his confinement.

**In addition to the seven and a half months Mr. Sibick spent in jail under very difficult circumstances, it is important to remember that he has**

not been on personal recognizance since his release on October 26, 2021. Rather, he has been on 24-hour home confinement for a period of 21 months – nearly two years. While the many months Mr. Sibick has spent on home confinement do not officially "count" as time served with respect to any prison sentence imposed, this Court should absolutely factor that lengthy period of time into its determination of a fair sentence.

This is because but for this case, Mr. Sibick would not have had to stay within the confines of his parents' property twenty-four hours a day, seven days a week, with limited exceptions.

The Court also severely limited his access to information (for valid reasons).

Over five months later, on April 6, 2022, the Court modified Mr. Sibick's conditions of release, keeping him on home confinement but allowing him to seek employment and to work from Monday through Friday at two discreet addresses near his parents' while he looked for work.

On June 3, 2022, the Court denied Mr. Sibick's motion for permission to engage in various activities (run in his neighborhood, go to dinner with his parents, etc…).

Mr. Sibick eventually found employment, and this Court allowed him to leave his parents' home for work, though, with limited exceptions, he has been required to go straight to work and go straight home. As a consequence, he has been continuously employed, full-time, for many months.

Mr. Sibick's compliance with his 21 months of home confinement  has also been exemplary.  And difficult.

He is obviously grateful for the various modifications the Court has granted him over this very long period.  But no one should mistake the freedoms this Court gave him with "freedom."  He was not in jail, but he was not a free man either.

For this reason, defendant asks the Court to give him some form of credit not only for the 21 months he spent in home confinement, but for his (admittedly required) excellent adherence to this Court's orders while on release.

### *The Scene Inside and Outside the Capitol that Afternoon*

As this Court surely has discerned, having presided over a number of January 6 cases by now, there were varying levels of participation and action by different people, and groups of people, at the Capitol on that day, both on the grounds outside the building, and inside the Capitol itself.

Some, as has been shown in numerous video recordings, were prepared for battle, wearing military-style outfits, carrying different types of weapons (guns, sticks, batons, flagpoles that were used as weapons, pepper, or bear spray, etc.) and implements of battle (zip ties, rope, etc…).

Many of the individuals had also posted messages in various social media platforms *before* January 6 indicating that it was time for a civil war, and that they

would not accept the official results of the election that were certified by the 50 States.

It is fair to say that the crowd, generally, was very angry about the outcome of the election, and strongly disagreed with certification of the votes by various State officials. Some in the crowd had resolved not to allow a peaceful transfer of power to a new administration.

However, it is equally clear that while some in the crowd were prepared for a physical battle, others went there to shout, scream, and protest the official results of the election. And others were simply caught up in the testosterone-laden actions of the overall crowd, acting in ways they likely never thought they would.

This included Mr. Sibick. While he did not enter the Capitol, he did, for a three minute-period, stand outside the temporary tunnel that had been erected on the lower West terrace for the upcoming inauguration, then make his way toward the front of the group in the tunnel, then exit the tunnel fairly quickly after he and others were tear-gassed.

The government argues that for a time, Mr. Sibick was at the forefront of the group of people inside the tunnel helping other rioters push against the police line inside. Mr. Sibick adamantly denies this.

In his Statement of Offense, which was carefully worded to comport with Mr. Sibick's admitted conduct, the defendant agreed that he "joined the rioters in the lower west terrace archway who were pushing against the police line." But while he joined them by being present, he did not join them in exerting any effort

to push up against the police line.  In fact, some of the video recordings of the events inside the tunnel show some spatial gaps between certain people at various points in time, belying the notion that everyone inside the tunnel was participating in the pushing action of others.  In any event, none of the videos show Mr. Sibick confronting any police officers or pushing up against their bodies or shields inside the tunnel.

While this may seem like semantics, it is not.  Mr. Sibick asserts that he did not join in pushing any officers, though he did slowly move from the back of the crowd toward the front.  When he got to the front of the line, as noted, he and others were soon tear-gassed, and rightfully so.  That caused Mr. Sibick to yell, "let me out! let me out!" as he retreated to the cleaner air outside of the tunnel.

After he had exited, and while still in a manic phase, he did say "let's go, let me get refreshed" and "just got tear-gassed, but we're going, baby, we're going. we're pushing forward now."  These statements were pure bravado, however, as he never did go back inside of that tunnel after his initial 3-minute foray inside.

Mr. Sibick was also not among the fairly small number of people who used violence to break windows or push open doors so that they, and others behind them, could gain entry to the building.

He was also not among the many people who shouted various chants at the police officers who were attempting, often in vain, to keep the crowd from

entering further into the Capitol building once the crowd had breached the perimeter.

He was not among the crowd of people who threw flagpoles, stolen police shields, chairs, and other objects towards police officers.  While he did pose with a police shield at one point, that was after someone had literally handed him the shield and suggested that he be photographed holding the shield.[4]

Mr. Sibick also did not spray any officers with any substances, as some rioters did.  He also was never overtly hostile and demonstrative toward the police, or aggressively screaming in their faces.

During his time outside the Capitol, he also did not incite others to commit any unlawful acts.

Despite this, he did, over a period of two seconds, reach out towards Officer Fanone, and for reasons still unknown to him, grab the officer's badge and radio.  He did not do so to obtain a "trophy," as he threw the radio away sometime after the day's events and later buried the police shield in his back yard.  He also did not post any pictures of himself with those items afterward.  He also did not mention his possession of those items to his aunt, Dr. Diane Cicatello, during their nearly contemporaneous phone call that afternoon.

---

[4] Most of the people there that day seemed to grasp the historicity of that day, though not in the way they should have.

He also did not grab Officer Fanone's body, or attempt to punch, kick, or otherwise hurt the officer.  He grabbed objects that were attached to the officer's ~~body~~ **vest**.

Mr. Sibick's actions that day are puzzling, even to him.  He has wanted to believe that he reached towards Officer Fanone to help him, and even said that to his aunt that day.  He later repeated that claim to the police.

Interestingly, his aunt has indicated to counsel that Mr. Sibick has always wanted, since childhood, to be the hero in any given situation, and "save the day."

Perhaps neither we, nor Mr. Sibick, will never know what he was thinking when he did what he did, as he was in a drug-aggravated mania that afternoon. But whatever the cause of his actions, including his use of prescribed Adderall, he has learned an extremely hard lesson when one considers that 1) he was inside or around the tunnel for no more than 3 minutes, and 2) was involved with Officer Fanone for no more than two seconds that day.

**Officer Fanone has spoken at the sentencing hearings of several defendants, and he understandably is livid, to this day, about what happened to him.  He should be.  Counsel notes, however, that the officer may not appreciate (factually) the difference between the actions of various individuals who interacted with him that day.  The Court, of course, can look at this evidence dispassionately, and assess the varying degrees of criminality toward the officer.**

**In Mr. Sibick's case, unlike the cases of Kyle Young, Albuquerque Cosper Head, and Daniel Rodriguez, the interaction with Officer Fanone was fleeting, if unacceptable.  So, when this Court hears the officer give his statement at sentencing, and understandably feels pressure to punish Mr. Sibick more harshly because of that statement, defendant hopes that the Court will judge and punish him according to his own actions, and not the actions of others with whom he did not conspire.  Hopefully the distinction in the relevant facts as to each defendant will be clear to the officer such that he accepts Mr. Sibick's much more minor role in this fiasco, and the lesser sentence defendant submits is appropriate in this case.**

### *Analysis of Sentencing Factors*

As this Court knows, pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), not only are the United States Sentencing Guidelines no longer mandatory, they are not even presumptively reasonable.  In determining an appropriate sentence, this Court must consider the factors delineated in 18 U.S.C. § 3553(a), and impose a sentence that:

1)  reflects the seriousness of the crime;

2)  promotes respect for the law;

3)  provides just punishment;

4)  deters criminal conduct;

5)  protects the public from further crimes, and

6) provides the Defendant with any necessary educational or

vocational training, medical care, or other correctional

treatment.

In addition, this Court must also consider

1) the nature and circumstances of the offense;

2) the history and characteristics of the defendant;

3) the kinds of sentences available;

4) the sentencing range;

5) the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty

of similar conduct, and

6) the need to provide restitution to any victims of the offense.

### *Dispute as to a Sentencing Guideline Enhancement*

Before addressing the 3553(a) factors, defendant notes that he does not

agree that his guideline offense level for the assault charge should be increased by

five levels pursuant to U.S.S.G. § 2A2.2(b)(3)(B) (Victim Sustained Serious

Bodily Injury).

In fact, the parties' dispute concerning this factor threatened to derail the

plea negotiations in this case for many months.  Ultimately, while the government

would not relent in its insistence that even under the facts of this case the

enhancement applied, it finally agreed to "allow" Mr. Sibick to contest this

enhancement at sentencing.  He does so now.

Preliminarily, defendant points out that this enhancement could only arguably apply with respect to Officer Michael Fanone.  None of the other officers who were remotely near Mr. Sibick that day suffered any *serious bodily injury* that Mr. Sibick could have contributed to or somehow be found to be responsible for.

In addition, the reason the analysis in this case is more complicated than normal is because the government is proceeding on a type of "vicarious liability" argument, rather than on a claim that Mr. Sibick directly caused the serious bodily injury suffered by the officer.

It is clear that Mr. Sibick did not directly cause Officer Fanone's "serious bodily injury."  Thus, the analysis shifts to whether Mr. Sibick can be found indirectly responsible for the officer's injuries under the "jointly undertaken criminal activity" standard found in the relevant guideline.

Thus, in advancing its claim that Mr. Sibick's offense level should be increased by five levels because of the injuries suffered by Officer Fanone, the government states (correctly) that under U.S.S.G. § 1B1.3(a)(1)(B), the serious bodily injury enhancement applies only "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy…." *Id*.

That guideline further specifies that the defendant is accountable only for such "conduct (acts and omissions) of others that was: (i) within the scope of the

jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity." *Id*.

The government also correctly notes that, as the guideline states,[5] a defendant does not have to be charged in a conspiracy for the enhancement to apply. *United States v. Patton*, 927 F.3d 1087, 1094 (10th Cir. 2019).

Nevertheless, for the enhancement to apply the Court must still find that the defendant jointly undertook criminal activity with others, and that any activity undertaken by others in concert with Mr. Sibick was reasonably foreseeable. The statute, in that sense, is "forward-looking" as it asks what a non-directly-offending defendant could have foreseen someone else doing.

In this case, the question is whether Mr. Sibick could have foreseen that his own removal of the badge and the radio from Officer Fanone's desk would in some way assist, or work in concert with, Daniel Rodriguez's tasing of Officer Fanone, as it was Rodriguez's tasing that caused the officer's serious bodily injury.

As will be discussed below, however, Mr. Sibick took the badge and radio *after* Rodriguez had already tased the officer, such that Sibick's actions had nothing to do with Rodriguez's action in tasing, and thereby causing, Fanone's serious bodily injury. Thus, the "forward-looking" nature of the enhancement matters, as will be further elucidated below.

---

[5] U.S.S.G. § 1B1.3(a)(1)(B).

The government is correct that the Court can consider an explicit "or implicit agreement fairly inferred from the conduct of the defendant and others." *United States v. Egbert*, 562 F.3d 1092, 1097 (10th Cir. 2009), citing Comment 3(B) of the foregoing guideline.

Thus, even if he did not know Mr. Rodriguez, or Kyle Young or Albuquerque Cosper Head, Mr. Sibick could still be vicariously liable for their actions ("the conduct of others")[6] if he explicitly or implicitly jointly undertook criminal activity with them, engaged in conduct that was *in furtherance of* that joint criminal activity and that was *reasonably foreseeable* in connection with that criminal activity.

In support of its vicarious liability theory, the government points to *United States v. Bassil*, 932 F.2d 342 (4th Cir. 1991). Its reliance on *Bassil* is misplaced, as its reading of *Bassil* is overly general, and ultimately inapplicable to the facts of this case.

The government states that in *Bassil*, "the defendants, prison inmates at Lorton Reformatory, took part in an extemporaneous riot that injured several prison guards." *Gov. Memo*. at 19. While this is technically correct, that description implies that there was a general riot at the prison, such that anyone in the area who may have participated in any way should, like the government argues here with respect to Sibick, be liable for the actions of any other inmate.

---

[6] Application Note 3 to U.S.S.G. § 1B1.3.

But that is not what happened in *Bassil*. As the opinion explains, "correctional officers at the Lorton Reformatory responded to a disturbance *in the B-wing of Dormitory Three*." *Id.*, at 344. (Emphasis added.)

That crucial distinction makes it clear that the inmates who participated in the riot were not just inmates from the general population of the prison who might have been out in a common area of the jail, such as a courtyard (or, in this case, outside the lower West side of the Capitol) at the time of the riot.

Rather, they were inmates who were all housed in **one wing of one dormitory building**.[7] That proximity and "familiarity" presents a very different picture of the relationship of the inmates to each other than one might otherwise infer from a description that merely presents the inmates as "prisoners at the Lorton Reformatory."

It is clear from the narrative in *Bassil* that the inmates all joined each other in resisting the commands of the officers in that particular wing of dormitory three on that day after an inmate had been assaulted by two other inmates. Officers who responded to the disturbance ordered the two inmates suspected of the assault to be removed from that dormitory. The other inmates refused to allow this to happen, and engaged in physical confrontations with several officers who were later backed up by about another dozen officers.

---

[7] As counsel recalls from his many, many visits to Lorton in the 80's and 90's, dorms typically had a capacity of between 40 to 80 inmates if fully occupied. There were multiple facilities at Lorton, of course (Youth Center, Youth Center II, the Modular Facility, Central, Max, and more), each with varying capacity. But most dorms had a limited capacity.

These inmates obviously slept in the same wing of the same dorm, ate in that same dorm, showered in that dorm, and were together on a constant basis when not out in the "rec. yard."  They were not disparate groups of inmates from various dorms or various parts of Lorton (or here, various parts of the country).

In other words, the dormitories at Lorton, and each wing of a particular dormitory, were small enough that unless an inmate had just recently arrived from another facility or had arrived to begin serving a sentence following a sentencing hearing, that inmate knew every other inmate in that dorm, especially in that wing of the dorm.  This is clear in how the inmates reacted to the commands of the guards.

Because the government discusses the facts in *Bassil* in overly broad terms ("inmates at the Lorton Reformatory" instead of "inmates in the B-wing of Dormitory Three"), it incorrectly extrapolates the holding in *Bassil* to the even larger group of rioters who were anywhere near Officer Fanone the afternoon of January 6, 2021, even if those rioters didn't know each other, did not explicitly or implicitly plan to do anything together, but just happened to individually take actions that affected the same officer.

In Mr. Sibick's case, he had never heard of, nor obviously met, any of the other individuals who interacted in any way with Officer Fanone that day.  And there were dozens of people in this group of individuals, as the officer was pulled out of the tunnel and through a large crowd to a position that appears to be dozens and dozens of feet away from the mouth of the tunnel.

Importantly, Mr. Sibick was not one of those individuals who participated in pulling the officer out of the tunnel and through the crowd.

Had Mr. Sibick been in that line of individuals who collectively pulled and pushed the officer out into the crowd, it could at least have been said that Sibick had implicitly joined in whatever activity those rioters were engaging in.  Even then, however, it would have been highly debatable, at the very least, whether all or any of these other individuals could have reasonably foreseen that Daniel Rodriguez would receive a taser from Kyle Young, that Mr. Young would then instruct Mr. Rodriguez on the use of that taser,  and that Rodriguez would then use the taser against Officer Fanone.  But Sibick was not in that group of individuals who pulled Officer Fanone out of the tunnel in any event, so that argument is irrelevant.

The fact that Mr. Sibick took the officer's badge and radio ***after*** the officer had already been tased is also critically significant in the context of this enhancement.  As noted above, the enhancement is forward-looking, i.e., it asks this Court to determine whether another person's future actions would have been reasonably foreseeable to the person who could have foreseen them – here, supposedly Mr. Sibick.

But Mr. Sibick literally interacted with Officer Fanone for a period of two seconds, on his own, when he reached in and ended up with the officer's badge in one hand, and his radio (which he ended up holding by the antenna, not the body of the radio) with his other hand.

26

And again, this was *after* Fanone had already been tased by Daniel Rodriguez, such that any actions undertaken by Sibick did not assist or enable Rodriguez in any way to commit the act that caused Fanone's serious bodily injury **since Rodriguez had already committed his assaults.**

Other individuals' grabbing and pulling of the officer, causing the officer to have to struggle to try to keep from having his gun stolen, or from being dragged further into the crowd, undoubtedly added to the physical strain on Officer Fanone's body, including his heart.

But Mr. Sibick's two-second action in removing the badge and the radio, while illegal, happened so fast that it did not in any way add to the strain Officer Fanone was under during this entire event.  The two items were "simply" quickly removed from whatever had attached them to the officer's vest, and it is very likely that Fanone never even knew that it happened until later.

*Comparison of This Case with Examples in the Application Notes*

In evaluating whether the five-level enhancement applies, this Court can further look to the 10 examples listed in Application Note 4 to U.S.S.G. § 1B1.3.

Defendant will not engage in an exhaustive comparison of each example with the facts in Mr. Sibick's case.  He maintains that a general reading of the examples clearly shows why Mr. Sibick cannot be held liable for the actions of Kyle Young or Daniel Rodriguez in tasing Officer Fanone.

All of the examples describe scenarios where the defendants knew each other, or of each other's activities, and performed some act that was designed to help the overall goal of a known group of individuals.

Defendant agrees that it is theoretically possible for people who don't know each other to spontaneously participate in an activity that is designed to help each other achieve some unlawful objective, but that is not what happened here.

When Mr. Sibick quickly reached toward Officer Fanone and pulled off his badge and radio, he did not do it to help anyone else commit any act against that officer, nor did his actions have that effect, especially as it relates to Fanone's serious bodily injury. That injury had already occurred, and Mr. Sibick in no way helped to bring it about.

For these reasons, the five-level enhancement is inappropriate under the circumstances of this case.

*Removal of the Officer's "Lifeline"*

The government argues, as it did from the beginning of this case in Buffalo, that Mr. Sibick's removal of the officer's radio took away his "lifeline to safety," thereby preventing the officer from calling for help.

But this argument, and those words, while "catchy," completely misrepresent the facts on the ground that afternoon. Officer Fanone was surrounded by, or right next to, many officers when he was dragged out of the tunnel and into the crowd. Other officers already knew, therefore, that he needed help. They were unable to provide that help, however, because of the large size of

the crowd in the tunnel.[8]  And as various video recordings show, there were no other available officers to come to Officer Fanone's rescue even had he been able to call for help on his radio.  Many other officers already knew that Fanone needed help but could do nothing about it.

Ultimately, it was the actions of a number of people in the crowd that finally protected Officer Fanone from any further confrontations, and literally physically moved him back into the safety of the tunnel where other officers attended to him.

Defendant is not in any way minimizing his actions, or denying responsibility for what he did.  What he did was criminal, and beyond the pale. But he can no longer remain silent and go along with the false notion that has been repeatedly invoked in this case that he caused some general harm to Officer Fanone by "depriving him of his lifeline."  That is just factually incorrect, even though what Sibick did in removing the items was illegal, wrong, and completely unacceptable.

Finally, even if this Court were to somehow find that Mr. Sibick can be held vicariously liable for the prior conduct of Daniel Rodriguez, he argues that the five-level enhancement grossly overstates any remote culpability he may have for Officer Fanone's serious bodily injuries.

---

[8] Mr. Sibick had already exited the tunnel by then and had no part in the actions of the crowd at that time.

The enhancement clearly applies where a person directly causes a serious bodily injury, and a five-level enhancement is obviously appropriate in that context.  It also applies "merely" where someone helps another person cause a serious bodily injury. And even if it applies in a case, such as here, where a person (Sibick) undertakes an action that takes place *after* a serious bodily injury has already been inflicted (what counsel would call a "brain twister"),  it would be inappropriate to punish such a person by imposing a sentence that invokes a guideline range that is many years more than would be warranted without the enhancement.

Without that enhancement, Mr. Sibick faces a guideline range of 33 to 41 months. – a difference of 24 months to 30 months.

### Enhancement for Obstructing or Impeding Administration of Justice

Defendant Sibick is not permitted, under the plea agreement, to argue whether this enhancement should apply.  This Court, however, must make an independent determination as to whether it applies, and that analysis must include consideration of the language and examples of covered and non-covered conduct discussed in the various Application Notes.

### Analysis of 3553(a) Factors

### The Proposed Sentence Would Reflect the Seriousness of the Crime

**As already noted, Mr. Sibick's conduct, when viewed in context, was vastly different than the actively assaultive behavior of the defendants this Court has already sentenced and who interacted with Officer Fanone.  Those**

defendants were bent on overthrowing the government, and said as much before January 6, 2021.  Moreover, they came prepared for battle, and used weapons that day, including a horrible weapon called a taser.  Mr. Sibick, by contrast, pulled on a badge that was loosely attached by a safety pin, and a radio that came out of its pocket rather easily and required hardly any force to remove.

While, again, he never should have done that, the level of violence he engaged in is infinitely less than that perpetrated by the other defendants, and resulted in no physical harm to the officer.  That matters, and calls for a sentence that is vastly different than the sentences meted out to other defendants.

> ### *The Proposed Sentence Must Also Promote Respect for the Law, Provide Just Punishment to Mr. Sibick, and Deter Criminal Conduct, both by him and by Others.*

Defendant has already provided a number of reasons that the proposed sentence would accomplish the foregoing goals of the sentencing statute.

He wishes to spend a few moments discussing the deterrence factor, however.  First, as to deterring Mr. Sibick himself, there is no doubt that he has already been deterred from committing future offenses by the months he spent in prison, as well as the nearly two years he has been restricted to his parents' home (and then his wife's home) under very strict conditions.

He has had to provide his weekly schedule plan to his Buffalo pretrial services officer days in advance, and it had to be approved (or rejected, as the

case may be) in order for him to have the right to go various places. He is hardly free to go where he pleases, though this Court has granted him the right to go to work and allowed him to attend a number of functions that were family oriented.

In light of all that he's been through, the last thing Mr. Sibick wants to do is risk a return to prison/jail.

He realizes, though, that this sentencing factor also requires that the Court consider the need to deter "others" from the type of conduct Mr. Sibick engaged in. And that, often (at least in counsel's view) results in sentences that are harsher than if the defendant was merely being sentenced for his own actions, without the need to scare (i.e., deter through fear) other would-be criminals.

While this factor is in the statute, counsel has always considered it an unfortunate inclusion. While the concept of needing to deter others is understandable, it often results in a sentence that, rather than punish a defendant for his or her actions, seeks to "make an example" out of him by factoring in the *possible future* actions of other, completely unrelated (legally), people.

Briefly, counsel has seen time and time again over the course of 37 years, in situations where at the time of sentencing a courtroom is full of other accused persons and/or their families, a judge decides that she cannot send a message to the broader community that a person can "get away" with

32

certain behavior by receiving a light sentence, and therefore imposes a harsh(er) sentence than she might otherwise have.

If that same defendant had been sentenced in an empty courtroom, or in a situation where there would be no press coverage, he or she would have received a sentence that the court believed was appropriate, rather than one that took into account the  need to "deter others."

Counsel has on quite a few occasions in the Superior Court, where many defendants await their hearings at the same time (unlike in federal court) asked the courtroom clerk to call his client's case last so that the above scenario was not created.  While it has resulted in counsel having to wait many hours over the course of the years counsel has been practicing, that has been a small price for counsel to pay to save defendants months or years in prison and ensure a fair sentence is imposed.

In any event, in the case of Mr. Sibick, defendant submits that anyone who knew all the facts of his case, including his mental health struggles, his extremely difficult months in prison, his further nearly-two-year time in home incarceration, his unusually strong remorse, and the other factors listed above, would view the proposed sentence as a fair one.  Such a person certainly would not want to go through everything Mr. Sibick has gone through if that person decided to do what Mr. Sibick has admitted doing here – grabbing a badge and the top of a radio (by the antenna) over the course of

two seconds, and spending three minutes in or around a tunnel that

admittedly was at times the

 scene of confrontations between the crowd (though not Mr. Sibick) and the

police.

      For these reasons, defendant submits that the proposed sentence would

accomplish the foregoing goals.

      *The Need to Protect the Public from Further Crimes*.

      As the probation office noted in recommending its 48-month sentence,

Mr. Sibick had not, before this case, been involved in a case since 2015.  And

these are his first and only felonies.  He had been doing extremely well

between 2015 and 2021, going to school and working.  While he had been

misdiagnosed, he was still maintaining his composure and being a productive

citizen.

      At this point, with the proper diagnosis, and his demonstrated ability

to abide by this Court's restrictive conditions, there is no basis to believe that

he would ever constitute a danger to the community.[9]

      *The Court's Duty to Provide the Defendant with any Necessary*
*Educational or Vocational Training, Medical Care, or Other Correctional*
*Treatment*.

      Mr. Sibick has already spent many years attaining various degrees,

including an MBA.  And he has spent a great deal of time since this Court

---

[9] Interestingly, no one, including the government and the probation office, believes he would present any danger to the public were he allowed to self-surrender, so it would be puzzling for anyone to believe that he would present any danger were he placed on home confinement and supervised release.

released him addressing – successfully – his mental health issues.  He and his new wife have also decided not to drink alcohol (or, obviously, use any illegal drugs).

As such, defendant submits that this Court need not impose any additional conditions to address any specific concerns it may have about Mr. Sibick.  He is already doing everything he can in that regard.

### The Need to Avoid Unwarranted Disparities

The government claims that Mr. "Sibick's co-defendants, Kyle Young and Albuquerque Head, are his closest comparators" among the January 6 defendants charged with assaulting police officers.  *Gov. Sent. Mem*. at 25-26. This is wildly inaccurate.

The only thing that Mr. Sibick has in common with those defendants is that he was not very far from where those defendants ended up once they dragged Officer Fanone out of the tunnel and Daniel Rodriguez tased him.

But Sibick's own actions pale in comparison to the actions of those men (Young, Head, and Rodriguez).

Young, as the government would concede, "repeatedly held a strobe light toward the officers fighting to hold the line against the onslaught of rioters."  *Gov. Sent. Mem*., Kyle Young, at 2.  He also "passed a taser to [Rodriguez], taking the time to show him how to use it."  *Id*.  "That rioter, Daniel Rodriguez, later repeatedly applied [the] taser to the back of MPD Officer Fanone's neck as Young joined in the assault."  *Id*.

As if that wasn't enough, Young "worked with another rioter to throw a large audio speaker toward the police line…." *Id*. "Young also jabbed a pole toward the police line where officers were holding plastic riot shields to protect themselves." *Id*.

The government further notes that "[a]fter leaving the tunnel, Young pivoted to assault two police officers who were pulled into the crowd in quick succession." *Id*. Young then restrained Fanone's wrist seconds after the officer was repeatedly tased. That restraining of the officer's wrist prevented Fanone "from protecting his service weapon …" as people shouted that someone should get Fanone's gun and kill him. *Id*.

Albuquerque Cosper Head, for his part, "moved to the front lines of a violent confrontation between rioters and [the police]." *Gov. Sent. Mem*., Albuquerque Head, at 2. Once he was at the front of the line, he "repeatedly struck towards the police line with a riot shield." Id. He also encouraged others to send him another shield, and when he acquired that shield, he used it to push against police officers to try to enter the Capitol. *Id*.

More damningly, Head hit Officer Fanone's hand and caused the officer "to lose his grip on the doorframe" inside the Capitol. That allowed him, shortly thereafter, to physically pull Officer Fanone out of the tunnel and into the crowd while yelling "I've got one!" *Id*. at 3. According to the government, this allowed "the crowd [to] violently assault[] the officer. *Id*.

Head then continued to restrain Officer Fanone at the time that Rodriguez tased the officer repeatedly.

Fanone eventually was pried away from Head by other demonstrators/rioters, but even then, Head attempted to go after Officer Fanone again.

Rodriguez, as noted, tased Officer Fanone repeatedly.

In stark contrast – and not to minimize, but to distinguish, Mr. Sibick's conduct – Thomas Sibick reached in and for whatever reason, pulled Fanone's badge and the top of his radio (i.e., the antenna) from his vest, and then fell backwards, never to cause any more problems that afternoon.

Thus, to suggest that it is apt to compare Sibick's two-second action – a one-time, short-lasting, action – to the lengthy and repeated attacks perpetrated by Young, Head, and Rodriguez is simply wrong.  Very wrong. And by attempting to hold Sibick accountable for the violent actions of others that took place *before* Mr. Sibick's two-second interaction with Fanone, thereby attempting to saddle Mr. Sibick with the serious bodily injury enhancement, the government completely and inappropriately tries to skew the sentencing guidelines and the realm of appropriate sentencing options.

In his efforts to find truly comparable cases, defense counsel has literally reviewed every single conviction, whether by trial or by plea, of defendants found guilty of a so-called "111" charge (aggravated assault). Counsel must say that it has not been an easy task to find an "assault" that

mirrors or parallels the actions of Mr. Sibick on January 6, 2021.  The vast majority of assaults that resulted in convictions were "true" assaults where defendants punched, kicked, hit, choked, sprayed, or otherwise actually tried to physically harm a police officer.

The following examples, involving conduct that is still much more severe than what this Court must punish in Mr. Sibick's case, at least give the Court some idea of the kinds of sentences that are being imposed in true assault cases.

### United States v. Mark Leffingwell

Mark Leffingwell (21-CR-5-ABJ) also pled guilty to assaulting a police officer (a "111" charge) in connection with January 6.  But in Mr. Leffingwell's case, he *actually* assaulted a police officer – in fact, two police officers.  As the government noted in its sentencing memorandum, not only did Leffingwell actually strike two police officers *in the head*, no less, he also encouraged officers to join him and other rioters in their attempts to take the Capitol.

What makes Leffingwell's case even more galling is the fact that he was a military veteran, a disabled military veteran at that.  Yet he chose to try to overthrow the government on January 6, 2021, the very government he had sworn to protect from all enemies, foreign and domestic.

Of course, one can distinguish Mr. Leffingwell's case from Mr. Sibick's in some respects, as no two cases are alike.  For while Mr. Leffingwell threw

punches at two officers, Mr. Sibick pulled a badge and a radio from the vest of another. Both men were at or near the front of a line of police for a while, but only Mr. Leffingwell threw punches at any officers.

And while Mr. Leffingwell encouraged officers to join the rioters in their attempts to take over the Capitol, Mr. Sibick left the western tunnel after he was tear-gassed and said that he was going to get refreshed and then move forward. Brave and bold words aside, he never did.

Mr. Sibick did steal the badge and the radio – something Leffingwell did not do, though Sibick eventually gave the badge back. That obviously (the theft as well as the return) should be taken into account at sentencing. How much more time Mr. Sibick deserves for having taken those items is debatable. Counsel would point out, however, that the theft was connected to the "assault" on Fanone, and not independent of it, so in that sense, it is all part of one action lasting two seconds.

In the end, Mr. Leffingwell was sentenced to six months in prison, followed by two years of supervised release, although he struck two police officers and tried to convince the police to turn against their own government.

<u>United States v. Barton Shively, 21-CR-151(JMC)</u>

Barton Shively pled guilty to two counts of assault under 18 U.S.C. §111(a)(1).

On January 6, 2021, Mr. Shively walked over barricades that had been knocked down by others, and grabbed a police officer by the officer's jacket,

yelling at that officer.  Mr. Sibick, by contrast, did not even grab Officer Fanone's vest, but pulled two items from it – items that came off of the frayed vest quite easily.

Mr. Shively then struck a second officer in the officer's hand, head, and shoulder area.  He then attacked *still more* officers, hitting one in the head with the officer's own baton, and kicking another officer with his (Shively's) boot.

After the attack, Shively gave a public news interview praising what the rioters had done that day.  Sibick, by contrast, sent out a somber message decrying the divisions in our country and lamenting the day's activity.  His mood at the time of his message is markedly somber, demonstrating a chilling emotional "crashing" that clearly demarcates his moods that afternoon/evening.

For his actions, Mr. Shively was sentenced to 18 months in prison on each count, to run concurrently, followed by three years of supervised release.

### United States v. Matthew Ryan Miller, 21-CR-75(RDM)

Matthew Ryan Miller entered guilty pleas to one count of Obstruction of an Official Proceeding (a so-called "1512" charge) and one count of Assault (a "111") charge.

In his Statement of Offense ("SOF"), Mr. Miller admitted that he had posted a picture of himself on Instagram (as did Mr. Sibick) at the rally.

Mr. Miller then used a section of the temporary barriers used by the U.S. Capitol Police as a ladder to scale the walls of the west side of the Capitol plaza. He also assisted others who were scaling the wall and other architectural objects. *SOF*, at 4.

When he was at the lower west terrace, he "waved his hand, and said multiple times, 'come on' as the mob chanted 'heave ho' and rocked back and forth in a push towards the tunnel entrance…." Multiple times, Mr. Miller "put up his fingers and yelled 'one, two, three, push!'" *Id.* (While Mr. Sibick went into the tunnel, there is no allegation that he did any of the foregoing – actions that truly distinguish Mr. Miller from Mr. Sibick.)

The Statement of Offense also states that Mr. Miller, "[f]rom this position … threw a few unidentifiable objects towards the … tunnel where law enforcement officers were attempting to secure the U.S. Capitol." *Id.*

Finally, when Mr. Miller was closest to the tunnel, he used a fire extinguisher to spray into the tunnel where many law enforcement officers were pushing back against rioters. He therefore affected much more than one officer with the chemical contained in the fire extinguisher.

For his actions, including incitement to violence, he received a sentence of 33 months in prison on each count, to run concurrently, and 24 months of supervised release.

Mr. Sibick's actions come nowhere close to what Mr. Miller did that day, either in attempting to interfere with the certification process or in "assaulting" any officer.[10]

<u>United States v. Logan Barnhart, 21-CR-35(RC)</u>

On January 6, 2021, Logan Barnhart and others attacked a line of police officers and knocked them to the ground.  During this attack, Barnhart grabbed an officer's neck and torso (apparently by grabbing his clothing) and dragged him over the body of another police officer and down a set of stairs where the officer was further attacked with weapons, including a flagpole and a baton.  The officer sustained physical injuries.

Shortly thereafter, Barnhart returned to the police line and joined others in charging against that line.  He then wielded a flagpole and used it to strike several more officers.

For all of that, Mr. Barnhart received a prison sentence of 36 months followed by 36 months of supervised release (and other minor sanctions).

<u>Summary of Comparable Cases</u>

Mr. Sibick could go on and on discussing other "111" cases that, while addressing criminal conduct that went well beyond what Mr. Sibick did that day, at least demonstrate the range of sentences judges have typically

---

[10] Incidentally, Mr. Sibick disagrees that he lied several times to law enforcement officers about the badge and the radio, though he does not want to spend the time and more space in this memorandum explaining the reality of the interviews with the FBI agents in March of 2021.  Suffice it to say that his father, a Navy veteran of several decades, was present for these interviews, and remembers the conversations quite differently.

imposed.  It is notable, of course, that these cases all involve an actual physical assault on the body of a police officer, rather than a brief pulling on two items loosely attached to a vest.[11]

But the bottom line is that very few individuals that day, if any, were indicted on 111 charges under similar circumstances.  Pulling two items from an officer's vest is, candidly and truthfully, very different than hitting an officer with one's fist, with an object, with pepper spray or another irritant, or holding that officer so others can do him or her harm.

Mr. Sibick, again, admits that his conduct in taking the officer's badge and radio was criminal, but it does not come close, even under these circumstances, to the conduct of any of the foregoing defendants, much less to the actions of Young, Head, and Rodriguez.

The defendant understands why the governments wants this Court to use Young and Head and Rodriguez as reference points, as they engaged in horrific conduct and received very stiff sentences.  But using their sentences as any kind of a reference point would drastically overstate the severity of Mr. Sibick's conduct, and result in a wholly unjust sentence.

*Conclusion*

To be clear, the foregoing memorandum is solely counsel's argument on behalf of Mr. Sibick.  Mr. Sibick has not written this memorandum – even

---

[11] Had the items been firmly affixed to the vest, they couldn't have come up in such an easy fashion.

small portions of it, so if this Court finds any particular argument objectionable or somehow unsupported, it should not hold that against Mr. Sibick.

Counsel has certainly tried to be objective about this case and accept the bad with the good.  He has presented the foregoing information solely to highlight the facts of the case, explain Mr. Sibick's actions, and point out the significant distinctions between various defendants' actions.

At sentencing, defendant will likely play a video recording of the badge and radio incident from a different angle than the government has presented. This will hopefully visually demonstrate what defendant has been arguing in this memorandum, and show the rapidity with which Mr. Sibick's interaction with Officer Fanone began and ended.

After a careful consideration of all of the arguments presented herein, defendant submits that the sentence he has requested would be just and fair, and sufficient, but not greater than necessary, to adequately punish him for his conduct, and accomplish all of the goals set out in the sentencing statute.

Respectfully submitted,

_____/s/_____

Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626 (facsimile)
E-mail:  sfbrennwald@cs.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was sent by email, this 25th day of July 2023, to all counsel of record.

/s/

_____

Stephen F. Brennwald